IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CITY CRESCENT LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | No. 05-580 |
| v. | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

CORRECTED APPENDIX TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DEBORAH A. BYNUM
Assistant Director

MICHAEL J. DIERBERG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Fl.
1100 L. St. NW
Washington, DC 20530
Attorneys for Defendant

March 10, 2006

# Exhibit A

STANDARD FORM 2
FEBRUARY 1965 EDITION
GENERAL SERVICES
ADMINISTRATION
FPR (41 CFR) 1-16.601

# U.S. GOVERNMENT
# LEASE FOR REAL PROPERTY

| DATE OF LEASE | LEASE NO |
|---|---|
| [illegible] | GS-03B-09074 |

THIS LEASE, made and entered into this date by and between City Crescent Limited Partnership c/o Otis Warren Real Estate Services

whose address is 7034 Liberty Road
Baltimore, Maryland 21207

and whose interest in the property hereinafter described is that of owner

hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

WITNESSETH: The parties hereto for the considerations hereinafter mentioned, covenant and agree as follows:

1. The Lessor hereby leases to the Government the following described premises:

Approximately 250,000 net usable square feet of office and related space at the City Crescent Office Building, Howard and Baltimore Streets, Baltimore, Maryland. Including 89 parking spaces at this location.

to be used for such purposes as determined by the General Services Administration

2. TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning on *See Lease Rider Paragraph 13 through *See Lease Rider Paragraph13, subject to termination and renewal rights as may be hereinafter set forth.

3. The Government shall pay the Lessor annual rent of $ *See Lease Rider Paragraph 13

at the rate of $ *See Lease Rider Paragraph 13 per *See Lease Rider Paragraph 13 in arrears. Rent for a lesser period shall be prorated. Rent checks shall be made payable to:

~~4. The Government may termin... days' notice in writing to the Lessor and no rental shall ... effective date of termination. Said notice shall be computed commencing with the day after the date of ...~~

DELETE

~~5. This lease may be renewed at the option of the Government, for the following terms and at the following rentals:~~

DELETE

~~provided notice be given in writing to the Lessor at least ...... days before the end of the original lease term or of any renewal term; all other terms and conditions of this lease shall remain the same during any renewal term. Said notice shall be computed commencing with the day after the date of mailing.~~





Initials: 2 [initials] Lessor [initials] Government

All Services, maintenance, utilities, operations, alterations, and other considerations as set forth in this lease.

7. The following are attached and made a part hereof:

~~The General Provisions and Instructions (Standard Form 2-A, ______ edition).~~

Section A Lease Form 2
Section B Rider to Lease GS-03B-09074
Section C Solicitation for offers MMD 99999
Section D General Clauses
Section E Representations & certifications.
Amendments 1,2,3,4 (Incorporated into the body of this lease)

8. The following changes were made in this lease prior to its execution:

None

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

LESSOR City Crescent Limited Partnership

Otis Warren
Managing General Partner

BY ______ (Signature) ______ (Signature)

IN PRESENCE OF: ______ (Signature) 1899 L STREET #1200 20036 WASH. DC (Address)

UNITED STATES OF AMERICA

BY ______ (Signature) DIRECTOR REAL ESTATE (Official title)

STANDARD FORM 2
FEBRUARY 1965 EDITION

• U.S. GPO: 1989-250-536/00286

Exhibit B

RIDER TO LEASE - GS-03B-09074

9. In no event shall the lessor enter into negotiations concerning the space leased with representatives of Federal agencies other than Contracting Officers and their designated representatives of the General Services Administration.

10. The total percentage of space occupied by the Government under the terms of the lease is equal to 95.2 percent of the total space available in the lessor's building, and will be used as the basis for computing the Government's pro-rata share of real estate taxes, as defined in the Annual Real Estate Tax Escalation Clause.

11. For purposes of determining the base rate for future adjustments to the operating cost the Government agrees that the base rate quoted on the "Lessor's Annual Cost Statement", (GSA Form 1217) dated April 19, 1990 , which is $ 6.21 per square foot, is acceptable. This figure includes the Government's pro-rata share of operating costs. The Government retains the right to inspect and review the lessor's records to verify the costs listed on the GSA Form 1217 and/or to require a certified audit report. The basis for annual operating costs escalations will be the revised U.S. All Cities Average Consumer Price Index for Wage Earners and Clerical Workers.

12. In accordance with paragraph 7.3 of the Solicitation for Offers the overtime rate shall be charged at a rate of $ 7.41 per hour per floor.

13. Lessor will complete all alterations, improvements, and repairs required by this lease, and deliver the leased premises ready for occupancy by the Government within 540 calendar days next following the date of the lease award, whichever shall last occur. For purposes of this paragraph, the date of lease award is deemed to be the day after the date on which the award letter from the Government, was mailed. When the lessor has completed all such alterations, improvements, and repairs, lessor shall promptly notify the Contracting Officer, who shall promptly cause the same to be inspected. Upon the date of completion of such alterations, improvements, and repairs and inspection and acceptance by the Government, the term of this lease shall commence and shall continue for ten (10) consecutive calendar years. Upon acceptance of the leased premises by the Government, the same shall be measured and rental shall be paid, in accordance with lease paragraphs; paragraph 21 of the lease, "Net Usable Space" and solicitation section of the lease, "Net Usable Space" and paragraph 7 of the General Clauses, GSA Form 3517, "Measurement for Payment" at the rate of $ 23.75 per net usable square foot per year. The annual rent for the first four (4) months of the lease term shall be abated.



Initials: ______ Lessor ______ Government

Exhibit C

GENERAL SERVICES ADMINISTRATION
PUBLIC BUILDINGS SERVICE

## SUPPLEMENTAL LEASE AGREEMENT

| | |
|---|---|
| SUPPLEMENTAL AGREEMENT NO. 9 | DATE 6/10/93 |
| TO LEASE NO. GS- 03B-09074 | |

ADDRESS OF PREMISES: CITY CRESCENT BUILDING
10 SOUTH HOWARD STREET
BALTIMORE, MARYLAND 21201

THIS AGREEMENT, made and entered into this date by and between

CITY CRESCENT LIMITED PARTNERSHIP

whose address is 7034 LIBERTY ROAD
BALTIMORE, MARYLAND 21207

hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

WHEREAS, the parties hereto desire to amend the above Lease.

NOW THEREFORE, these parties for the considerations hereinafter mentioned covenant and agree that the said Lease is amended, effective MARCH 31, 1993, as follows:

A) Paragraphs 1, 2 and 3 of the Lease, Standard Form 2, are amended by deleting the existing texts in their entireties and substituting, in lieu thereof the following:

"1. The Lessor hereby leases to the Government the following described premises: 264,753 net usable square feet of office and related space being further defined as 4,838 net usable square feet on the first floor and all the usable space in the remainder of the building floors 2 through 11 and the penthouse area of the City Crescent Office Building, Howard and Baltimore Streets, Baltimore, Maryland, (including 89 indoor parking spaces at the location) to be used for such purposes as may be determined by the General Services Administration."

"2. TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning on March 31, 1993 through March 30, 2003, subject to termination and renewal rights as may be hereinafter set forth."

"3. The Government shall pay the Lessor annual rent of $6,287,883.75 at the rate of $523,990.31 per month in arrears. Rent for a lessor shall be prorated. Rent checks shall be made payable to: City Crescent Limited Partnership
c/o Otis Warren Real Estate Services
7034 Liberty Road, Baltimore, MD 21207"

All other terms and conditions of the lease shall remain in force and effect.
IN WITNESS WHEREOF, the parties subscribed their names as of the above date.

