**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CITY CRESCENT LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-580** |
| | ) | **(Judge Wheeler)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted By:

Robert G. Watt, Esq.
Christopher M. Anzidei, Esq.
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 400
McLean, VA 22102

Attorneys for Plaintiff City Crescent Limited Partnership

March 17, 2006

# TABLE OF CONTENTS

Page

PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S CROSS-MOTION FOR SUMMARY JUDGMENT .......... 1

STATEMENT OF QUESTIONS INVOLVED .......... 2

STATEMENT OF THE CASE .......... 2

I. The GSA's Unqualified Obligation to Pay Real Estate Property Tax Increases under the Tax-Adjustment Clause in the Lease. .......... 3

II. Baltimore's Supplemental Annual Property Tax. .......... 4

III. The GSA's Initial Acknowledgment of Liability for the Supplemental Annual Property Tax through its Original Interpretation of the Tax-Adjustment Clause and its Annual Payments for its Share of the Tax. .......... 6

IV. The Parties' Lease Extension and the GSA's Representations Related to the Tax-Adjustment Clause. .......... 7

V. After the Lease Renewal, the GSA Announces its New, Erroneous Interpretation of the Tax-Adjustment Clause and Unjustifiably Refuses to Pay the Supplemental Annual Property Tax. .......... 8

ARGUMENT .......... 10

I. Under the Lease's Tax Adjustment Clause, the GSA Is Obligated to Pay for Tax Increases Attributable to Baltimore's Supplemental Annual Property Tax on the City Crescent Building. .......... 11

A. The plain language of the Lease's Tax-Adjustment Clause obligates the GSA to pay Baltimore's supplemental annual property tax. .......... 11

1. The BGK decision is instructive in the present dispute because it involves the same Tax-Adjustment Clause applied to an additional real estate tax imposed by a similar downtown tax district. .......... 13

2. The Wright Runstad decision is inapposite because it involves an explicit "special assessment" levied against the leased property to pay for a specific capital improvement. .......... 15

B. The GSA's initial interpretation of the Tax-Adjustment Clause confirms its obligation to pay the supplemental annual property tax. .......... 17

II. The GSA Is Precluded By Waiver and Estoppel from Changing its Interpretation of the Lease's Tax Adjustment Clause. .......... 20

CONCLUSION .......... 23

PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT .......... 24

STATEMENT OF QUESTIONS INVOLVED .......... 24

SUMMARY OF ARGUMENT .......... 24

ARGUMENT .......... 25

I. As Evidenced by the Plain Language of Baltimore City Code Article 14 § 1-10, the Supplemental Annual Property Tax Is a Real Estate Tax, Not a Special Assessment, and Must Be Paid by the GSA under the Lease's Tax-Adjustment Clause. .......... 25

II. The Defendant's Acknowledgement that a "Property Tax" Differs from a "Special Assessment" Undermines Its Attempt to Avoid the Import of the Precise Language of Baltimore's Supplemental Annual Property Tax Ordinance. .......... 27

III. The Baltimore Ordinance, Read as a Whole, Confirms the Legislative Intent to Enact a Property Tax Rather than a Special Assessment. .......... 28

IV. The Cases Cited by the Defendant Underscore the Importance of Giving Effect to the Precise Statutory Language in Distinguishing Taxes from Special Assessments. .......... 30

CONCLUSION .......... 35

# TABLE OF AUTHORITIES

**Federal Cases** Page

2nd Roc-Jersey Assoc. v. Town of Morristown, 731 A.2d 1, 3-4 (N.J. 1999) .................... 34

Aetna Casualty and Surety Co. v. United States, 228 Ct. Cl. 146, 156-157, 158-160 (1981) .................... 28

Allstate Mgmt. Corp. v. Grand Union Co., 142 A.D.2d 344, 346 (N.Y. App. Div. 1988) .................... 31

Alvin, Ltd. v. United States Postal Service, 816 F.2d 1562, 1566 (Fed. Cir. 1987) .................... 18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) .................... 10, 22

Badgley v. United States, 31 Fed. Cl. 508, 511 (1994) .................... 10

BGK Main Street Operating Assocs., Ltd. P'ship, Inc. v. General Services Administration, GSBCA No. 16238, 04-2 BCA ¶ 32,658 at 161,652-654, 2004 WL 1352894 (GSBCA June 16, 2004) .................... passim

Blinderman Constr. Co., Inc. v. United States, 695 F.2d 552, 558 (Fed. Cir. 1982) .................... 18

Branch Banking & Trust Co. v. United States, 120 Ct. Cl. 72, 87-88 (1951) .................... 21

C C Distributors, Inc. v. United States, 38 Fed. Cl. 771, 778 .................... 28

Carstens v. McLean, 7 F.2d 322, 323 (9th Cir. 1925) .................... 31

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) .................... 26

Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1, 657 F.2d 183, 185 (8th Cir. 1981) .................... 34

G&A Inc. v. Nahra, 514 N.W.2d 255 (Mich. Ct. App. 1994) .................... 31

Gould v. Mayor of City Council of Baltimore, 59 Md. 378 (1883) .................... 32

Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991) .................... 11

Gozlon-Peretz v. United States, 498 U.S. 395, 409 (1991) .................... 28

Kendall v. Douglas, et. al, 820 P.2d 497, 503 (Wash. 1991) .......... 35

Kimco Realty v. United States, 51 Fed. Cl. 257, 264 (2001) .......... 21

Litton Systems, Inc. v. United States .......... 22

Maryland Div. of Labor and Indus.v. Triangle Gen. Contractors, Inc., 784 A.2d 534, 541-42 (Md. 2001) .......... 26, 28

McDaniel Brothers Construction Company, GSBCA No. 6973, 84-2 BCA ¶ 17,497 (1984) .......... 14, 20, 31

Riverside County Comm. Facilities Dist. No. 87-1 v. Bainbridge 17, 77 Cal. App. 4th 644 (1999) .......... 35

Roberts v. United States, 174 Ct. Cl. 940, 952-53 (1966) .......... 21

Rome v. Lowenthal, 428 A.2d 75, 79 (Md. 1981) .......... 26, 28

S.S. Silberblatt Inc. v. United States, 888 F.2d 829 (Fed. Cir. 1989) .......... 31

State Dep't. of Assessments and Taxation v. Glick, 422 A.2d 34, 37-38 (Md. Ct. App. 1980) .......... 26, 28

Sulzer v. Montgomery County, 484 A.2d 285, 286 (Md. 1984) .......... 32

Summerfield Housing Ltd. Partnership v. United States, 42 Fed. Cl. 160, 168 (1998) .......... 26

Thompson v. First National Bank of Hollywood, 321 So.2d 466, 467 (Fla. Dist. Ct. App. 1975) .......... 31

V.F.W. v. Montgomery County, 115 A.2d 249, 250 (Md. 1955) .......... 32

Walling Warehouse Co. v. Springhill Fuel Co., 562 P.2d 1221, 1222 .......... 31

Williams v. Anne Arundel County, 638 A.2d 74, 77 (Md. 1994) .......... 32

Wright Runstad Props., Ltd. Partnership v. United States, 40 Fed. Cl. 820 (1998) .......... passim

Zimmerman v. City of Memphis, 67 S.W.3d 798, 799 (Tenn. App. 2001) .......... 34

**Statutes** Page

Baltimore City Code Art. 14 .......... passim

Pursuant to the Court's Order, entered on December 20, 2005, and modified by the Court on February 2, 2006, Plaintiff City Crescent Limited Partnership ("CCLP") respectfully submits its Cross-Motion for Summary Judgment and its Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S CROSS-MOTION FOR SUMMARY JUDGMENT

CCLP respectfully requests that the Court grant summary judgment on its claims in this lawsuit arising from the defendant U.S. General Services Administration's ("GSA") failure to reimburse CCLP for a supplemental annual property tax increase in breach of the Tax-Adjustment Clause in the parties' Lease. After paying this tax increase for seven years, the GSA abruptly reversed course in October 2002, announced an erroneous right to recoup tax increases paid for the tax years 1995/1996 through 2001/2002, and subsequently withheld $311,522.54 from rental payments otherwise due to CCLP. The GSA has also refused to pay $182,868.10 in tax increases due under the Tax-Adjustment Clause for the tax years 2002/2003 through 2005/2006. CCLP seeks damages totaling $494,390.64, and a declaration that the GSA must continue to pay tax increases resulting from the supplemental annual property tax through the remainder of the Lease term.

