**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CITY CRESCENT LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-580** |
| | ) | **(Judge Wheeler)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF CITY CRESCENT LIMITED PARTNERSHIP'S PROPOSED FINDINGS OF UNCONTROVERTED FACT AND RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56, Plaintiff City Crescent Limited Partnership (CCLP) hereby submits the following Proposed Findings of Uncontroverted Fact in support of its Cross-Motion for Summary Judgment:

1. City Crescent Limited Partnership ("CCLP") entered into Lease Number GS-03B-09074, which bears the date August 31, 1990, for the City Crescent Building located at 10 South Howard Street, Baltimore, Maryland. The original term of the Lease was March 31, 1993 through March 30, 2003. See Appendix at 3, 11 (Warren Affidavit, Attachment A).

2. In June 2001, CCLP and GSA renewed the Lease for a period of fifteen years, extending the term from March 31, 2003, through March 30, 2018. See Appendix at 16 (Warren Affidavit, Attachment B, Supplemental Lease Agreement No. 23).

3. The GSA is the primary tenant of the City Crescent Building, having occupied 97% or more of the building's square-footage since 1993. See Appendix at 3 (Warren Affidavit at ¶ 5).

4. The parties' Lease includes a Tax Adjustment Clause, GSAR 552.270-24 (1985), which provides, in pertinent part:

> (A) The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year). * * *
>
> (B) The Government's share of the tax increase will be based on the ratio of the square feet occupied by the Government to the total rentable square feet in the building. * * *

Appendix at 13 (Warren Affidavit at Attachment A, Lease, Section C, ¶ 3.4). A complete copy of the Lease, including Supplemental Lease Amendment Nos. 1 through 28, is attached to the Plaintiff's Complaint. For the Court's convenience, the relevant pages have been reproduced in the Appendix at Exhibit 1, Attachment A.

5. In 1992, the Baltimore City Council increased real estate taxes within the downtown area in which the City Crescent Building is located by enacting Ordinance No. 92-057, which was approved by the Mayor on June 29, 1992, and codified at Article 14, § 1 of the Baltimore City Code. See Baltimore City Code Art. 14 §§ 1-1 through 1-21 (2006), attached as Appendix at 94 to 120.

6. This statute authorizes the creation of a business district known as the "Downtown Management District" ("the District") to be overseen by the "Downtown Management Authority for Baltimore City" ("the Authority"). Id. at §§ 1-3, 1-4; Appendix at 102-03.

7. Section 1-10 of this statute, entitled "Supplemental Tax," states that "[a] portion of the funding for the operation of the Authority shall be provided by a

supplemental annual property tax, levied on all properties subject to real property taxation. . . ." Id. at § 1-10(a); Appendix at 109.

8. The annual tax bills for the City Crescent Building include three categories of real estate taxes—State, City, and the supplemental annual property tax—all of which are calculated by multiplying the City Crescent Building's assessed value by the applicable tax rate. See Appendix at 4, 7 (Warren Affidavit at ¶ 8, 19, Attachments C, I); accord Appendix at 110 (Baltimore City Code Art. 14, § 1-10(b)); Appendix at 91 (Fowler Affidavit at ¶ 8).

9. The supplemental annual property tax is utilized to fund governmental services for the general public in downtown Baltimore. In accordance with its statutory mission, the DMA promotes and markets the downtown area, provides supplementary security and maintenance services, and provides amenities. See Appendix at 90 (Fowler Affidavit at ¶ 5).

10. The purpose of the DMA is to supplement and augment traditional public services, and the DMA's services are virtually identical to services provided by governmental agencies, including traditional "Clean and Safe" services. These services are provided to all of the downtown area for the benefit of the general public. See Appendix at 90 (Fowler Affidavit at ¶ 5).

11. The DMA's services are necessary due to the increased needs of a downtown area for general government services that make the downtown clean and safe for the general public. Individual property owners receive no specific services or benefits in exchange for the supplemental annual property tax, and

any benefits provided by the Authority run to the general public. Appendix at 90-91 (Fowler Affidavit at ¶¶ 5-6, 9).