LESSOR CITY CRESCENT LIMITED PARTNERSHIP
By: Otis Warren of Maryland City Crescent, Inc.

BY [signature] (Signature) President (Title)

IN PRESENCE OF
[signature] (Signature) 2221 Wheatley Drive, Balto. MD 21207 (Address)

UNITED STATES OF AMERICA GSA, REAL ESTATE DIVISION, SHENANDOAH BRANCH

BY [signature] 6/10/93 (Signature) CONTRACTING OFFICER (Official Title)



GSA FORM 276 (REV. 7-67)

Exhibit D

| GENERAL SERVICES ADMINISTRATION<br>PUBLIC BUILDINGS SERVICE<br>SUPPLEMENTAL LEASE AGREEMENT | SUPPLEMENTAL AGREEMENT NO. 23 | DATE JUN 0 6 2001 |
|---|---|---|
| | TO LEASE NO. GS- 03B-09074 | |

ADDRESS OF PREMISES CITY CRESCENT BUILDING
10 SOUTH HOWARD STREET
BALTIMORE, MARYLAND 21201

THIS AGREEMENT, made and entered into this date by and between
CITY CRESCENT LIMITED PARTNERSHIP
c/o OTIS WARREN REAL ESTATE SERVICES

whose address is 10 SOUTH HOWARD STREET
BALTIMORE, MARYLAND, 21201

hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

WHEREAS, the parties hereto desire to amend the above Lease.

NOW THEREFORE, these parties for the considerations hereinafter mentioned covenant and agree that the said Lease is amended, effective upon GSA execution, as follows:

Per the following terms, the Government hereby exercises a fifteen (15) year renewal option for 266,574 usable square feet(USF) and 89 inside parking spaces at the City Crescent Building, 10 South Howard Street, Baltimore, MD, which extends the firm term of this lease until March 30, 2018.

A. Annual Rent (Fully Serviced): There are not any accumulated escalations from 3/31/1993 to 3/30/2003 added to the renewal option rent.

1. March 31, 2003 through March 30, 2008: 266,574 USF X $28.00/USF = $7,464,072.00 per year.
March 31, 2008 through March 30, 2018: 266,574 USF X $28.80/USF = $7,677,331.00 per year, plus all allowed accrued operating cost and real estate tax adjustments added from 3/31/2004 to 3/31/2008.

All other terms and conditions of the lease shall remain in force and effect.
IN WITNESS WHEREOF, the parties subscribed their names as of the above date.

LESSOR CITY CRESCENT LIMITED PARTNERSHIP

BY ____________________ (Signature) Managing General Partner (Title)
Otis Warren, Jr.

IN PRESENCE OF ____________________ (Signature) 10 S. Howard St., Baltimore, MD 21201 (Address)

UNITED STATES OF AMERICA GENERAL SERVICES ADMINISTRATION

BY ____________________ (Signature) CONTRACTING OFFICER (Official Title)



GSA FORM 276 (REV. 7-67)

# Exhibit E

3.4 TAX ADJUSTMENT GSAR 552.270-24 (6/85)

(A) THE GOVERNMENT SHALL PAY ADDITIONAL RENT FOR ITS SHARE OF INCREASES IN REAL ESTATE TAXES OVER TAXES PAID FOR THE CALENDAR YEAR IN WHICH ITS LEASE COMMENCES (BASE YEAR). PAYMENT WILL BE IN A LUMP SUM AND BECOME DUE ON THE FIRST WORKDAY OF THE MONTH FOLLOWING THE MONTH IN WHICH PAID TAX RECEIPTS FOR THE BASE YEAR AND THE CURRENT YEAR ARE PRESENTED, OR THE ANNIVERSARY DATE OF THE LEASE, WHICHEVER IS LATER. THE GOVERNMENT WILL BE RESPONSIBLE FOR PAYMENT ONLY IF THE RECEIPTS ARE SUBMITTED WITHIN 60 CALENDAR DAYS OF THE DATE THE TAX PAYMENT IS DUE. IF NO FULL TAX ASSESSMENT IS MADE DURING THE CALENDAR YEAR IN WHICH THE GOVERNMENT LEASE COMMENCES, THE BASE YEAR WILL BE THE FIRST YEAR OF A FULL ASSESSMENT.

(B) THE GOVERNMENT'S SHARE OF THE TAX INCREASE WILL BE BASED ON THE RATIO OF THE SQUARE FEET OCCUPIED BY THE GOVERNMENT TO THE TOTAL RENTABLE SQUARE FEET IN THE BUILDING. IF THE GOVERNMENT'S LEASE TERMINATES BEFORE THE END OF A CALENDAR YEAR, PAYMENT WILL BE BASED ON THE PERCENTAGE OF THE YEAR IN WHICH THE GOVERNMENT OCCUPIED SPACE. THE PAYMENT WILL NOT INCLUDE PENALTIES FOR NON-PAYMENT OR DELAY IN PAYMENT. IF THERE IS ANY VARIANCE BETWEEN THE ASSESSED VALUE OF THE GOVERNMENT'S SPACE AND OTHER SPACE IN THE BUILDING, THE GOVERNMENT MAY ADJUST THE BASIS FOR DETERMINING ITS SHARE OF THE TAX INCREASE.

(C) THE GOVERNMENT MAY CONTEST THE TAX ASSESSMENT BY INITIATING LEGAL PROCEEDINGS ON BEHALF OF THE GOVERNMENT AND THE LESSOR OR THE GOVERNMENT ALONE. IF THE GOVERNMENT IS PRECLUDED FROM TAKING LEGAL ACTION, THE LESSOR SHALL CONTEST THE ASSESSMENT UPON REASONABLE NOTICE BY THE GOVERNMENT. THE GOVERNMENT SHALL REIMBURSE THE LESSOR FOR ALL COSTS AND SHALL EXECUTE ALL DOCUMENTS REQUIRED FOR THE LEGAL PROCEEDINGS. THE LESSOR SHALL AGREE WITH THE ACCURACY OF THE DOCUMENTS. THE GOVERNMENT SHALL RECEIVE ITS SHARE OF ANY TAX REFUND. IF THE GOVERNMENT ELECTS TO CONTEST THE TAX ASSESSMENT, PAYMENT OF THE ADJUSTED RENT SHALL BECOME DUE ON THE FIRST WORKDAY OF THE MONTH FOLLOWING CONCLUSION OF THE APPEAL PROCEEDINGS.

(D) IN THE EVENT OF ANY DECREASES IN REAL ESTATE TAXES OCCURRING DURING THE TERM OF OCCUPANCY UNDER THE LEASE, THE RENTAL AMOUNT WILL BE REDUCED ACCORDINGLY. THE AMOUNT OF ANY SUCH REDUCTIONS WILL BE DETERMINED IN THE SAME MANNER AS INCREASES IN RENT PROVIDED UNDER THIS CLAUSE.

3.5 OPERATING COSTS GSAR 552.270-23 (6/85)

(A) BEGINNING WITH THE SECOND YEAR OF THE LEASE AND EACH YEAR AFTER, THE GOVERNMENT SHALL PAY ADJUSTED RENT FOR CHANGES IN COSTS FOR CLEANING SERVICES, SUPPLIES, MATERIALS, MAINTENANCE, TRASH REMOVAL, LANDSCAPING, WATER, SEWER CHARGES, HEATING, ELECTRICITY, AND CERTAIN ADMINISTRATIVE EXPENSES ATTRIBUTABLE TO OCCUPANCY. APPLICABLE COSTS LISTED ON GSA FORM 1217, LESSOR'S ANNUAL COST STATEMENT, WHEN NEGOTIATED AND AGREED UPON, WILL BE USED TO DETERMINE THE BASE RATE FOR OPERATING COSTS ADJUSTMENT.