There are no genuine issues of material fact related to the real estate taxes at issue under the parties' Lease, and CCLP is entitled to judgment as a matter of law. The Lease's unambiguous Tax-Adjustment Clause, GSAR 552.270-24 (1985), obligates the GSA to pay additional rent for its share of increases in real estate taxes on the leased property, and the GSA has failed to pay its share of tax increases for a

"supplemental annual property tax" levied pursuant to Baltimore City Code Article 14, § 1-10 (2006).

## **STATEMENT OF QUESTIONS INVOLVED**

The question before this Court is whether CCLP is entitled to summary judgment under Counts I and II of its Complaint for breach of contract and/or declaratory judgment arising out of the GSA's refusal to pay its share of tax increases for a supplemental annual property tax in accordance with the Lease's Tax-Adjustment Clause, which obligates the GSA to pay additional rent for tax increases on the property. This determination requires the resolution of the following issues:

1. Whether the unambiguous plain language of the Lease's Tax-Adjustment Clause, which requires the GSA to pay its share of increases in "real estate taxes," should be enforced;

2. Whether the clear legislative intent of the Baltimore ordinance enacting a "supplemental annual property tax" should be given effect;

3. Whether the GSA waived any right that it may have had—or is otherwise estopped—to avoid paying the supplemental annual property tax where the GSA paid the tax for seven consecutive years prior to the parties' execution of a fifteen-year extension of the Lease that included a new annual rent, which was premised upon the GSA's payment of the supplemental annual property tax.

## **STATEMENT OF THE CASE**

The parties' Lease includes a "Tax-Adjustment" Clause under which the GSA has agreed to pay additional rent for its share of increases in real estate taxes on the City Crescent Building. See Plaintiff's Proposed Findings of Uncontroverted Fact ("SOF") at ¶ 4, Appendix to Plaintiff's Cross-Motion for Summary Judgment and Proposed Findings

of Uncontroverted Fact ("Appendix") at 13. After the parties entered into the Lease, the Baltimore City Council created a business district within the downtown area in which the City Crescent Building is located and subjected that district to higher taxes. Baltimore City Code Art. 14 §§ 1-1 through 1-21 (2006) (the entire ordinance is attached to the Appendix at pages 94 to 120). This tax increase was effectuated by an ordinance that levied a "supplemental annual property tax . . . on all [non-exempt] properties subject to real estate property taxation." Id. at § 1-10(a), Appendix at 109.

For seven years, the GSA acknowledged and paid additional rent for its share of tax increases due to the supplemental annual property tax on the City Crescent Building. This dispute arose in 2002, when the GSA reversed its course, announced that it would not longer pay its share of rent increases attributable to supplemental annual property tax, and asserted an erroneous right to obtain reimbursement of previously-paid supplemental annual property taxes. The GSA has since continued to breached its lease with CCLP by failing to pay $182,868.10 in supplemental annual property taxes for the years 2002/2003 through 2005/2006 and by recently deducting a total of $311,524.54 in payments otherwise due under the Lease for purported overpayments attributable to the supplemental annual property taxes for previous years.

## I. The GSA's Unqualified Obligation to Pay Real Estate Property Tax Increases under the Tax-Adjustment Clause in the Lease.

In or about August 1990, the defendant, acting through the GSA, entered into the Lease with CCLP, the lessor, for the City Crescent Building located at 10 South Howard Street, Baltimore, Maryland. SOF at ¶ 1. The original term of the Lease was March 31, 1993, through March 30, 2003. Id. In 2001, the parties renewed the Lease for an additional 15 years, establishing a new annual rent and extending the Lease term

through March 30, 2018. Id. at ¶ 2, Appendix at 16 (Supplemental Lease Agreement No. 23). The GSA is the primary tenant of the City Crescent Building, having occupied 97% or more of the building's square-footage since 1993. SOF at ¶ 3.

The parties' Lease includes a Tax Adjustment Clause, GSAR 552.270-24 (1985), which obligates the GSA to pay additional rent for its share of real estate tax increases on the City Crescent Building:

> (A) The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year). ***
>
> (B) The Government's share of the tax increase will be based on the ratio of the square feet occupied by the Government to the total rentable square feet in the building. * * *

SOF at ¶ 4, Appendix at 13 ("Tax-Adjustment Clause," GSAR 552.270-24 (1985), Solicitation for Offers at ¶ 3.4). A complete copy of the Lease, including the Supplemental Lease Agreements, is attached to the Plaintiff's Complaint.

## II. Baltimore's Supplemental Annual Property Tax.

The Baltimore City Council increased real estate taxes within the downtown area in which the City Crescent Building is located by enacting Ordinance No. 92-057, which was approved by the Mayor on June 29, 1992, see Complaint at Ex. 2, and codified at Article 14, § 1 of the Baltimore City Code. See Baltimore City Code Art. 14 §§ 1-1 through 1-21 (2006), Appendix at 94-120. This statute authorizes the creation of a business district known as the "Downtown Management District" ("the District") to be overseen by the "Downtown Management Authority for Baltimore City" ("the Authority"). Id. at §§ 1-3, 1-4, Appendix at 102 - 103.

Section 1-10 of this statute, entitled "Supplemental Tax," states that "[a] portion of the funding for the operation of the Authority shall be provided by a *supplemental annual property tax*, levied on all properties subject to real property taxation. . . ." Id. at § 1-10(a) (emphasis added), Appendix at 109. This "supplemental annual property tax" operates like the other real estate taxes imposed by Baltimore City and the State of Maryland: (i) the City is required to assess and collect the supplemental annual property tax in conjunction with the other City and State property taxes, id. at § 1-10(b)(1); (ii) the statute subjects property owners to the same enforcement mechanisms as exist for other property taxes, id. at § 1-10(b)(2); (iii) the City's Department of Finance includes the supplemental annual property tax on its annual property tax bills issued to property owners, id. at § 1-15(d); and (iv) the rules pertaining to penalties and interest on delinquent property taxes apply to the supplemental annual property tax. Id. at § 1-15(e). Appendix at 110, 113. As provided by this statute, the annual tax bills for the City Crescent Building include three categories of real estate taxes—State, City, and the supplemental annual property tax—all of which are calculated on an *ad valorem* basis, i.e., by multiplying the City Crescent Building's assessed value by the applicable tax rate. SOF at ¶ 8.

Individual property owners receive no specific services, benefits, or preferences in exchange for the supplemental annual property tax. SOF at ¶ 11. Rather, any benefits provided by the Authority run to the general public in the downtown area. Id. at ¶¶ 9-12. This tax allows Baltimore to augment its traditional public services in the downtown area, which has increased needs for general governmental services to keep the area clean and safe. Id. at ¶¶ 10 -11. In sum, the supplemental annual property tax

is utilized to fund increased “clean and safe” services that are virtually identical to other traditional governmental services. Id. at ¶¶ 9 -12.

As with other real estate taxes, Baltimore’s supplemental annual property tax differs in kind from special assessments utilized to finance specific capital improvements. Any such projects would be funded through the assessment of a special charge made under a separate provision of Article 14, which empowers the Authority to “impose charges and fees for any special services requested by and performed for 1 or more property owners.” Baltimore City Code Art. 14 at § 1-11(a)(2). The City Crescent Building has received no such special benefits in exchange for its supplemental annual property taxes. SOF at ¶ 12.