12. Baltimore's supplemental annual property tax is not utilized to finance specific services or capital improvements that would benefit one or more property owners. Appendix at 90-91 (Fowler Affidavit at ¶¶ 6, 9). Any such projects would be funded through the assessment of a special charge made under a separate provision of Article 14 § 1-11(a)(2), which empowers the Authority to "impose charges and fees for any special services requested by and performed for 1 or more property owners." Appendix at 110. The City Crescent Building has received no special benefits in exchange for its supplemental annual property taxes. Appendix at 3-4 (Warren Affidavit at ¶ 7).

13. For the taxable years running from 1995/1996 through 2001/2002, CCLP submitted to the GSA its tax bills for the City Crescent Building, which included the State of Maryland tax ("State Tax"), the City of Baltimore tax ("City Tax"), and the supplemental annual property tax. In each of these years, CCLP's calculation of the additional rent due under the Tax-Adjustment Clause included the supplemental annual property tax. In each of these years, the GSA paid additional rent to CCLP pursuant to CCLP's calculation of the amount due under the Tax-Adjustment Clause, which included the supplemental annual property tax. <u>See</u> Appendix at 4, 25 (Warren Affidavit at ¶ 8, Attachment C).

14. In four of these years, CCLP and the GSA's Contracting Officer memorialized the annual calculation of the additional rent due under the Tax-Adjustment Clause by jointly executing a written "Real Estate Tax Escalation

Analysis." See Appendix at 4, 44 (Warren Affidavit at ¶ 9, Attachment D, Tax Escalation Analyses for 1995/1996, 1996/1997, 1999/2000, and 2000/2001).

15. The GSA and CCLP memorialized the 1997/1998 real estate tax increase as a formal change to the Lease documents. See Appendix at 4, 50 (Warren Affidavit at ¶ 10, Attachment E, Supplemental Lease Agreement No. 18 for the 1997/1998 Tax Year).

16. With respect to the 1998/1999 tax bill and the 2001/2002 tax bill, the GSA paid the tax increase after receipt of the tax bills from CCLP. See Appendix at 5, 25 (Warren Affidavit at ¶ 11, Attachment C, Tax Bills Submitted to the GSA for 1998/1999 and 2001/2002).

17. In June 2001, CCLP and GSA renewed the Lease for a period of fifteen years, extending the term from March 31, 2003, through March 30, 2018. See supra SOF at ¶ 2. When CCLP and GSA renewed the Lease in 2001, CCLP's calculation of the annual rent to be paid by the GSA was premised upon the GSA's payment of the supplemental annual property tax. See Appendix at 5 (Warren Affidavit at ¶ 13).

18. The Lease extension provides that "the real estate tax base remains unchanged." See Appendix at 14 (Attachment B to Warren Affidavit, Supplemental Lease Agreement No. 23). The parties also explicitly addressed future tax adjustments, agreeing that "there shall be no operating or real estate tax adjustment paid by the Government at the beginning of the 11th year, March 31, 2003, of the lease, in recognition of the increased rent rate." Id. at 17.

19. As part of this Lease renewal process, on October 15, 2001, GSA's Contracting Officer provided a Lease Status Report to CCLP's lenders, which was a prerequisite to CCLP's ability to obtain long-term financing for the Property. See Appendix at 5, 57 (Warren Affidavit at 14, Attachment F, Lease Status Report dated October 15, 2001).

20. Paragraph 3 of the Lease Status Report, provides, in pertinent part:

> The GSA Lease is currently in full force and effect as against the Government. Neither the Government nor the Partnership are in default under the GSA lease, nor are there conditions that are existing or pending in and of themselves which may ripen into default under the GSA Lease. All duties and obligations of the Partnership with respect to the Project due through the date hereof have been satisfied or waived. There are no circumstances, events or conditions presently in existence that would confer upon the Government the right (i) to seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to the Partnership under the GSA Lease or (ii) to seek to terminate the GSA Lease. . . .The Government has not requested any changes to the Project which would cause a reduction of the non-maintenance portion of the rent.

See Appendix at 5, 59 (Warren Affidavit at ¶ 14, Attachment F, Lease Status Report dated October 15, 2001).

21. In Paragraph 2 of the GSA's Lease Status Report, the Contracting Officer confirmed that the Lease was authorized by the United States and that any required approvals for performance of the Lease had been obtained. See Appendix at 5, 59 (Warren Affidavit at ¶ 14, Attachment F (Lease Status Report at 2).

22. After the GSA provided this Lease Status Report, CCLP's lenders provided long-term financing to CCLP for the Property. CCLP also relied on

GSA's representations in the Lease Status Report that GSA would not seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to CCLP under the Lease. See Appendix at 5, 6 (Warren Affidavit at ¶¶ 12, 15).