(B) THE AMOUNT OF ADJUSTMENT WILL BE DETERMINED BY MULTIPLYING THE BASE RATE BY THE PERCENT OF CHANGE IN THE COST OF LIVING INDEX. THE PERCENT CHANGE WILL BE COMPUTED BY COMPARING THE INDEX FIGURE PUBLISHED FOR THE MONTH PRIOR TO THE LEASE COMMENCEMENT DATE WITH THE INDEX FIGURE PUBLISHED FOR THE MONTH WHICH BEGINS EACH SUCCESSIVE 12-MONTH PERIOD. FOR EXAMPLE, A LEASE WHICH COMMENCES IN JUNE OF 1985 WOULD USE THE INDEX PUBLISHED FOR MAY OF 1985 AND THAT FIGURE WOULD BE COMPARED WITH THE INDEX PUBLISHED FOR MAY OF 1986, MAY OF 1987, AND SO ON, TO DETERMINE THE PERCENT CHANGE. THE COST OF LIVING INDEX WILL BE MEASURED BY THE U.S. DEPARTMENT OF LABOR REVISED CONSUMER PRICE INDEX FOR WAGE EARNERS AND CLERICAL WORKERS, U.S. CITY AVERAGE, ALL ITEMS FIGURE, (1982-84 = 100) PUBLISHED BY THE BUREAU OF LABOR STATISTICS. PAYMENT WILL BE MADE WITH THE MONTHLY INSTALLMENT OF FIXED RENT. RENTAL ADJUSTMENTS WILL BE EFFECTIVE ON THE ANNIVERSARY DATE OF THE LEASE. PAYMENT OF THE ADJUSTED RENTAL RATE WILL BECOME DUE ON THE FIRST WORKDAY OF THE SECOND MONTH FOLLOWING THE PUBLICATION OF THE COST OF LIVING INDEX FOR THE MONTH PRIOR TO THE LEASE COMMENCEMENT DATE.

(C) IF THE GOVERNMENT EXERCISES AN OPTION TO EXTEND THE LEASE TERM AT THE SAME RATE AS THAT OF THE ORIGINAL TERM, THE OPTION PRICE WILL BE BASED ON THE ADJUSTMENT DURING THE ORIGINAL TERM. ANNUAL ADJUSTMENTS WILL CONTINUE.

(D) IN THE EVENT OF ANY DECREASES IN THE COST OF LIVING INDEX OCCURRING DURING THE TERM OF THE OCCUPANCY UNDER THE LEASE, THE RENTAL AMOUNT WILL BE REDUCED ACCORDINGLY. THE AMOUNT OF SUCH REDUCTIONS WILL BE DETERMINED IN THE SAME MANNER AS INCREASES IN RENT PROVIDED UNDER THIS CLAUSE.

(E) THE OFFER MUST CLEARLY STATE WHETHER THE RENTAL IS FIRM THROUGHOUT THE TERM OF THE LEASE OR IF IT IS SUBJECT TO ANNUAL ADJUSTMENT OF

INITIALS: [signature] & [signature]
LESSOR GOVERNMENT

Exhibit F

# ARTICLE 14
# SPECIAL BENEFITS DISTRICTS

(Current through May 31, 2005)

**Published by**
**BALTIMORE CITY DEPARTMENT OF LEGISLATIVE REFERENCE**
**Avery Aisenstark, Director**
**2005**

**Copyright © 2005**
The Mayor and City Council of Baltimore
Department of Legislative Reference
*All rights reserved*

For information or to order – call, write, or fax:

**Department of Legislative Reference**
**626 City Hall**
**Baltimore, Maryland 21202**
**Tel: (410) 396-4730 ☎ Fax: (410) 396-8483**

## TABLE OF SUBTITLES

**Subtitle 1. Downtown Management District**
**Subtitles 2 to 5. *{Reserved}***
**Subtitle 6. Charles Village Community Benefits District**
**Subtitle 7. Midtown Community Benefits District**
**Subtitles 8 to 10. *{Reserved}***
**Subtitle 11. Retail Business Districts**
**Subtitles 12 to 15. *{Reserved}***
**Subtitle 16. Public Safety Conservation Areas**

## TABLE OF SECTIONS

### SUBTITLE 1
### DOWNTOWN MANAGEMENT DISTRICT

§ 1-1. Definitions.
§ 1-2. Findings.
§ 1-3. District created; boundaries.
§ 1-4. Authority created.
§ 1-5. Powers of Authority.
§ 1-6. Limitations on Authority.
§ 1-7. Board of Directors.
§ 1-8. Fiscal affairs.
§ 1-9. Annual Financial Plan.
§ 1-10. Supplemental Tax.
§ 1-11. Other charges.
§ 1-12. Baseline City services.
§ 1-13. Partnerships.
§ 1-14. Vacancy factor.
§ 1-15. Collection and disbursement.
§ 1-16. Long-term debt.
§ 1-17. Administrator.
§ 1-18. Oversight by Board of Estimates.
§ 1-19. Election approval process.
§ 1-20. Renewal and expiration.
§ 1-21. Minority involvement.

### SUBTITLES 2 TO 5
*{RESERVED}*

### SUBTITLE 6
### CHARLES VILLAGE
### COMMUNITY BENEFITS DISTRICT

§ 6-1. Declarations.
§ 6-2. District created; boundaries.
§ 6-3. Authority created.
§ 6-4. Powers of Authority.
§ 6-5. Limitations on Authority.
§ 6-6. Board of Directors.
§ 6-7. Annual Financial Plan.
§ 6-8. Supplemental Tax.
§ 6-9. Other charges.
§ 6-10. Baseline City services.
§ 6-11. Partnerships.
§ 6-12. Collection and disbursement.
§ 6-13. Administrator.
§ 6-14. Oversight by Board of Estimates.
§ 6-15. Election approval process.
§ 6-16. 4-year reviews.
§ 6-17. Dissolution of District.

### SUBTITLE 7
### MIDTOWN COMMUNITY BENEFITS DISTRICT

§ 7-1. Declarations.
§ 7-2. District created; boundaries.
§ 7-3. Authority created.
§ 7-4. Powers and functions of Authority.
§ 7-5. Limitations on Authority.
§ 7-6. Board of Directors.
§ 7-7. Annual Financial Plan.
§ 7-8. Supplemental Tax.
§ 7-9. Other charges.
§ 7-10. Baseline City services.
§ 7-11. Partnerships.
§ 7-12. Collection and disbursement.
§ 7-13. Administrator.
§ 7-14. Oversight by Board of Estimates.
§ 7-15. Election approval process.
§ 7-16. 4-year reviews.
§ 7-17. Dissolution of District.

### SUBTITLES 8 TO 10
*{RESERVED}*

### SUBTITLE 11
### RETAIL BUSINESS DISTRICTS

#### *Part 1. General Provisions*

§ 11-1. Definitions.
§ 11-2. Legislative intent .
§ 11-3. Establishment of Districts.
§ 11-4. Modifications.
§ 11-5. District license.
§ 11-6. Establishment of fee.
§ 11-7. Collection of fee.
§ 11-8. Transfers and renewals.
§ 11-9. Business Associations.
§ 11-10. Special fund accounts.
§ 11-11. Penalty for nonpayment.
§ 11-12. Appeals Board.
§ 11-13. Appeals procedure.
§ 11-14. Rules and regulations.
§ 11-15. Compliance with other laws.
§§ 11-16 to 11-20. *{Reserved}*

#### *Part 2. Designated Districts*

§ 11-21. Oldtown Mall.
§ 11-22. Market Center.
§ 11-23. York Road.
§ 11-24. Pimlico.
§ 11-25. Monument Street.
§ 11-26. Highlandtown.
§ 11-27. Hamilton.
§ 11-28. Federal Hill Market Place.
§ 11-29. Pennsylvania Avenue/Lafayette Market.
§ 11-30. Mount Washington.