## III. The GSA’s Initial Acknowledgment of Liability for the Supplemental Annual Property Tax through its Original Interpretation of the Tax-Adjustment Clause and its Annual Payments for its Share of the Tax.

In the seven years prior the onset of this dispute, the GSA paid additional rent to CCLP for its share of the increases in real estate taxes for the City Crescent Building in accordance with GSAR 552.270-24 and the terms of the Lease. SOF at ¶ 13. Each year, the annual tax bills for the City Crescent Building included the State, City, and supplemental annual property taxes. Id. For seven consecutive seven years, the GSA paid the City Crescent Building’s annual tax increases—including the supplemental annual property tax—upon receipt of the tax bills from CCLP. Id.

In four of these years, CCLP and the GSA memorialized their annual calculation of the tax increase by jointly executing a written Real Estate Tax Escalation Analysis, which was signed by the Contracting Officer. SOF at ¶ 14, Appendix at 44 (Tax Escalation Analyses for 1995/1996, 1996/1997, 1999/2000, and 2000/2001). On another occasion, the GSA and CCLP executed a formal change to the Lease in order

to compensate CCLP for the 1997/1998 real estate tax increase. SOF at ¶ 15, Appendix at 50 (Supplemental Lease Agreement No. 18 for the 1997/1998 Tax Year). In the other two years prior to the dispute, the GSA paid the tax increase after receipt of the tax bills from CCLP without any complaint. SOF at ¶ 16, Appendix at 25 (Tax Bills Submitted to the GSA for 1998/1999 and 2001/2002).

**IV. The Parties' Lease Extension and the GSA's Representations Related to the Tax-Adjustment Clause.**

In June 2001, CCLP and GSA renewed the Lease for a period of fifteen years, extending the term from March 31, 2003, through March 30, 2018. See SOF at ¶ 2, Appendix at 16 (Supplemental Lease Agreement No. 23). At the time of the extension, the GSA was paying the supplemental annual property tax, and the new annual rent agreed to by the parties for the extended term was based upon this apportionment of tax liability. SOF at ¶ 17. This lease extension provides that "the real estate tax base remains unchanged." Id. at ¶ 18. In this lease extension, the parties carved out a specific, narrow exception to the GSA's otherwise unqualified liability for tax increases. The parties agreed that "there shall be no operating or real estate tax adjustment paid by the Government at the beginning of the 11th year, March 31, 2003, of the lease, in recognition of the increased rent rate." Id.

In conjunction with the renewal of the Lease, on October 15, 2001, GSA's Contracting Officer provided a Lease Status Report to CCLP's lenders. See SOF at ¶ 19, Appendix at 57 (Lease Status Report dated October 15, 2001). This Lease Status Report was a prerequisite to CCLP's ability to obtain long-term financing for the Property. See SOF at ¶ 19. In Paragraph 3 of the Lease Status Report, the GSA represented to CCLP's lenders that there were "no circumstances" that would give the

GSA a right "to seek an offset against, take a deduction from or otherwise reduce any payment" to be made to CCLP:

> The GSA Lease is currently in full force and effect as against the Government. Neither the Government nor the Partnership are in default under the GSA lease, nor are there conditions that are existing or pending in and of themselves which may ripen into default under the GSA Lease. All duties and obligations of the Partnership with respect to the Project due through the date hereof have been satisfied or waived. There are no circumstances, events or conditions presently in existence that would confer upon the Government the right (i) to seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to the Partnership under the GSA Lease or (ii) to seek to terminate the GSA Lease. . . .The Government has not requested any changes to the Project which would cause a reduction of the non-maintenance portion of the rent.

Id. at ¶ 20, Appendix at 59 (Lease Status Report at 2-3).

In Paragraph 2 of the GSA's Lease Status Report, the Contracting Officer also confirmed that the Lease was authorized by the United States and that any required approvals for performance of the Lease had been obtained. Id. at ¶ 21, Appendix at 59 (Lease Status Report at 2). CCLP relied upon the GSA's Lease Status Report in obtaining financing and renewing the Lease. SOF at ¶ 19. After the GSA provided this Lease Status Report, CCLP's lenders provided long-term financing to CCLP for the Property. Id. at ¶ 22.

## V. After the Lease Renewal, the GSA Announces its New, Erroneous Interpretation of the Tax-Adjustment Clause and Unjustifiably Refuses to Pay the Supplemental Annual Property Tax.

After paying the supplemental annual property tax for seven years and renewing the Lease in 2001, the GSA changes its position. In a letter dated October 15, 2002, the GSA notified CCLP that it would no longer pay tax increases attributable to

Baltimore's supplemental annual property tax. SOF at ¶ 23, Appendix at 62 (GSA's October 15, 2002 letter). In this letter, the GSA contended that a tax must be a "general real estate tax" to be compensable under the Lease's Tax Adjustment Clause. Id. The GSA asserted that the supplemental annual property tax was a "District Surcharge" rather than a general real estate tax, and was thus not compensable under the Lease. Id. Based upon this rationale, the GSA asserted that the prior years' tax analyses had been computed incorrectly. Id. The GSA's letter asserted entitlement to reimbursement for $311,522.54 in purported "overpayments" under the Lease, attaching revised Real Estate Tax Escalation Analyses for the previous years. Id. Each of the GSA's revised Tax Escalation Analyses states, "No Special Benefit District Surcharge Allowed." Id.

Since 2002, the GSA has refused to pay any tax increases arising from the supplemental annual property tax levied by Baltimore. SOF at ¶ 26. On or about June 1, 2004, the Contracting Officer issued a Final Decision finding that GSA was entitled to a refund of the supplemental annual property tax amounts that had been paid by the GSA throughout the term of the Lease. SOF at ¶ 24, Appendix at 74 (Contracting Officer's Final Decision). The Final Decision was based on the Contracting Officer's incorrect reasoning that the supplemental annual property tax is a "special assessment," not a "real estate tax" compensable pursuant to the terms of the Lease.

The GSA deducted $4,548.70 from its tax-increase reimbursement payment to CCLP in 2002, and the GSA has since deducted the remaining portion of the $311,522.54 from its monthly rental payments made to CCLP in 2005. SOF at ¶ 25. Since 2002, the GSA has also refused to pay $182,868.10 in real estate tax increases attributable to the supplemental annual property tax. Id. at ¶ 26. CCLP seeks payment

of these taxes in the total amount of $494,390.64, plus interest and any other recoverable costs, and CCLP seeks a declaration that the GSA is obligated to pay additional rent for its share of increases in real estate taxes due to the supplemental annual property tax.

**ARGUMENT**

CCLP is entitled to summary judgment on its claim that the GSA breached its Lease obligations by refusing to pay additional rent required by the Tax-Adjustment Clause for increases in real estate taxes, increases that are attributable to a supplemental annual property tax imposed by Baltimore City. Summary judgment is appropriate where there is no genuine dispute as to any material fact and where one party is entitled to judgment as a matter of law. RCFC 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "Where there is a question of construction of a written contract, and it can be determined by consideration of the plain and unambiguous wording of the contract, the question is one of law which can be resolved by the court on a motion for summary judgment." Badgley v. United States, 31 Fed. Cl. 508, 511 (1994).

Here, the material facts are undisputed. In sum, the parties' Lease includes a Tax-Adjustment Clause that requires the GSA to "pay additional rent for its share of increases in real estate taxes." SOF at ¶ 4, Appendix at 13 (Tax-Adjustment Clause). Baltimore's City Council enacted a "supplemental annual property tax" that applies to the City Crescent Building. Baltimore City Code Art. 14 § 1-10(a). Although the GSA initially reimbursed CCLP for this tax under the Tax Adjustment Clause for seven years prior to 2002, the GSA has refused to pay this tax since 2002 and has recouped its prior payments made to CCLP for the supplemental annual property tax. SOF at ¶¶ 13, 23.