23. In a letter dated October 15, 2002, that it would no longer pay tax increases attributable to Baltimore's supplemental annual property tax. In this letter, the GSA contended that this tax must be a "general real estate tax" to be compensable under the Lease's Tax Adjustment Clause. Appendix at 6, 62 (Warren Affidavit at ¶ 16, Attachment G, GSA Letter dated October 15, 2002). The GSA asserted that the supplemental annual property tax was a "District Surcharge" and was not compensable under the Lease. The GSA also asserted that the prior years' tax analyses had been computed incorrectly. See id. The GSA's letter claimed entitlement to reimbursement for $311,522.54 in purported "overpayments" under the Lease, attaching revised Real Estate Tax Escalation Analyses for the previous years. Id.

24. On or about June 1, 2004, the Contracting Officer issued a Final Decision finding that GSA was entitled to a refund of the supplemental annual property tax amounts that had been paid by the GSA throughout the term of the Lease. Appendix at 6, 74 (Warren Affidavit at ¶ 17, Attachment H, Contracting Officer's Final Decision). In the Final Decision, the Contracting Officer asserted that the supplemental annual property tax is a "special assessment" and is therefore not a "real estate tax" compensable pursuant to the terms of the Lease. Id. at 75.

25. The GSA has obtained reimbursement of $311,522.58 of taxes paid to CCLP for the taxable years running from 1995/1996 through 2001/2002. In 2002, the GSA deducted $4,548.70 from its payment of a tax adjustment otherwise due to CCLP for 2002/2003 tax increases. The remaining portion, $306,973.88, was withheld by the GSA through a reduction of $76,743.47 in its rental payments made to CCLP on July 1, 2005, August 1, 2005, September 1, 2005, and October 1, 2005. See Appendix at 6-7 (Warren Affidavit at ¶ 18).

26. Starting with the bill for tax years 2002/2003, the calculation utilized by the GSA to determine its additional rent due under the Tax-Adjustment Clause has not included the supplemental annual property tax levied by Baltimore. See Appendix at 7, 78 (Warren Affidavit at ¶ 19, Attachment I, Tax Bills for 2002/2003 – 2005/2006). The GSA owes $36,655.08 in additional rent for the tax year 2002/2003, $96,400.23 for the tax year 2004/2005, and $49,812.79 for the tax year 2005/2006. In Supplemental Lease Agreement No. 23, the parties agreed that the GSA would not pay any tax adjustments for the period running from March 31, 2003, through March 30, 2004. See Appendix at 7, 16 (Warren Affidavit at ¶ 19, Supplemental Lease Agreement No. 23).

**PLAINTIFF CITY CRESCENT'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56, Plaintiff City Crescent Limited Partnership (CCLP) hereby submits the following Response to Defendant's Proposed Findings of Uncontroverted Fact:

1. Not in dispute. See Plaintiff's SOF at ¶ 1.

2. Not in dispute. See Plaintiff's SOF at ¶¶ 1, 2.

3. Not in dispute. See Plaintiff's SOF at ¶ 4.

4. The first sentence is not in dispute. The second sentence requires clarification. Contrary to the defendant's contention, the Mayor and the City Council of Baltimore established the district and enacted the supplemental annual property tax, and not the Downtown Management Authority. This clarification does not give rise to a factual dispute, as the interpretation of the plain language of the relevant ordinance (attached as Exhibit 2 to Plaintiff's Complaint) is a matter of law for the Court to decide. The third sentence is also subject to statutory interpretation. This sentence is also subject to Plaintiff's clarification regarding the role of the Downtown Partnership of Baltimore ("DPOB"), which is explained in detail in response to Defendant's Proposed Finding No. 7. In sum, the DPOB has entered into contracts with the DMA to administer the performance of certain services provided by the DMA; the DPOB also engages in separate activities on its own that are separate from its contracts with the DMA. See Plaintiff's Appendix at 91 (Fowler Affidavit at ¶ 10).