### SUBTITLES 12 TO 15
*{RESERVED}*

## SUBTITLE 16
## PUBLIC SAFETY CONSERVATION AREAS

§ 16-1. Definitions.
§ 16-2. Program established.
§ 16-3. Advisory Board.
§ 16-4. Rules and regulations.
§ 16-5. Applications for participation.
§ 16-6. Referral to police district.
§ 16-7. Action by Board.
§ 16-8. Operation of Program.

## SUBTITLE 1
## DOWNTOWN MANAGEMENT DISTRICT

### § 1-1. Definitions.

(a) *In general.*

In this subtitle, the following terms have the meanings indicated.

(b) *Administrator.*

"Administrator" means the individual or entity engaged to administer the programs and undertakings of the Authority.

(c) *Authority.*

"Authority" means the Downtown Management Authority established by this subtitle.

(d) *Board.*

"Board" means the Board of Directors of the Authority.

(e) *CBD.*

"CBD" means the downtown or central business district of the City.

(f) *District.*

"District" means the Downtown Management District established by this subtitle.

(g) *Enabling Legislation.*

"Enabling Legislation" means Article II, § (61) of the City Charter.

(h) *Partnership.*

"Partnership" means the Downtown Partnership of Baltimore, Inc.

*(Ord. 92-057.)*

### § 1-2. Findings.

(a) *In general.*

The following findings are critical to the exercise of the authority set forth in Article II, § (61) of the Charter of Baltimore.

(b) *Importance of Downtown.*

(1) The downtown or central business district ("CBD") of the City of Baltimore is the center of employment for the entire metropolitan region and is the source for a very substantial portion of all jobs within the City.

(2) The CBD is also the center for tourism for the entire State of Maryland, having within its boundaries some of the most popular attractions in the country.

(3) The CBD is an important part of the tax base of the City, contributing taxes totally disproportionate to the relative area involved.

(4) The CBD is a vital link to the long-term health of the City and the focus of critical decisions as to the source of employment for the future.

(c) *Problems facing CBD.*

(1) While an undeniable asset to the region, the CBD is very dependent on public perception regarding safety and cleanliness.

(2) Studies conducted by a task force of the Partnership have identified the existence of significant concern among CBD residents and workers of being a victim of crime, despite statistics indicating that the CBD is as safe or safer than other parts of the City.

(3) Because of the high influx of workers and visitors, the CBD is likely to generate higher amounts of trash, litter, and graffiti than other parts of the City.

(4) In order to maintain the CBD as an attractive destination for visitors, there need to be efforts made to improve the perceptions regarding safety and cleanliness.

(5) Traditional sources of funding, enhancing public services, are no longer available, and a variety of financial crises have suggested that future funding from existing sources will become ever more difficult.

(d) *Concept of Special Benefit District.*

(1) A special benefit district is a mechanism by which property owners within a defined area can agree to impose additional taxes and charges on themselves in order to provide enhanced and supplemental public services.

(2) Special benefit districts have been created in numerous cities across the country, and the reports received suggest that they are almost uniformly highly successful in achieving their objectives.

(3) Critical to any special benefit district is the creation of a partnership between the public and private sector, with the public sector committing to maintain services at specified levels and the private sector agreeing to accept new taxes and charges for the purpose of supplementing public services.

(4) A district in this City cannot be successful without the full cooperation of the City, the State of Maryland, and the various private property owners within that district.

(e) *Considerations.*

(1) The Council has considered the materials compiled by the Downtown Partnership of Baltimore, Inc., regarding the alternatives to the creation of a district and the pattern of success for such districts elsewhere.

(2) The Council has considered the comments and suggestions of property owners, retail merchants, hotel and motel operators and owners, property tenants, and workers in the CBD.

(3) The Council finds that a special benefit district of the kind authorized by the Enabling Legislation would be an important and vital element of the long-term health and growth of the CBD, the City, and the region.

(4) Although 1 or more districts would be of great value throughout the CBD, the district created herein will be a significant start towards achieving the goals and objectives outlined above.

(5) Since 1982, the Partnership has been responsible for the management and operation of ever-increasing parts of the CBD, and has demonstrated its ability to deal with the kinds of problems such a district needs to address.

(6) The City should not burden a district with unnecessary layers of administration, nor should the City deny itself the benefit of the experience and expertise acquired by the Partnership.

(7) The Council finds that the existing system of assessments, appeals, and adjustments for vacancies on income-producing properties adequately addresses the concerns raised in the Enabling Legislation.

(8) The Council finds that an assessment system for a district should be uncomplicated, direct, and fair. The system provided for in this subtitle satisfies such criteria.

(9) The Council finds that the district should encourage the involvement of minorities in the operation of the district and in the business community itself.

*(Ord. 92-057.)*

**§ 1-3. District created; boundaries.**

(a) *In general.*

Pursuant to the Enabling Legislation, and within boundaries that are authorized by such laws, there is hereby created a district to be known as the "Downtown Management District", within the boundaries set forth on Exhibit A and Exhibit A-1 to this subtitle (which are part hereof).

(b) *Expansions.*

The District may be expanded (and as so expanded, shall be deemed included within the term "District" as used hereafter), in 1 or more resolutions of this Council, up to, but not beyond, the boundaries authorized in the Enabling Legislation upon a recommendation from the governing board of the Authority created by this subtitle which is endorsed by the Board of Estimates of the City.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-4. Authority created.**

(a) *In general.*

As authorized by the Enabling Legislation, there is hereby created a downtown commercial district management authority to be known as the "Downtown Management Authority for Baltimore City".

(b) *Status.*

The Authority:

(1) shall not be or constitute or be deemed an agency of the City or the State of Maryland;

(2) shall, to the greatest extent allowable by law, be deemed a special taxing district, and therefore a governmental body, both politic and corporate, exercising only such powers as are provided for in this subtitle;

(3) shall not exercise any power specifically withheld by the terms of either the Enabling Legislation or, if more restrictive, this subtitle.

(c) *Interpretation of powers.*

However, the powers of the Authority shall be broadly interpreted in order to allow the Authority to achieve the goals of the Enabling Legislation, including the provision of supplementary security and maintenance services, the promotion and marketing of the District, and the provision of amenities in public areas.