CCLP is entitled to judgment as a matter of law on these facts. The plain and unambiguous language of the Lease's Tax-Adjustment Clause obligates the GSA to pay additional rent for its share of increases due to the supplemental annual property tax, a real estate tax paid by CCLP to Baltimore on the City Crescent Building. The GSA's initial interpretation of the Tax-Adjustment Clause was not a "mistake." On the contrary, the GSA's actions confirm its understanding of the parties' original bargain prior to the GSA's reversal of policy in October 2002. The GSA is also bound to this initial interpretation under the doctrines of waiver and estoppel. The parties' agreement to renew their Lease in 2001—which included a new annual rent and a fifteen-year extension—was premised upon the parties' then-mutual understanding that the GSA was responsible for the supplemental annual property tax.

## I. Under the Lease's Tax Adjustment Clause, the GSA Is Obligated to Pay for Tax Increases Attributable to Baltimore's Supplemental Annual Property Tax on the City Crescent Building.

### A. <u>The plain language of the Lease's Tax-Adjustment Clause obligates the GSA to pay Baltimore's supplemental annual property tax.</u>

The GSA's obligation to pay its share of taxes for Baltimore's supplemental annual property tax is set forth in the plain language of the parties' Lease. Like any other contract, a lease must be interpreted according to its plain language. <u>E.g.</u>, <u>Gould, Inc. v. United States</u>, 935 F.2d 1271 (Fed. Cir. 1991). The Lease includes a Tax-Adjustment Clause, GSAR 552.270-24 (1985), which obligates the GSA to bear the risk of real estate tax increases:

> (A) The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year).* * *
>
> (B) The Government's share of the tax increase will be based on the ratio of the square feet occupied by the

> Government to the total rentable square feet in the building.
> * * *

SOF at ¶ 4, Appendix at 13 ("Tax-Adjustment Clause).

The GSA's unqualified obligation to pay all types of "real estate taxes" by its very nature includes Baltimore's "supplemental annual property tax." There is no distinction between a tax on "property" and a tax on "real estate." See Black's Law Dictionary at 1254 (8th Ed. 1999). The terms "real estate" and "real property" are synonyms of "property," which is defined as land or anything attached to or erected on it. Id.

By statute, Baltimore's annual tax is a real estate tax, levied against all real property subject to taxation:

> A portion of the funding for the operation of the Authority shall be provided by a *supplemental annual property tax*, *levied on all properties subject to real property taxation*, unless exempt under this subtitle, the Enabling Legislation, or other applicable laws (the "Supplemental Tax").

Baltimore City Code Art. 14 § 1-10(a) (emphasis added), Appendix at 109. This ordinance establishes the supplemental annual property tax as another *ad valorem* real estate tax, assessed, collected, and enforced in the same manner as other real estate taxes. Id. at §§ 1-10(b), 1-15(e). As with other real estate taxes, the supplemental annual property tax benefits the general public, and not specific property owners. SOF at ¶¶ 9-12. This tax is utilized to augment the level of traditional governmental services required to keep the downtown area—an area with increased needs for public services—clean and safe for the general public. Id. Individual property owners receive no specific services, benefits, or preferences in exchange for the supplemental annual property tax. Id. at ¶¶ 11-12. Rather, any benefits provided by the Authority run to the general public. Id. at ¶¶ 9-12.

In sum, the City Crescent Building is located within the District subject to this supplemental annual property tax. SOF at ¶ 5. Therefore, the plain language of the Lease's Tax-Adjustment Clause obligates the GSA to pay its share of additional rent for tax increases for the supplemental annual property tax, a real estate tax imposed by Baltimore City.

1. The BGK decision is instructive in the present dispute because it involves the same Tax-Adjustment Clause applied to an additional real estate tax imposed by a similar downtown tax district.

The GSA has previously been held liable under the Tax-Adjustment Clause to pay additional rent for property taxes imposed within a special downtown district. BGK Main Street Operating Assocs., Ltd. P'ship, Inc. v. General Services Administration, GSBCA No. 16238, 04-2 BCA ¶ 32,658 at 161,652-161,654, 2004 WL 1352894 (2004). BGK stands on all fours with the present case. BGK involved an analogous "additional tax on taxable real property" located within a newly-created municipal "Downtown Service District," and the GSA's lease in BGK included the same operative language in its Tax-Adjustment Clause (the 1992 version). Id. at 161,653 (quoting Norfolk City Code at § 24-212.4 and GSAR 552.270-24 (1992)).

In BGK, the Board held that the GSA's unequivocal obligation to pay "its share of increases in real estate taxes" under the lease's Tax-Adjustment Clause included the additional property tax imposed by the City of Norfolk, Virginia on properties located within a designated "Downtown Service District." Id. at 161,654. This additional tax imposed by Norfolk is nearly identical to the supplemental annual property tax imposed by Baltimore. As is the case here, Norfolk established a downtown business district and increased taxes within this newly-created district. Similar to Baltimore's ordinance,

Norfolk imposed this additional tax to supplement other state and local taxes, assessing and collecting the tax in conjunction with the other real estate taxes due each year.

BGK is also analogous because the GSA's denial of its tax liability was based upon a misreading of both GSAR 552.270-24 and the plain language of the tax ordinance at issue. In BGK, the Contracting Officer had mistakenly interpreted GSAR 552.270-24 "to include only taxes of a general nature" and had also erroneously asserted that the additional property tax was a "special assessment." Id. at 161,653-161,654. The GSBCA rejected the Contracting Officer's interpretation as contrary to the plain language of the Tax-Adjustment Clause and the tax ordinance. The GSBCA found no basis to read into the lease any purported distinction between "general real estate taxes" and other "real estate taxes," and the GSBCA gave effect to the plain language of Norfolk's ordinance in distinguishing the tax at issue from a "special assessment." Id. The GSBCA reasoned that "[t]he Tax Adjustment clause states that the taxes which result in adjustment are 'real estate taxes,' and the clear and unambiguous language of the ordinance and the City of Norfolk Code state that the tax at issue is a 'real estate tax.' We need look no further." Id.

In so holding, the GSBCA distinguished BGK from one of the principal cases relied upon by the defendant in this case, the GSBCA's prior decision in McDaniel Brothers Construction Company, GSBCA No. 6973, 84-2 BCA ¶ 17,497 (1984). As observed in BGK, McDaniel involved a different tax-adjustment clause under which the GSA had qualified its tax liability by using the term, "general real estate taxes" instead of "real estate taxes." BGK, 04-2 BCA ¶ 32,658 at 161,654. In addition, McDaniel is distinguishable from both BGK and the present case because the improvement district

in McDaniel had expressly levied "special assessments" for the sole purpose of financing specific drainage improvement projects. 84-2 BCA ¶ 17,497 at 87,148. In contrast to McDaniel, the GSBCA in BGK noted that the Tax-Adjustment Clause at issue was unqualified, and the ordinance expressly imposed a property tax.

Here, the plain language of the parties' Lease for the City Crescent Building similarly obligates the GSA to pay for increases in "real estate taxes." As in BGK, the GSA's obligation is not qualified or otherwise defined in a manner that would narrow the scope of the GSA's liability for increases in "real estate taxes." The GSA's October 15, 2002 letter erroneously asserts that the GSA is only liable for "general real estate taxes." SOF at ¶ 23, Appendix at 63 (GSA's October 15, 2002 Letter). The GSA's position is contrary to the Lease's plain language.

In addition, as with the Downtown Service District established in BGK, the City of Baltimore established a Management District and imposed a "supplemental annual property tax," an additional real estate tax on the properties located in the District, including the City Crescent Building. Contrary to the defendant's suggestion, there is no "special assessment" at issue in the present case. Rather, Baltimore imposed a "supplemental annual property tax." Baltimore City Code Art. 14 § 1-10(a). The plain language of the Lease's Tax-Adjustment Clause obligates the GSA to pay its share of additional rent for this real estate tax.