5. Not in dispute.

6. The defendant is incorrect in asserting that '[t]he Baltimore City Code authorizes the DMA to impose a *surcharge* upon property owners within the *special benefit district*." Baltimore City Code Article 14 § 1-1(f) defines the relevant "District" as the "Downtown Management District established by this subtitle," and Article 14 § 1-10(a) provides for "a supplemental annual property tax," which is defined in the statute as a "Supplemental Tax." Appendix at 100, 109. The term "surcharge" appears nowhere in the relevant statute. The

defendant's incorrect use of the term "surcharge" throughout its brief and proposed findings of fact in reference to the statutory terms, "supplemental annual property tax" or "Supplemental Tax," is not a factual dispute, however, because the interpretation of the plain language of the relevant ordinance, Baltimore City Code Art. 14 § 1-10, is a question of law.

7. The defendant's Proposed Finding No. 7 relies upon materials obtained from the website of the Downtown Partnership of Baltimore ("DPOB"). The defendant's reliance upon these materials is misleading because the DPOB is a distinct entity from the DMA. While the DPOB contracts with the DMA to perform certain services which the DMA is authorized to perform by statute, the DPOB also generates revenue from other outside sources unrelated to the DMA or the supplemental annual property tax. The DMA is authorized by statute to provide enhanced levels of traditional governmental services in the downtown area, some of which are provided through contracts with the DPOB, whereas the DPOB is a non-profit corporation with a broader overall mission. See Plaintiff's Appendix at 91 (Fowler Affidavit at ¶ 10).

The defendant not only ignores the distinction between the activities of the DMA and DPOB, but also the defendant provides a misleading and incomplete summary of the materials cited as its evidentiary support for the range of services provided by the DPOB. The defendant's evidentiary support consists of (i) ten pages from the 2003 Annual Report for the Downtown Partnership of Baltimore, Defendant's Appendix at 49-58; and (ii) one page from a four-page report currently published on the website for the Downtown Partnership of Baltimore,

entitled, "Downtown Partnership Initiatives Focus Area," (http://www.godowntownbaltimore.com/publications/Initiative%20broch.pdf), see Defendant's Appendix at 47. (The copy of this latter report that was served upon the Plaintiff was not legible. Thus, a legible copy is attached as Exhibit 4 to the Plaintiff's Appendix, p. 121 to 125).

To the extent that the Court deems it appropriate to refer to these two documents from the DPOB despite their questionable relevance, the lack of any authentication by the defendant, and the hearsay evidentiary objection, these documents should be read in their entirety in order to avoid any misimpression that may result from the defendant's paraphrased, incomplete recitation of the "improvements and services" performed within the District by the Downtown Partnership of Baltimore.

According to the "Downtown Partnership Initiatives Focus Area" Report, the DPOB's public safety initiatives include:

- Public Safety Guides;
- On-Call Escort Service;
- Video Camera Patrol Network;
- Public Safety Coalition;
- Personal Safety Training;
- Property Security Evaluations;
- Street Smart Awareness Campaign;
- Panhandling Interaction;
- Homeless Outreach.

Plaintiff's Appendix at 125.

According to the "Downtown Partnership Initiatives Focus Area" Report, the DPOB's initiatives to maintain and beautify the downtown are include:

- Maintenance:
    - Clean Sweep Ambassadors;

- Litter and Graffiti Removal;
- Maintenance Training;
- Homeless Training and Employment;
- Community Service Deployment;

- Beautification:
  - Streetscape Improvement Program;
  - Façade Improvement Program;
  - Landscaping and Maintenance;
  - Pedestrian Wayfinding/Signage System;
  - Open Space Improvements.

Plaintiff’s Appendix at 125.

8. Not in dispute. See Plaintiff’s SOF at ¶¶ 13-16.

9. Not in dispute. See Plaintiff’s SOF at ¶¶ 13-16.

10. Not in dispute. See Plaintiff’s SOF at ¶ 14.

11. Not in Dispute. See Plaintiff’s SOF at ¶¶ 13-16.

12. Not in Dispute. See Plaintiff’s SOF at ¶ 23.

13. Paragraph No. 13 unused by the defendant and/or missing from its Proposed Findings of Fact provided to the Plaintiff.

14. Paragraph No. 14 unused by the defendant and/or missing from its Proposed Findings of Fact provided to the Plaintiff.

15. Not in Dispute. See Plaintiff’s SOF at ¶ 24.

March 17, 2006

Respectfully submitted,

City Crescent Limited Partnership
By Counsel

s/Robert G. Watt, Esquire
Robert G. Watt, Esquire
Christopher M. Anzidei, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 (phone)
(703) 893-8029 (fax)