*(Ord. 92-057.)*

**§ 1-5. Powers of Authority.**

Except as limited by the Enabling Legislation and this subtitle, the Authority shall possess the following powers:

(1) to acquire, hold, and use both real and personal property necessary to achieve its purposes, including the acquisition by purchase, lease, use, or other rights;

(2) to make contracts, including contracts to provide services for areas adjoining the District;

(3) to engage the services of an administrator, which may be an individual or an entity, including the Partnership, to administer the programs and undertakings of the Authority;

(4) to sue and be sued, provided that the District, the Authority, and the Administrator shall benefit, to the fullest extent allowable by law, from any provisions of federal, state, and local law limiting the liability of employees, officers, agents, and officials of governmental bodies;

(5) to accept grants;

(6) to borrow funds for purposes consistent with the public purposes of the Authority, provided that unless specific approval is provided by the Board of Estimates no borrowing shall be for a term beyond the date for renewal of the District under § 1-20 of this subtitle;

(7) to adopt an annual budget and impose, charge, and collect the taxes or charges on benefitted properties within the District authorized by the Enabling Legislation and this subtitle; provided, however, that no taxes shall be levied against (i) residential properties with fewer than 4 dwelling units, or (ii)properties which are exempt under state law from ordinary property taxes;

(8) to create and enter into partnerships between the Authority and various property owners otherwise exempt from ordinary property axes, which partnerships may provide for the provision of permitted services and benefits by the Authority in exchange for payments arranged by contract, donation, gift, services in kind, or other mechanism by which funds or benefits are provided to the Authority;

(9) to establish and elect such officers as are not specified in this subtitle and provide for their terms and duties;

(10) to contract for and purchase goods and services, but as provided in the Enabling Legislation, such contracting shall not be subject to Baltimore City requirements regarding wage scales, competitive bidding, or other local procurement laws, but nonetheless shall be subject to applicable ordinances regarding City policy on encouraging and achieving goals for minority and women's business enterprises participation in the contracting activities of the Authority;

(11) to adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle;

(12) to implement the programs and goals of the Authority directly through employees, or through 1 or more contracts, which contracts can be with independent contractors or contract employees;

(13) to assist the leasing, marketing, and promotion activities within the District, to the extent such activities are approved by the governing board of the Authority;

(14) to appoint, hire, or engage such auditors, accountants, attorneys, assistants, aides, employees, and advisors as may be deemed necessary for the proper performance of the duties of said Authority, but consistent with this subtitle; and

(15) to do all other things necessary or convenient to carry out its goals, objectives, and powers.
*(Ord. 92-057; Ord. 96-093.)*

**§ 1-6. Limitations on Authority.**

The Authority shall be subject to the following limitations:

(1) The Authority is not permitted to exercise any police or general powers other than those authorized by the Enabling Legislation, State law, or this subtitle;

(2) The Authority may not pledge the full faith and credit of the City;

(3) The Authority shall comply with the requirements of City ordinances and City policies requiring achievement of goals regarding participation of minority and women's business enterprises and shall submit a quarterly report on the status of minority participation in the operation and governance of the Downtown Management District to the President and each member of the City Council;

(4) The Authority shall not extend its life and shall not modify the boundaries of the District except in accordance with this subtitle;

(5) The Authority shall not impose taxes, fees, and assessments in excess of those authorized by this subtitle or those approved by the Board of Estimates of the City or the City Council;

(6) The Authority shall not exercise powers of eminent domain;

(7) In order to adhere to the requirement of the Enabling Legislation that employees of the Authority reside in the City of Baltimore, the Authority shall not hire any new employee that does not voluntarily deliver to the Authority an affidavit certifying that the employee's residence is within the political boundaries of the City of Baltimore and that such employee intends to remain as a resident for the foreseeable future;

(8) Any fees, charges, or taxes collected by the Authority pursuant to this subtitle shall be used only for the purposes set forth in this subtitle and for no other purposes;

(9) Except as otherwise authorized by law, including the Enabling Legislation and this subtitle, and as necessary to exercise the powers provided for herein, the Authority shall not engage in competition with the private sector; and

(10) Notwithstanding any other provisions of this subtitle, unless specifically approved by the Board of Estimates, no borrowing, leasing, contracting, or other agreement or obligation shall be for a term beyond the date for renewal of the District under § 1-20 of this subtitle.
*(Ord. 92-057; Ord. 96-093.)*

**§ 1-7. Board of Directors.**

(a) *In general.*

The Authority shall be governed by and administered through a Board of Directors. The Board shall be subject to the following requirements.

(b) *Interim Board.*

(1) The initial interim Board of the Authority shall be those individuals whose names are set forth on the list attached to Ordinance 92-057 as Exhibit B.

(2) As described below, the interim Board shall be primarily responsible for recommending a full Board for the Authority to the Board of Estimates, and is not expected to engage in any other substantive activity.

(c) *Term.*

(1) The initial interim members shall serve as the members of the Board for a period not to exceed 6 months, unless extended by the Board of Estimates, and only until a full Board is approved by the Board of Estimates as provided hereafter.

(2) In the event of resignation, expiration, or other departure from the Board, or removal in accordance with the bylaws of the Authority, of any member of the Board, successors shall be elected by the remaining members of the Board.

(d) *Number and appointment.*

(1) The number of members of the full Board shall be not less than 10, excluding vacancies, and no more than 25.

(2) The interim membership of the Board shall be the 5 individuals listed on Exhibit B. The interim Board, upon approval of the District and the Authority in accordance with § 1-19 of this subtitle, shall propose to the Board of Estimates the initial full membership of the Board and the proposed terms for each director.

(3) Interim Board members may be included in the recommended full Board list.

(4) Such recommendation shall occur within 10 days of approval of the District, and shall be subject to the consent and concurrence of the Board of Estimates.

(5) The Board shall have the full authority to increase or decrease its membership, within the above limits, provided that at all times after approval of the initial full Board by the Board of Estimates, the requirements of this subtitle are adhered to.

(e) *Minimum representation.*

The following minimum representation shall be present on the Board, except during periods of temporary vacancies:

(1) 1 member shall be appointed by the Mayor.

(2) 1 member shall be appointed by the Governor.

(3) 1 member shall be selected by and approved through Resolution of the City Council.

(4) The Administrator shall designate an individual to be on the Board.

(5) At least 1 member shall be appointed by and shall represent each of the following constituent groups within the District:

(i) a trade group recognized by the Board as representing the hotels and motels within the District, which at the time of passage of this subtitle is acknowledged to be the Hotel and Motel Association of Greater Baltimore;

(ii) a trade group recognized by the Board as representing the retail merchants within the Market Center area, which at the time of passage of this subtitle is acknowledged to be the Market Center Association;

(iii) a trade group recognized by the Board as representing the retail merchants within the Charles Street corridor, which at the time of passage of this subtitle is acknowledged to be the Charles Street Association;

(iv) a trade group recognized by the Board as representing the property owners and managers within the District, which at the time of passage of this subtitle is acknowledged to be the Building Owners and Managers Association of Metropolitan Baltimore;

(v) a group recognized by the Board as representing the leaders of major institutional and business interests within the District, which at the time of passage of this subtitle is acknowledged to be the Greater Baltimore Committee;

(vi) a professional trade organization recognized by the Board as representing the users of commercial real estate space within the District. which at the time of passage of this subtitle is acknowledged to be the Greater Baltimore Board of Realtors; and

(vii) in the event that the Partnership is not the Administrator, the Partnership or any successor organization having similar functions and constituent boundaries, as determined by the Board;

provided that each such member of the Board shall also be or represent an owner of property subject to the tax imposed by this subtitle.

(6) At least ⅔ of the Board shall be comprised of owners or representatives of owners of property subject to the tax imposed by this subtitle; provided that members of the Board elected under clauses (1) though (5) above may be included in such group if they otherwise qualify.

(7) The Board shall endeavor to maintain representatives on the Board from the tourist and convention industry, professionals practicing in the District, retail merchants in the District, and tenants of properties in the District; however, no minimum representation applies.

(8) Consistent with the encouragement of partnerships between the Authority and property owners exempt from the tax imposed by this subtitle, the Board should consider representation of such partners within the Board.

(f) *Exercise of Authority powers.*

All powers of the Authority shall be exercised by and through the Board, unless delegated by the Board to 1 or more officers thereof or to the Administrator.