2. The Wright Runstad decision is inapposite because it involves an explicit "special assessment" levied against the leased property to pay for a specific capital improvement.

The only other case interpreting the scope of the GSA's liability under the Tax-Adjustment Clause, GSAR 552.270-24, Wright Runstad Properties Limited Partnership v. United States, 40 Fed. Cl. 820 (1998), is factually inapposite, and its reasoning

dictates that the GSA must pay the supplemental annual property tax in this case. In Wright Runstad, the GSA's ten-year lease for a commercial office building in Seattle, Washington included the same tax-adjustment clause that is at issue in the present case. Based upon a markedly different set of facts, the Court held that the GSA was not liable for a one-time special assessment levied against the leased property for a specific improvement, the construction of a downtown bus tunnel to alleviate traffic congestion. Id. at 821.

The Wright Runstad case is the polar opposite of the present dispute, and the Court's reasoning dictates that CCLP must prevail. The lessor in that case attempted to argue that the express "special assessment" made by Seattle was actually a "real estate tax in disguise." Id. at 826. Rejecting this attempt to shoehorn an express "special assessment" into the lease's tax-adjustment clause, the Court observed that the disputed "special assessment" exemplified the definition of that term: (i) the assessment was a one-time charge for a specific tunnel project; (ii) the assessment did not fund general governmental services; (iii) the assessment was levied only against the properties specially benefited by the tunnel; and (iv) the assessment's amount was calculated to be commensurate with the benefit to each individual property. See id. This special assessment was accomplished by singling out properties that would be specially benefited by an increase in property values arising from the tunnel construction and calculating the charge for each property based upon an individualized determination of the amount of the special benefit. Id. at 822. The one-time charge levied against the property in Wright Runstad, for example, was $3,451,198, paid in installments of $230,521.08 over fifteen years. Id. Finally, the Court found no evidence

that the tunnel's useful life expectancy would expire before the end of the GSA's ten-year lease. Id.

The "special assessment" in Wright Runstad differs in kind from the "supplemental annual property tax" imposed by Baltimore. The "supplemental annual property tax" at issue in this case is an annual charge levied on an *ad valorem* basis in the same manner as other real estate taxes. Baltimore City Code Art. 14 § 1-10. In addition, Baltimore's "supplemental annual property tax" is not linked to any specific government improvement, service, or benefit to any individual property. Id.; see also SOF at ¶¶ 9-12. Further, the purpose of the supplemental annual property tax is to fund general government services, not a specific construction project that will benefit the property owner long after the lease's expiration. In fact, elsewhere in the same Baltimore ordinance is a mechanism for Baltimore to charge property owners for specific projects similar to the tunnel construction at issue in Wright Runstad. See Baltimore City Code Art. 14 § 1-11(a)(2). Thus, taken together, BGK and Wright Runstad present a clear juxtaposition of compensable taxes and non-compensable special assessments. In this case, CCLP is entitled to a tax adjustment for the real estate tax imposed by Baltimore in the form of a supplemental annual property tax.

B. The GSA's initial interpretation of the Tax-Adjustment Clause confirms its obligation to pay the supplemental annual property tax.

CCLP must also prevail because the GSA originally acknowledged its liability for the supplemental annual property tax. For seven years, the GSA correctly interpreted the Lease's Tax-Adjustment Clause and paid the supplemental annual property tax pursuant to GSAR 552.270-24. In interpreting contracts, courts give great weight to the parties' contemporaneous interpretation of their contractual obligations. See, e.g.,

Blinderman Constr. Co., Inc. v. United States, 695 F.2d 552, 558 (Fed. Cir. 1982). According to the Restatement of Contracts, one party's contemporaneous interpretation is particularly instructive when it has had repeat occasions for performance:

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

Restatement (Second) of Contracts § 202(4).

Nor can one party disclaim its prior interpretation or performance of a contract merely by asserting that it had made a "mistake." Alvin, Ltd. v. United States Postal Service, 816 F.2d 1562, 1566 (Fed. Cir. 1987). In Alvin, a case cited in the defendant's brief, the tax-escalation clause limited the Postal Service's obligation to "general real estate taxes" and specifically disclaimed any obligation for the Postal Service to pay "special assessments." Id. at 1563. After the California Constitution was amended to cap the amount of general property taxes, a locality began utilizing special assessments to fund governmental services. The Postal Service continued to pay certain assessments before ultimately changing its position and asserting that the payments were a "mistake." In affirming the Postal Service's obligation to continue to pay these assessments, the Federal Circuit determined that the contemporaneous evidence of the Postal Service's payments confirmed the parties' original understanding of their bargain. See id. at 1566.

In the present case, the undisputed facts reveal a clear picture of both the GSA's correct initial interpretation and the faulty reasons for its subsequent erroneous change of position. For seven consecutive years during the original Lease term, the GSA

acknowledged its understanding of the parties' original bargain by paying a tax adjustment to CCLP that included the supplemental annual property tax. SOF at ¶¶ 13-16. In four of those years, CCLP and the GSA memorialized their annual calculation of the tax increase by jointly executing a written Real Estate Tax Escalation Analysis, which was signed by the Contracting Officer. SOF at ¶ 14, Appendix at 44 (Tax Escalation Analyses for 1995/1996, 1996/1997, 1999/2000, and 2000/2001). On another occasion, the GSA and CCLP executed a formal change to the Lease to provide for the requisite tax adjustment, which accounted for the supplemental annual property tax. SOF at ¶ 15, Appendix at 50 (Supplemental Lease Agreement No. 18 for the 1997/1998 Tax Year). In the other two years, the GSA paid the tax increase after receipt of the tax bills from CCLP without any complaint, again accounting for the supplemental annual property tax. SOF at ¶ 16, Appendix at 25 (Tax Bills Submitted to the GSA for 1998/1999 and 2001/2002).

The GSA also reaffirmed its understanding of the nature of the parties' original bargain in 2001, when the parties extended the Lease term another fifteen years through 2018. As with the parties' original bargain, this lease extension was founded upon the parties' then-mutual understanding that the GSA would continue to pay the supplemental annual property tax. CCLP's calculation of the annual rent for the new term was premised upon the GSA's prior payment of the supplemental annual property tax. SOF at ¶ 17. It is also undisputed that the Contracting Officer provided a Lease Status Report to CCLP's lenders on October 15, 2001, related to the Lease extension. Id. at 19, Appendix at 57 (Lease Status Report). In this Lease Status Report, the GSA represented that there were "no circumstances" that would give it a right "to seek an

offset against, take a deduction from or otherwise reduce any payment" to be made to CCLP. Id. at ¶ 20. Thus, in 2001, the parties executed a fifteen-year Lease extension that was premised upon their mutual understanding of the GSA's liability for the supplemental annual property tax.

Finally, as was the case in BGK, the GSA's abrupt policy reversal in 2002 was based upon a misreading of both the Lease's Tax Adjustment Clause and the plain language of the Baltimore ordinance that established the supplemental annual property tax. The GSA notified CCLP that it would no longer pay the supplemental annual property tax in a letter dated October 15, 2002. SOF at ¶ 23, Appendix at 62 (GSA's October 15, 2002 Letter). In this letter, the GSA refers to the "supplemental annual property tax" as a "District Surcharge," and asserts that only a "general real estate tax" is compensable under the Tax-Adjustment Clause. Id.

Nowhere in the ordinance, however, is the "supplemental annual property tax" referred to as a "District Surcharge," and nowhere in the Lease is the Tax-Adjustment Clause limited to "general" real estate taxes. Thus, the GSA's change of policy in 2002 was premised upon language that may have been utilized in other GSA leases, see, e.g., McDaniel, or in tax ordinances from other jurisdictions, but the GSA's position is not supported by the plain language of CCLP's Lease or Baltimore's tax ordinance. The GSA must be held accountable for its tax obligations under the parties' original bargain, which includes its payment of Baltimore's supplemental annual property tax.