(g) *Bylaws, rules, and regulations.*

(1) The Board my adopt such bylaws, rules, and regulations as it deems necessary in carrying out the powers of the Authority, so long as the same shall not be inconsistent with the terms of this subtitle or of any ordinance amendatory or supplementary hereof or of the Enabling Legislation.

(2) All bylaws shall be subject to the approval of the Board of Estimates.

(3) The Board may establish its own procedures relating to the internal administration of the Authority, except as may be restricted by the Enabling Legislation or this subtitle.

(h) *Officers.*

The Board shall select from among its members, individuals to serve, at the pleasure of the Board, as president, vice-president, treasurer, and secretary of the Authority, delegating to such individuals such responsibilities as the Board deems appropriate.

*(Ord. 92-057; Ord. 04-672.)*

**§ 1-8. Fiscal affairs.**

The fiscal affairs of the Authority shall be conducted in accordance with the following provisions. *(Ord. 92-057.)*

### § 1-9. Annual Financial Plan.

(a) *Board to adopt.*

The Board shall adopt an annual Financial Plan, based on the City's fiscal year, which at the time of the passage of this subtitle is July 1 through June 30, consisting of at least:

(1) a proposed schedule of taxes or charges to be imposed throughout the District;

(2) in the first Financial Plan submitted, a budget for the current fiscal year of the City; and

(3) in Financial Plans for each fiscal year after the year of approval of this subtitle, a budget for the full fiscal year.

(b) *Public hearing.*

Before adopting the Financial Plan, the Board of the Authority shall arrange for a public hearing to be held on the Financial Plan. Such hearing shall not occur any sooner than after notice of such hearing has been published in a newspaper of general circulation in Baltimore City at least once a week for 3 consecutive weeks.

(c) *Board of Estimates approval required.*

(1) The Financial Plan shall be subject to the approval of the Board of Estimates in accordance with the procedures set forth in this subtitle.

(2) The Authority may not approve a Financial Plan that includes taxes or charges in excess of those approved by the Board of Estimates.

(d) *Initial budget.*

(1) The initial budget for the Authority shall include all of the fiscal year ending on June 30, 1993 (the "Initial Fiscal Year"), and may include the costs of preparing the Financial Plan and implementing the Authority and the District, so long as such costs were incurred during that fiscal year.

(2) In the event that the Authority is not implemented as a result of the operation of § 1-19 of this subtitle, neither the Authority nor the District, nor the City, shall have any liability for costs incurred prior to the initiation of operations, whether or not incurred by the Administrator or on behalf of the District or the Authority.

*(Ord. 92-057; Ord. 96-093.)*

### § 1-10. Supplemental Tax.

(a) *In general.*

A portion of the funding for the operation of the Authority shall be provided by a supplemental annual property tax, levied on all properties subject to real property taxation, unless exempt under this subtitle, the Enabling Legislation, or other applicable laws (the "Supplemental Tax").

(b) *Assessment, collection, enforcement.*

(1) The Supplemental Tax shall be assessed and collected in conjunction with the property taxes assessed and collected by the City (the "Regular Tax"), unless otherwise established by the Board and approved by the Board of Estimates.

(2) Enforcement of the Supplemental Tax shall be in accordance with the enforcement of the Regular Tax, and all provisions applicable to the assessment, collection, enforcement, and refunding of the Regular Tax shall apply to the Supplemental Tax unless modified herein.

(c) *Limitations.*

The Supplemental Tax shall be further subject to the following limitations.

(1) The rate of the Supplemental Tax for the Initial Fiscal Year shall be that amount (the "Initial Base Rate") required to generate $1,700,000 in revenues for a full budget year from properties subject to the Supplemental Tax (the "Initial Base Budget").

(2) For any year after the Initial Fiscal Year, the rate of the Supplemental Tax may be increased to generate revenues equal to the "Adjusted Base Budget", which is the Initial Base Budget plus a cumulative annual increase in the Initial Base Budget equal to 5% of the Initial Base Budget for each year after the Initial Fiscal Year, but shall be subject to the further limitations set forth below:

(i) Any increase in the rate of the Supplemental Tax must be approved by a majority of the Board members that are property owner representatives for purposes of § 1-7(e)(6).

(ii) The rate of the Supplemental Tax shall not at any time exceed the then current equivalent of a limitation on March 1992 of 30¢ per $100 of assessed value. This limitation shall be adjusted for any increases in the cost-of-living, using standards approved by the Board, up to a maximum cost-of-living adjustment of 5% from the prior year. This clause (ii) limitation shall not apply to any portion of the Supplemental Tax imposed to retire obligations ("Approved Debt Service") incurred with the approval of the Board of Estimates under §§ 1-5(6), 1-6(10), and 1-16 of this subtitle.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-11. Other charges.**

(a) *Property subject to Supplemental Tax.*

(1) Properties within the District subject to the Supplemental Tax shall not be required to pay any other charges or fees for services generally provided within the District by the Authority.

(2) However, the Authority may impose charges and fees for any special services requested by and performed for 1 or more property owners.

(b) *Others.*

The Board of the Authority, with the approval of the Board of Estimates, may establish other fees and charges for specific services performed within the District, within areas adjoining the District, for properties and owners not subject to the Supplemental Tax and in conjunction with partnerships encouraged by this subtitle.
*(Ord. 92-057.)*

**§ 1-12. Baseline City services.**

(a) *Agreement to maintain.*

Prior to imposing and collecting the Supplemental Tax authorized by this subtitle, the Authority shall enter into a memorandum of understanding with the Mayor of the City regarding the level of services to be maintained by the City as the City's partnership obligation to the Authority and the District's taxpayers.

(b) *Scope of agreement.*

(1) Such a memorandum shall:

(i) describe the existing levels of service within the District;

(ii) commit the City to the maintenance of such levels of service; and

(iii) outline the further undertakings of the City in response to the initiative represented by the creation of the District (the "Baseline Plus").

(2) In addition, the City may include in the memorandum a process by which the Authority and the City shall cooperate on a comprehensive sidewalk repair program, which shall include the issuing of notices by the City relating to footways requiring repair, repaving, or regrading, and the arranging for repairs to be made by the Authority, with the enforcement support of City assessments, where appropriate.

(c) *Governing principles.*

The maintenance of existing services shall be governed by 2 principles:

(1) No decrease in such services shall occur except as part of an overall decrease in services necessitated by changes in funding, policy, or resources, and then only in proportion to the decreases implemented elsewhere in the City.

(2) Any increase in such services generally throughout the City shall be matched with increases in such services within the District, in proportion to the increases implemented elsewhere in the City.
*(Ord. 92-057; Ord. 96-093.)*

**§ 1-13. Partnerships.**

(a) *Authority encouraged to create.*

The Authority is authorized and encouraged to enter into partnerships with the property owners and users within the District and adjoining areas that are not subject to the Supplemental Tax ("Exempt Partners") for the purpose of furthering the broad objectives of improving and enhancing public services throughout the CBD.

(b) *Specific powers.*

In furtherance of that objective, the Authority may:

(1) contract to provide varying levels of services to areas adjoining the District;

(2) agree to accept donations, contributions, and voluntary payments of any kind from Exempt Partners (collectively, "Voluntary Payments"), with or without agreements regarding specific services and functions;

(3) enter into agreements with Exempt Partners to include property owned by those Exempt Partners within the District in return for Voluntary Payments and/or commitments regarding the provision of similar services and functions within properties owned by Exempt Partners; and

(4) establish rates and charges for the provision of services to Exempt Partners.