## II. The GSA Is Precluded By Waiver and Estoppel from Changing its Interpretation of the Lease's Tax Adjustment Clause.

The actions taken by the GSA in paying the supplemental annual property tax between 1995 and 2002 also independently bind the defendant under the doctrines of

waiver and estoppel. When the Government is acting in a contractual capacity, it is estopped from denying the binding effect of an action taken by its duly authorized representative. See, e.g., Roberts v. United States, 174 Ct. Cl. 940, 952-53 (1966); Branch Banking & Trust Co. v. United States, 120 Ct. Cl. 72, 87-88 (1951); but see Kimco Realty v. United States, 51 Fed. Cl. 257, 264 (2001) (stating that the government has a common law right to recoup erroneously paid taxes without analyzing estoppel or effect of contractor's reliance); Wright Runstad, 40 Fed. Cl. at 827 (same).

Unlike Kimco and Wright Runstad, the present case involves an abrupt change in the GSA's interpretation of the Tax Adjustment Clause after seven years, a change that the GSA implemented only after CCLP renewed the Lease in reliance on the parties' original interpretation. In June 2001, the parties renewed the Lease, agreeing upon an new amount of annual rent and extending the term for an additional fifteen-year period from March 31, 2003, through March 30, 2018. SOF at ¶¶ 2, 17, Appendix at 16 (Supplemental Lease Agreement No. 23). The parties specifically addressed the scope of future tax adjustments, carving out a narrow exemption from liability for tax adjustments arising between March 31, 2003, through March 30, 2004. Appendix at 16. The GSA sought no additional agreements related to the supplemental annual property tax or future tax adjustments. Thus, when the parties extended the Lease, the GSA had been paying CCLP for the supplemental annual property tax in accordance with the Tax-Adjustment Clause, and CCLP had no reason to believe that the GSA intended to change its position.

The GSA's liability for the supplemental annual property tax was part of the parties' bargain when they renewed the Lease and agreed upon a new annual rent.

This conclusion is bolstered by the GSA's Lease Status Report to CCLP's lenders, dated October 15, 2001, in which the Contracting Officer represented that there were "no circumstances" that would give the GSA a right "to seek an offset against, take a deduction from or otherwise reduce any payment" to be made to CCLP. SOF at ¶ 20, Appendix at 57 (Lease Status Report).

The present case does not involve a mere alleged accounting error by the GSA that would give rise to grounds for recoupment of the alleged overpayment. Rather, the GSA's new interpretation of the Tax-Adjustment Clause—expressed for the first time after the parties renewed the Lease through 2018—altered the nature of the parties' bargain. This case is analogous to Litton Systems, Inc. v. United States, where the plaintiff relied upon the government's approval of its cost accounting method in entering into several contracts with the Government and then later was notified that a new accounting method would be required. 196 Ct. Cl. 133,148-149 (1971). The Court of Claims held that the Government's newly-imposed accounting method could not be applied retroactively to contracts already in existence because of the contractor's reliance on the previously-accepted method in pricing the work. See id. Here, the result should be same. The GSA's initial interpretation of the Tax-Adjustment Clause was in force when the parties renewed the Lease, and CCLP relied upon the GSA's interpretation in extending the Lease term and agreeing upon the amount of annual rent for the new term. The GSA, a lessee, must not be permitted to induce the reliance of CCLP, a lessor, upon one premise—the lessee's payment of a tax—and then unilaterally alter that premise after the parties have negotiated a new annual rent and an extended term based upon their prior mutual understanding.

## CONCLUSION

The plain language of the Tax-Adjustment Clause in the parties' Lease entitles CCLP to judgment as a matter of law on its claim that the GSA is liable for tax increases due to Baltimore's supplemental annual property tax. The Lease's plain language should be construed in accordance with the parties' original interpretation, and the defendant has waived (or is otherwise precluded by estoppel) from altering the parties' original bargain because it executed a fifteen-year Lease extension that was premised upon the GSA's payment of the supplemental annual property tax. The GSA has opted to lease a building that has a prime location, downtown Baltimore, and it must bear the associated tax consequences under the parties' Lease.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests to be heard in oral argument regarding its Cross-Motion.

**PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF QUESTIONS INVOLVED**

1. Whether the defendant has erroneously characterized the supplemental annual property tax as a "special assessment" in contravention of established precedent and legislative intent, in order to avoid its obligation to pay real estate tax increases under the plain language of the parties' Lease.

**SUMMARY OF ARGUMENT**

The defendant's cross-motion for summary judgment lacks merit because its argument runs contrary to the plain language of both the Lease and the "supplemental annual property tax" ordinance enacted by Baltimore. The GSA chose to lease a building in an ideal location—downtown Baltimore—but the defendant now seeks to avoid the tax consequences of this decision by unilaterally attempting to rewrite both the Tax-Adjustment Clause and the supplemental annual property tax ordinance. The defendant's argument is a straw-man: it reads into the Lease a ban on payments for "special assessments" and then refers to Baltimore's supplemental annual property tax as a "special assessment" in contravention of legislative intent.

The unambiguous plain language of Baltimore's "supplemental annual property tax" ordinance must be enforced, as it is the best evidence of legislative intent. Baltimore City Code Art. 14. § 1-10(a). The sharp distinction drawn in the defendant's motion between a "tax" and a "special assessment" is fatal to its argument because the Baltimore City Council explicitly enacted a "supplemental annual property tax" on the District, not a "special assessment." Id. This legislative intent to enact a tax rather than a special assessment—manifested by the plain language of Article 14, § 1-10—is

further evident from an examination of the statutory scheme as a whole. In contrast to the separate provision that allows the Authority to assess charges on District property owners for specific services or benefits to their property, see Art. 14 § 1-11, the supplemental annual property tax is levied against all properties in the same manner as an additional *ad valorem* real estate tax. See, e.g., Art. 14 §§ 1-10(b), 1-15(d),(e).

Finally, the cases relied upon by the defendant undercut its argument because these cases involve express "special assessments" imposed by localities as one-time charges for specific capital improvement projects, such as sewer systems, waterways, road construction, and other discrete projects. The conclusion that Baltimore's supplemental annual property tax is not a "special assessment" is crystallized by the juxtaposition of the defendant's cases with the facts of the present dispute, which involves an express annual tax imposed by Baltimore on all properties within the District in order to fund traditional governmental services for the general public. Thus, CCLP's claim under the Lease's Tax-Adjustment Clause is supported by the plain language of the "supplemental annual property tax" provision, the operation of the ordinance as a whole, and the body of case law related to special assessments.

## ARGUMENT

### I. As Evidenced by the Plain Language of Baltimore City Code Article 14 § 1-10, the Supplemental Annual Property Tax Is a Real Estate Tax, Not a Special Assessment, and Must Be Paid by the GSA under the Lease's Tax-Adjustment Clause.

Contrary to the defendant's argument, the "supplemental annual property tax" imposed by Baltimore is, as a matter of law, a "real estate tax," and not a "special assessment." The parties' Lease is a contract governed by federal law, and there is no need to resort to Maryland law (as the defendant suggests) to define the terms "tax" and

"special assessment." While the defendant notes that this Court examined Maryland law to define a "special assessment" in Summerfield, the lease at issue in that case specifically obligated the lessor to pay all "special assessments" without defining that term. Summerfield Housing Ltd. Partnership v. United States, 42 Fed. Cl. 160, 168 (1998). Here, Maryland's definition of a "special assessment" is irrelevant because neither the parties' Lease nor the relevant statute utilizes that term. Rather, the Lease obligates the GSA to pay its share of increases in "real estate taxes," and the relevant Baltimore ordinance—Article 14, § 1-10(a)—imposes a "supplemental annual property tax" that is applicable to the City Crescent Building.