*(Ord. 92-057; Ord. 04-672.)*

**§ 1-14. Vacancy factor.**

The Authority is directed to recommend to the Board of Estimates whether some process or automatic adjustment is necessary to reflect the direction of the Enabling Legislation regarding current rates of occupancy in buildings.

*(Ord. 92-057.)*

**§ 1-15. Collection and disbursement.**

(a) *In general.*

The Authority is authorized and directed to establish with the appropriate City agencies the methods by which the Supplemental Tax is to be assessed, collected, and disbursed to the Authority.

(b) *Funds not part of City revenues.*

Amounts collected by the City on behalf of the Authority:

(1) shall not be included in the revenues of the City;

(2) shall not be deemed subject to the budgetary and appropriation process; and

(3) shall be disbursed promptly upon collection.

(c) *City to bear expense of collection, etc.*

As part of the City's contribution to the District, such collection, assessment, disbursement, record-keeping, and enforcement as may be involved in the process shall not be a charge to or against the Authority or the District but shall be an element of the Baseline Plus.

(d) *Department of Finance authorized to collect.*

(1) The Department of Finance of the City is authorized to collect the Supplemental Tax and such other charges as are approved by the Board of Estimates.

(2) The assessment for the Supplemental Tax may be included with the periodic real property tax bill submitted to the owners of properties within the District.

(3) The Department of Finance shall make regular remittances of the amounts collected to the Board of the Authority.

(e) *Penalties and interest.*

The penalties and interest applicable to delinquent taxes shall be applied to delinquencies in payment of the Supplemental Tax.

(f) *Lien on property.*

(1) The amount of any outstanding assessment on any property, and accrued interest and other charges, shall constitute a lien on the property.

(2) The lien:

(i) shall take precedence over all other liens, whether created prior to or subsequent to the assessment, commensurate with a lien for state and county taxes, general municipal taxes, and prior improvement assessments; and

(ii) shall not be defeated or postponed by any private or judicial sale, by any mortgage, or by any error or mistake in the description of the property or in the names of the owners.

(3) No error in the proceedings of the City or the Board of the Authority shall exempt any property from the lien, or from payment thereof, or from the penalties or interest thereon, as herein provided.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-16. Long-term debt.**

(a) *In general.*

Any borrowing by the Authority that is intended to survive beyond the next date for renewal of the District ("Long-Term Debt") is subject to the following conditions.

(b) *Maximum amount.*

(1) The aggregate amount of Long-Term Debt outstanding at any one time may not exceed $2,000,000.

(2) No Financing Plan may be submitted and no Long-Term Debt may be approved if the current and projected payments for the sum of (i) debt service on the Long-Term Debt and (ii) any other debt having a maturity in excess of 1 year, in any year exceed 10% of the revenues of the Authority.

(c) *Required Financing Plan.*

(1) No Long-Term Debt may be issued by the Authority until after a Financing Plan has been presented for review and approval by the Board, the Department of Finance of the City, and the Board of Estimates of the City.

(2) Each Financing Plan shall provide information on:

(i) the use of the proceeds of the Long-Term Debt;

(ii) the anticipated term of the obligations;

(iii) the annual maximum debt service anticipated for the Long-Term Debt; and

(iv) the means by which the Long-Term Debt will be retired if a terminating event described in § 1-20 occurs.

(3) In addition, the Plan shall consider the operation and maintenance costs of any improvements funded with the Long-Term Debt and the means by which those expenses will be paid.

(d) *Public hearing.*

Before submitting a Financing Plan for approval under subsection (c) above, the Authority shall, after notice to all taxpayers in the District, hold a public hearing at which the Plan is presented.

(e) *Limitation on sales.*

No Long-Term Debt may be issued and sold to the general public or to other than institutional investors, lending institutions, and other sophisticated purchasers of debt obligations.

(f) *Capital projects.*

Capital projects for which both City funds and Long-Term Debt proceeds are to be used must be approved in accordance with applicable requirements, including, but not limited to, approval in the Capital Budget and the Ordinance of Estimates.

*(Ord. 96-093.)*

**§ 1-17. Administrator.**

(a) *Initial Administrator.*

The initial Administrator of the Authority shall be the Partnership, unless otherwise determined by the Board.

(b) *Powers of Administrator.*

The Administrator shall have the following powers with regard to the District and the Authority:

(1) The Administrator shall prepare the Financial Plan for review and approval by the Board of the Authority.

(2) The Administrator shall implement the approved Financial Plan and arrange for the collection and disbursement of the Supplemental Tax and all other charges, fees, and revenues of the Authority.

(3) The Administrator shall establish such procedures and processes as are necessary to perform the functions called for under the Financial Plan and the budget.

(4) The Administrator is hereby charged with responsibility for the day-to-day operations of the Board and its employees and contractors.

(5) The Administrator shall be empowered to exercise the powers granted to the Authority under this subtitle, provided that the Board of the Authority shall retain final discretion and power with regard to all substantive agreements, contracts, and other arrangements binding on the Authority.

(6) The Administrator shall hire and retain such employees, agents, and contractors as are needed to perform its functions for the Authority, provided that all such hiring and contracting shall comply with §§ 1-5(10) and 1-6(3) of this subtitle.

(7) The Administrator shall be deemed to be the direct agent of the Authority, such that any immunity afforded to the Authority and its officers, employees, and agents shall be afforded as well to the Administrator.

(8) The Administrator shall have such further rights, powers, and authority as may be granted to it by the Board of the Authority.

(9) Any limitations on the powers and authority of the Authority shall apply as well to the Administrator in performing the functions charged to the Administrator by this subtitle or by the Board of the Authority.

*(Ord. 92-057.)*

**§ 1-18. Oversight by Board of Estimates.**

(a) *In general.*

The Board of Estimates shall have the following powers with regard to the District and the Authority.

(b) *Establishment of full Board.*

The full Board of the Authority proposed by the interim Board in accordance with § 1-7 of this subtitle shall be subject to the approval of the Board of Estimates.

(c) *Financial Plan; rates and charges.*

(1) The Financial Plan and the schedule of rates and charges shall be subject to the approval of the Board of Estimates.

(2) Beginning with the Financial Plan for Fiscal 1994, the Board of the Authority shall submit such materials at least 2 months prior to the proposed effective date of a budget or Supplemental Tax.

(3) In considering a proposed budget and schedule of taxes and charges, the Board of Estimates shall not have the power to exceed or increase either the budget or the schedule of taxes, rates, and charges beyond those proposed by the Authority.

(d) *Occupancy-based adjustments.*

The Board of Estimates shall review and consider any request by the Authority regarding adjustments to reflect existing occupancy of properties. Such adjustments shall be matters of policy and not decisions on specific properties.

(e) *Bylaws.*

The Board of Estimates shall review and approve the initial bylaws of the Authority and any proposed amendments thereto.

(f) *Approval and renewal process.*

The Board of Estimates shall be the final arbiter and decision maker regarding the approval and renewal process for the District specified in this subtitle.

*(Ord. 92-057.)*

## § 1-19. Election approval process.

(a) *In general.*

The Authority shall not impose any taxes or charges until the approval process set forth below is completed and certified by the Board of Estimates.

(b) *Assessable Base and Ownership Roll.*

(1) The Board of Estimates shall obtain from the Director of Finance the "Assessable Base" of the District, which shall constitute a listing by property and a calculation of the sum of assessments on properties subject to the Supplemental Tax. The Assessable Base shall provide the total assessable value for purposes of calculating voting percentages by value.