Nevertheless, under both federal law and Maryland law, the defendant's erroneous characterization of Baltimore's "supplemental annual property tax" as a "special assessment" violates established principles of statutory construction. The cardinal rule of statutory construction is to ascertain and effectuate the intention of the legislature. See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); accord Maryland Div. of Labor and Indus.v. Triangle Gen. Contractors, Inc., 784 A.2d 534, 541-42 (Md. 2001); Rome v. Lowenthal, 428 A.2d 75, 79 (Md. 1981); State Dep't. of Assessments and Taxation v. Glick, 422 A.2d 34, 37-38 (Md. Ct. App. 1980). A statute's plain language is ordinarily the best evidence of legislative intent. See id. Here, the plain language of Art. 14, § 1-10 indicates that Baltimore's City Council enacted a "supplemental annual property tax," which it also defined using the shorthand term, "Supplemental Tax." Id.

This case is similar to BGK, where the GSBCA enforced the plain language of the City of Norfolk's ordinance imposing an "additional tax on taxable real property,"

which was utilized to fund a downtown service district. BGK Main Street Operating Assocs., Ltd. P'ship, Inc. v. General Services Administration, GSBCA No. 16238, 04-2 BCA ¶ 32,658, 2004 WL 1352894 (2004). The GSBCA relied upon the plain language of the ordinance in holding that this tax was a "real estate tax" rather than a "special assessment" for the purposes of the lease's tax adjustment clause. Id. This case also presents the flip-side of the Wright Runstad decision, where the plaintiff unsuccessfully argued that an express "special assessment" for a tunnel construction project should be treated as a "real estate tax in disguise" under the lease's tax-adjustment clause. 40 Fed. Cl. at 821. Just as the Court rejected the plaintiff's attempt to transform an express special assessment into a tax in Wright Runstad, this Court should reject the defendant's erroneous argument, which attempts to portray an express supplemental tax as a special assessment in disguise.

## II. The Defendant's Acknowledgement that a "Property Tax" Differs from a "Special Assessment" Undermines Its Attempt to Avoid the Import of the Precise Language of Baltimore's Supplemental Annual Property Tax Ordinance.

The defendant's argument is internally inconsistent because the defendant goes to great lengths to distinguish a "real estate tax" from a "special assessment" while ignoring the precise statutory language enacted by the Baltimore City Council. Here, Baltimore enacted a "supplemental annual property tax" in Article 14, § 1-10(a) of the City Code. Baltimore did not enact a "special assessment" or a "special benefit district surcharge," as the defendant suggests. Neither of these terms is utilized in the tax ordinance, Article 14, Section 1.

Where a statute utilizes one term-of-art with a precise meaning instead of another term-of-art, this evidence of legislative intent must be effectuated. See, e.g.,

Gozlon-Peretz v. United States, 498 U.S. 395, 409 (1991); C C Distributors, Inc. v. United States, 38 Fed. Cl. 771, 778; accord Triangle Gen. Contractors, 784 A.2d at 543; Lowenthal, 428 A.2d at 79-80; Glick, 422 A.2d at 38-39. Separate terms-of-art with distinct meanings should not be utilized interchangeably, and statutes must not be judicially rewritten in order to substitute or "read in" terms or limitations that were not enacted by the legislature. See, e.g., Aetna Casualty and Surety Co. v. United States, 228 Ct. Cl. 146, 156-157, 158-160 (1981); Stellacom, Inc. v. United States, 24 Cl. Ct. 213, 218-19 (1991); accord Lowenthal, 428 A.2d at 79-80; Glick, 422 A.2d at 38-39.

Here, the Baltimore City Council could have chosen to enact a "special assessment," as was the case in the decisions cited by the defendant (discussed infra in Section IV). But the plain language of Baltimore's ordinance reveals that the City instead enacted an annual property tax. This tax is utilized to supplement traditional governmental services. Given the defendant's contention that "real estate taxes" differ from "special assessments," it is not credible for the defendant to suggest that Baltimore intended to levy a "special assessment" when the plain language indicates otherwise.

**III. The Baltimore Ordinance, Read as a Whole, Confirms the Legislative Intent to Enact a Property Tax Rather than a Special Assessment.**

The defendant's argument also fails to properly account for other provisions within the same statutory scheme, which further indicate the legislative intent to implement an additional property tax rather than a mere special assessment. By misconstruing the supplemental annual property tax as a special assessment, the defendant ignores a separate provision within the same ordinance—Article 14, § 1—that expressly allows the Authority to assess additional charges against property owners for specific benefits to their property. See Baltimore City Code Art. 14, § 1-11. In addition,

the defendant's interpretation does not properly account for other provisions of the ordinance which confirm that the supplemental annual property tax actually operates as a tax.

The defendant's misinterpretation of the supplemental annual property tax provision in Section 1-10 of Article 14 would render this provision duplicative of a separate provision within the same ordinance that gives the Authority a mechanism to make special assessments. Compare Baltimore City Code Art. 14 § 1-10(a) with id. at § 1-11. This separate provision— entitled, "Other Charges"—provides that "the Authority may impose charges and fees for any special services requested by and performed for 1 or more property owners." Id. at § 1-11(a)(2). The additional charges provided for in Section 1-11(a) are necessary because individual property owners within the District are promised no specific services or benefits in exchange for the supplemental annual property tax. Id.; accord Appendix at 90-91 (Fowler Affidavit). On the contrary, any benefits provided by the Authority run to the general public. Id. The supplemental annual property tax is used to fund these general governmental services. See Baltimore City Code Art. 14 §§ 1-10(a), 1-11(a)(1); accord Appendix at 90-91 (Fowler Affidavit). Thus, in the event that a special service is performed for one or more property owner within the District, a special assessment is made under Article 14 § 1-11(a)(2) to fund the improvement. See Baltimore City Code Art. 14 § 1-11.

The defendant's flawed statutory interpretation is further undermined by the operation of Baltimore's "supplemental annual property tax," i.e., the manner in which this property tax is assessed, collected, and enforced. The supplemental annual property tax has all of the characteristics of any other real estate tax. The

"supplemental annual property tax" is issued in conjunction with the City and State Tax, and it is similarly calculated on an *ad valorem* basis, i.e., multiplying the property value by the tax rate. Baltimore City Code Art. 14 § 1-10(b), § 1-15(d). The statute is subject to the same enforcement mechanisms as the other property taxes, id. at § 1-10(b)(2), and the rules pertaining to penalties and interest on delinquent property taxes apply to the supplemental annual property tax. Id. at § 1-15(e). In sum, the ordinance, read as a whole, provides further evidence that Baltimore intended for the supplemental annual property tax to be another real estate tax, not a special assessment.

## IV. The Cases Cited by the Defendant Underscore the Importance of Giving Effect to the Precise Statutory Language in Distinguishing Taxes from Special Assessments.

The cases cited in the defendant's brief are largely irrelevant to the present dispute because they do not address the GSA's liability for a property tax under the Lease's Tax-Adjustment Clause applicable to "real estate taxes." If anything, the defendant's cases further elucidate the distinction between the "property tax" at issue in this case and a "special assessment."

The defendant acknowledges that a "special assessment" is typically utilized to fund a specific improvement, whereas a "tax" is typically utilized for the benefit of the public within the taxing district. Def. Mem. at 13 (quoting Illinois Cent. R. Co. v. City of Decatur, 147 U.S. at 197-98 and Blacks Law Dictionary, 112 (7th Ed. 1999)). Keeping with this distinction, the cases cited by the defendant where a lease's tax-adjustment clause did not cover payment of special assessments are distinguishable on two grounds: (i) these cases involve express enactments of "special assessments," and not "property taxes;" and (ii) these cases involve special assessments that were utilized to fund specific improvement projects for the benefit of a discrete segment of property

owners. See, e.g., Wright Runstad, 40 Fed. Cl. at 821 ("special assessment" for tunnel construction); accord, e.g., Carstens v. McLean, 7 F.2d 322, 323 (9th Cir. 1925) (special assessment for waterway district improvements); G&A Inc. v. Nahra, 514 N.W.2d 255 (Mich. Ct. App. 1994) ("special assessment" to construct off-street parking); Allstate Mgmt. Corp. v. Grand Union Co., 142 A.D.2d 344, 346 (N.Y. App. Div. 1988) ("sewer assessment" for extension project); Walling Warehouse Co. v. Springhill Fuel Co., 562 P.2d 1221, 1222 ("sewer lien assessment"); Thompson v. First National Bank of Hollywood, 321 So.2d 466, 467 (Fla. Dist. Ct. App. 1975) ("special assessment lien" for sewer improvements).