(2) The Board of Estimates shall also obtain from the Director of Finance a list of all properties and their owners, each property thereby counting as 1 vote regardless of the number of owners (the "Ownership Roll"). The Ownership Roll shall be used to determine votes based on the number of property owners.

(3) In the event of dispute or uncertainty, the Board of Estimates shall determine, with finality, the Assessable Base and Ownership Roll upon which the procedures shall be based.

(c) *Notices.*

Notices shall be provided to each property affected by this subtitle regarding the passage of the subtitle and the rights of protest available hereunder.

(d) *Protest period.*

(1) Upon enactment of this subtitle, there shall ensue a 30-day period within which the Board of Estimates is directed to accept notarized petitions of protest (the "Protest Period").

(2) Such petitions shall be on any form which, to the satisfaction of the Board of Estimates, specifies the location of the property, the name of the owner and such additional information as would enable the Director of Finance to certify the current assessment of such property.

(e) *Percentage opposition.*

(1) If within the Protest Period, the Board of Estimates does not receive protests (the "Base Level Protests"), determined to be valid by the Board of Estimates, either

(i) representing property owners owning more than 40% of the Assessable Base, or

(ii) representing the same percentage of property owners from the Ownership Roll,

the Authority shall, at the conclusion of the Protest Period, be certified as approved for operations.

(2) In the event of a dispute as to ownership or representation, the Board shall disregard the protest unless satisfied as to the person properly authorized to act on behalf of the property owner.

(f) *Referendum.*

If protests in excess of the Base Level Protests are received, the Board of Estimates shall establish procedures it deems appropriate for a referendum of property owners within the District, to determine whether property owners of at least 50% of both the Assessable Base and the Ownership Roll are in support of the District. Such a referendum shall be conducted and completed within 30 days after the end of the Protest Period.

*(Ord. 92-057.)*

**§ 1-20. Renewal and expiration.**

(a) *In general.*

The Authority and the District shall be subject to the following provisions regarding renewal and expiration.

(b) *Renewal.*

(1) It is the expectation of the Council that the District will be successful.

(2) No sooner than 4 years and no later than 5 years from the passage of this subtitle, the Council shall hold 1 or more public hearings to evaluate the activities and undertakings of the Authority and the District. At the conclusion of the hearings, the Council shall utilize the procedures described in § 1-19 to determine whether the opposition in excess of the Base Level Protests exists to the continuation of the District.

(3) If such opposition exists, the Board of Estimates shall conduct a referendum comparable to that described in § 1-20 to determine whether the District is to continue for another 5 years.

(4) This process shall be repeated periodically to satisfy the requirements of the Enabling Legislation.

(c) *Expiration.*

(1) If the District and the Authority are not approved through the process described in § 1-19 of this subtitle, or are not renewed as provided above, the Authority shall cease its operations and the District ceases to exist, with the end of the fiscal year of the City in which the terminating event occurs.

(2) The Authority shall continue its existence only so long as is necessary to terminate operations in a reasonable fashion and shall include, as part of the Financing Plan required by § 1-16, a mechanism by which Long-Term Debt can be retired if a terminating event occurs.

(3) If a terminating event occurs, in addition, the Authority shall arrange for the refunding of all funds not needed to satisfy outstanding obligations and reserves for uncertain obligations and liabilities.

*(Ord. 92-057; Ord. 96-093; Ord. 04-672.)*

**§ 1-21. Minority involvement.**

(a) *In general.*

It is the intent of the Council that involvement by minorities in the business community and in the affairs of the District is to be encouraged.

(b) *MBE/WBE goals to apply.*

Accordingly, City policies regarding the achievement of goals for minority and women's business enterprises shall apply to the District and the Authority, and furthermore, the Authority is encouraged to seek means by which greater minority involvement can take place with the District and the larger central business district of the City.

*(Ord. 92-057.)*

## EXHIBIT A
## DISTRICT BOUNDARIES

The Boundaries of the Downtown Management District are:

Beginning at the point of intersection of the center lines of Greene Street and Saratoga Street; then, east along the center line of Saratoga Street to a point of intersection with an alley located immediately west of Howard Street; then north along the center line of said alley to intersect with the center line of Franklin Street; then east along the center line of Franklin Street to intersect with the property line between Lot 4 and Lot 5 of Block 551; then north along that property line continuing across Hamilton Street to intersect with the center line of W. Centre Street; then east on Centre Street to intersect with the center line of I-83; then south and southeast on I-83 to intersect with the center line of the Fallsway; then south on the center line of the Fallsway to a point of intersection with the center line of Pratt Street; then west along the center line of Pratt Street to the center line of Light Street; then south on the center line of Light Street to intersect with the center line of Lee Street; then west on Lee Street to intersect with the center line of Charles Street; then north on Charles Street to intersect with the center fine of Conway Street; then west along the center line of Conway Street to the center line of Sharp Street; then north on the center line of Sharp Street to intersect with the center line of Camden Street; then west along the center line of Camden Street to intersect with the center line of Greene Street; then north along the center line of Greene Street to the point of beginning.

## EXHIBIT A-1
## ADJACENT AREA

Adjacent Area A-1 is hereby defined as that area bounded generally by Franklin Street to the south, Eutaw Street to the west, Martin Luther King, Jr. Boulevard and Read Street to the north. and Park Avenue to the east. As of January 1, 1993, the Downtown Management District shall be automatically expanded to encompass and include adjacent Area A-1

**EXHIBIT B**
**MEMBERS OF INITIAL INTERIM BOARD**

H. Grant Hathaway
Milt Rosenbaum
Laurie B. Schwartz
Walter Sondheim, Jr.
Otis Warren, Jr.

## SUBTITLES 2 TO 5
*{RESERVED}*

Exhibit G




Home
Members Only
Newsroom
Marketplace
Streetscape Updates
Stay Connected
Site Map

# Downtown Partnership

About Us · DPOB Annual Report · Affirmative Action Statements

Membership · Upcoming Business Events

## About Us

Downtown Partnership is a nonprofit corporation working with the public and private sectors to make Downtown Baltimore a great place for businesses, employees, residents, and visitors. The Partnership's policies and programs have led to a cleaner & safer Downtown, to an increase in housing and retail opportunities, to the retention of key employers, to the development of solutions to transportation challenges, and to increased public and private investments in the area.

Many of The Partnership's programs are funded directly by the support of our members and sponsor organizations. Click here to learn about sponsorship opportunities.

We also oversee the Downtown Management Authority (DMA) and the delivery of Clean & Safe services that are funded through a surcharge on commercial properties located in the 106-block DMA district (bordered roughly by Centre Street on the north, President Street on the east, Pratt Street on the south, and Greene Street on the west. Click here for the DMA map.

Commercial property owners in the DMA district pay an annual surcharge of $14.39 cents per $100 of assessed property value. There are 1,400 taxable properties currently within the DMA that yield $3 million in total revenue from the surcharge.

Since the DMA was created in 1992, property owners have continued to recognize the importance of the Clean & Safe services funded by the surcharge. A survey of Downtown property owners and tenants conducted in early 2002 found that support for the services provided by Downtown's Public Safety Guides and Clean Sweep Ambassadors remains strong. Because of the programs success, in 2002 the Baltimore City Board of Estimates unanimously voted to renew the DMA through June 30, 2007.

Click here for a complete list of The Partnership's initiatives.

DPOB Board List

DPOB Staff List

Employment Opportunities

© Copyright 2002 Downtown Partnership of Baltimore, Inc. All Rights Reserved.

Accessibility Statement | Terms of Use | Privacy Statement

Site maintained by DPOB-IS

Exhibit H