The other cases from the lease context relied upon by the defendant are also distinguishable because they involve a different clause under which the government qualified its tax obligation by agreeing to pay only *general* real estate taxes. See S.S. Silberblatt Inc. v. United States, 888 F.2d 829 (Fed. Cir. 1989) (special assessment not compensable under lease clause that adjusts rent for increases in "general real estate taxes"); McDaniel Bros. Construction Co., GSBCA No. 6973, 84-2 BCA ¶ 17,497 (1984) ("special assessment" for improvements constructed by drainage districts not compensable under lease clause that adjusts rent for increases in "general real estate taxes"). Here, in contrast, the GSA agreed to an unqualified obligation to pay its share of rent arising from real estate tax increases.

The defendant's reliance upon these cases underscores that it cannot prevail without "reading in" a qualification into the Tax-Adjustment Clause that does not exist, i.e., a limitation that the clause only applies to increases in "general real estate taxes." In fact, the GSA's letter announcing its policy change in this case contends that it will

only pay "general real estate tax" increases under the Lease's Tax Adjustment Clause. SOF at ¶ 23, Appendix at 63 (GSA's October 15, 2002 Letter). Similarly, the defendant's motion cites a 1984 memo from the GSA's Leasing Division, which similarly distinguishes general taxes from other taxes, see Def. Motion at 10. While this parol evidence is plainly inadmissible, it in no way supports the defendant's argument. In this case, the parties bargained for the GSA to pay its share of increases in "real estate taxes."

Similarly, the Maryland cases relied upon by the defendant purportedly to define a "special assessment" are of little import because these cases involve express legislative enactments of special assessments. Williams v. Anne Arundel County, 638 A.2d 74, 77 (Md. 1994) (assessment for improvements to and services for jointly-owned community property); V.F.W. v. Montgomery County, 115 A.2d 249, 250 (Md. 1955) ("assessment for street paving"); Sulzer v. Montgomery County, 484 A.2d 285, 286 (Md. 1984) ("special assessment" for parkway construction); Gould v. Mayor of City Council of Baltimore, 59 Md. 378 (1883) ("assessment" for street paving). Nor do any of these cases involve liability for charges under a lease's tax-adjustment clause.

While none of these Maryland cases have a direct bearing on the facts of the present case, the defendant mistakenly places too much emphasis on discrete aspects of the Williams decision that it reads out of context. In Williams, which involved a challenge to Anne Arundel County's unique system of paying for community services within subdivisions, the plaintiffs unsuccessfully argued that the special assessment levied by their subdivision was invalid because it did not serve a public purpose. Id., 638 A.2d at 77. The special assessment in Williams was used to fund improvements

and services for community beach property that was jointly owned by the subdivision's residents, including construction of a pier, outdoor lighting, telephones, as well as private security and maintenance costs and property taxes on the property. Id. at 78-79. It would have been nonsensical to find that the special assessment in Williams was a "tax," as a portion of the assessment was actually utilized to pay taxes on the jointly-owned property. Id.

The defendant relies upon Williams primarily for two propositions, both of which it extends too far. First, the defendant quotes dicta from the Williams court for the proposition that "special assessments 'may be, but are not required to be, based upon ad valorem assessments.'" Def. Motion at 12 (quoting Williams, 638 A.2d at 77, n.4). The court made this observation, however, to *distinguish* special assessments from property taxes, which are subject to the uniformity requirement of Article 15 of the Maryland Declaration of Rights. Williams, 638 A.2d at 77, n.4.

Second, the defendant also argues that Williams stands for the proposition that special assessments may be used to pay for special services as well as capital improvements. The defendant fails to acknowledge, however, that the services and improvements covered by the special assessment were utilized on community-owned property, not public spaces. Id. at 77. The Williams court did not need to address whether the property owners were receiving a specific benefit—they owned the property on which the services were actually performed. Williams involved a different issue that is not present here, whether the funds from the assessment was properly being spent on items that would increase the value of the community property. Id. at 80. Finally, the defendant not only misconstrues Williams, but also relies upon that case in constructing

an argument that is a fallacy: the hasty generalization that because a special assessment was utilized to fund certain services for the community property in Williams, therefore (according to the defendant's faulty reasoning) all services in Maryland must be funded by a special assessment. In sum, Williams has no bearing on the plain intent of Baltimore to levy a supplemental annual property tax on the properties within a district in downtown Baltimore, an area that includes the City Crescent Building.

The other cases cited by the defendant that relate to special benefits districts are similarly inapplicable because they arise outside of the lease context and involve statutes that expressly provide for special assessments—not taxes—to fund the districts. Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1, 657 F.2d 183, 185 (8th Cir. 1981); Zimmerman v. City of Memphis, 67 S.W.3d 798, 799 (Tenn. App. 2001); 2nd Roc-Jersey Assoc. v. Town of Morristown, 731 A.2d 1, 3-4 (N.J. 1999).

Finally, the defendant seems to mistakenly imply that the supplemental annual property tax should be treated as a special assessment per se because it is imposed upon a sub-region of the Baltimore City. As BGK instructs, however, the appropriate analysis is not whether a particular sub-region is affected, but rather whether the municipality is imposing a "tax" or a "special assessment" on that sub-region. See id., 04-2 BCA ¶ 32,658. Just as a municipality may designate a sub-region to be a special-assessment district (as evidenced by several of the cases cited in the defendant's brief), municipalities may also create regional-tax districts that are funded by taxes rather than special assessments. See, e.g., Riverside County Comm. Facilities Dist. No. 87-1 v.

Bainbridge 17, 77 Cal. App. 4th 644 (1999); Kendall v. Douglas, et. al, 820 P.2d 497, 503 (Wash. 1991).

In sum, the defendant's argument ignores the unambiguous language of the parties' Tax-Adjustment Clause and the clear legislative intent evinced by the terms and operation of Baltimore's supplemental annual property tax statute. The defendant instead relies upon cases that involve different contract clauses and different legislative enactments. The defendant, however, cannot escape the inexorable: CCLP's claim under the Lease's Tax-Adjustment Clause is supported by the plain language of the "supplemental annual property tax" provision enacted by Baltimore, the operation of the ordinance as a whole, and the body of case law related to special assessments.

## CONCLUSION

This case can be resolved by reference to the clear intent of the Lease's Tax-Adjustment Clause and the Baltimore tax ordinance, both of which should be construed in accordance with their plain language. The cases cited by the defendant underscore the importance of resolving each tax dispute between a lessor and a lessee in accordance with the intention of the parties and the taxing body. Here, CCLP is entitled to additional rent payments from the GSA for real estate tax increases that are attributable to a supplemental annual property tax enacted by Baltimore. The defendant's argument improperly seeks to transform the supplemental annual property tax into something that it is not, a special assessment, in an attempt to avoid its clear obligation to pay tax increases under the parties' Lease. CCLP respectfully requests that the defendant's cross-motion for summary judgment be denied and that CCLP's Cross-Motion for Summary Judgment be granted.

Dated: March 17, 2006

Respectfully submitted,

City Crescent Limited Partnership

By Counsel

s/Robert G. Watt, Esquire
Robert G. Watt, Esquire
Christopher M. Anzidei, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 (phone)
(703) 893-8029 (fax)