# Exhibit 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CITY CRESCENT LIMITED PARTNERSHIP, Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Case No. 05-580 (Judge Wheeler) |

**<u>AFFIDAVIT OF J. KIRBY FOWLER, JR.</u>**

I, J. Kirby Fowler, Jr., being duly sworn, hereby depose and state as follows:

1. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

2. I currently serve as the President of the Downtown Partnership of Baltimore, Inc. ("DPOB") and I am the Executive Director of the Downtown Management Authority ("DMA").

3. The DMA and the taxing district that it administers (the "Downtown Taxing District") were created in 1992, after action by both the General Assembly of Maryland and the City Council of Baltimore.

4. The boundaries of the Downtown Taxing District are roughly Pratt Street, Jones Falls Expressway, Martin Luther King Boulevard and Centre Street. The property located at 10 South Howard Street (the "Property") is included in the Downtown Taxing District.

5. In accordance with the enabling legislation and Baltimore City Code Art. 14 § 1-4(c), the DMA is authorized to promote or market the Downtown Taxing District, provide supplementary security and maintenance services, and provide amenities. The purpose of the DMA is to supplement and augment traditional public services, and the DMA's services are virtually identical to services provided by governmental agencies, including traditional "Clean and Safe" services. These services are provided to all of the downtown area for the benefit of the general public. The DMA's services are necessary due to the increased needs of a downtown area for general government services that make the downtown clean and safe for the general public.

6. There are no specific services required or provided by the DMA to individual properties or property owners. There is no preference given to specific property owners by the DMA, and the benefits provided by the DMA run to the general public. When specific additional services are requested by property owners, either within or outside of the Downtown Taxing District, they are charged separately for any such services performed.

7. By law, unless otherwise exempt, all real property owners in the DMA are required to pay a supplemental annual property tax ("Supplemental Tax") to fund services provided by the DMA. This Supplemental Tax is in addition to other real property taxes already levied by the City and State. This Supplemental Tax is a fair way to pay for the enhanced downtown governmental services and does not burden taxpayers outside of the downtown area.

8. The Supplemental Tax appears on each property tax owner's tax bill along with the other property taxes imposed by the State of Maryland and Baltimore City. The Supplemental Tax is assessed and collected similar to, and in conjunction with, the State and City taxes. A failure to pay the Supplemental Tax is subject to the same remedies and liens that would result from a failure to pay the State and City property taxes.

9. The DMA and the Supplemental Tax do not fund specific capital improvements or related projects in Baltimore City.

10. The DMA has entered into contracts with the Downtown Partnership of Baltimore ("DPOB") to act as an administrator in overseeing the performance of certain services that are funded by the DMA's Supplemental Tax. The DPOB, however, is a non-profit corporation that operates separately from the DMA and which generates revenues both through its contracts with the DMA and through other efforts of the DPOB acting on its own. Thus, the DPOB provides certain services under its contracts with the DMA, generally involving traditional governmental services necessary to keep public areas clean and safe, and the DPOB provides other services on its own that are funded by its membership dues, grants, sponsorships, and other sources of funding that are not related to the Supplemental Tax.

Further Affiant Sayeth Not.

I declare under penalty of perjury under the laws of the United States of America and the State of Maryland that the foregoing is true and correct to the best of my personal knowledge.

Dated the 8th day of March, 2006.

J. Kirby Fowler, Jr.

On the 8th day of March, 2006, before me personally appeared J. Kirby Fowler, Jr., personally known to me to be the person whose name is subscribed herein.

In witness whereof I hereunto set my hand and official seal.

Notary Public

My commission expires:
11/01/09

# Exhibit 3

# ARTICLE 14
# SPECIAL BENEFITS DISTRICTS

(Current through February 28, 2006)

**Published by**
BALTIMORE CITY DEPARTMENT OF LEGISLATIVE REFERENCE
**Avery Aisenstark, Director**
2006

**Copyright © 2006**
The Mayor and City Council of Baltimore
Department of Legislative Reference
*All rights reserved*

For information or to order – call, write, or fax:

**Department of Legislative Reference**
**626 City Hall**
**Baltimore, Maryland 21202**
**Tel: (410) 396-4730 ☎ Fax: (410) 396-8483**

## TABLE OF SUBTITLES

**Subtitle 1. Downtown Management District**
**Subtitles 2 to 5. *{Reserved}***
**Subtitle 6. Charles Village Community Benefits District**
**Subtitle 7. Midtown Community Benefits District**
**Subtitles 8 to 10. *{Reserved}***
**Subtitle 11. Retail Business Districts**
**Subtitles 12 to 15. *{Reserved}***
**Subtitle 16. Public Safety Conservation Areas**

## TABLE OF SECTIONS


### SUBTITLE 1
### DOWNTOWN MANAGEMENT DISTRICT

§ 1-1. Definitions.
§ 1-2. Findings.
§ 1-3. District created; boundaries.
§ 1-4. Authority created.
§ 1-5. Powers of Authority.
§ 1-6. Limitations on Authority.
§ 1-7. Board of Directors.
§ 1-8. Fiscal affairs.
§ 1-9. Annual Financial Plan.
§ 1-10. Supplemental Tax.
§ 1-11. Other charges.
§ 1-12. Baseline City services.
§ 1-13. Partnerships.
§ 1-14. Vacancy factor.
§ 1-15. Collection and disbursement.
§ 1-16. Long-term debt.
§ 1-17. Administrator.
§ 1-18. Oversight by Board of Estimates.
§ 1-19. Election approval process.
§ 1-20. Renewal and expiration.
§ 1-21. Minority involvement.

### SUBTITLES 2 TO 5
*{RESERVED}*

### SUBTITLE 6
### CHARLES VILLAGE
### COMMUNITY BENEFITS DISTRICT

§ 6-1. Declarations.
§ 6-2. District created; boundaries.
§ 6-3. Authority created.
§ 6-4. Powers of Authority.
§ 6-5. Limitations on Authority.
§ 6-6. Board of Directors.
§ 6-7. Annual Financial Plan.
§ 6-8. Supplemental Tax.
§ 6-9. Other charges.
§ 6-10. Baseline City services.
§ 6-11. Partnerships.
§ 6-12. Collection and disbursement.
§ 6-13. Administrator.
§ 6-14. Oversight by Board of Estimates.
§ 6-15. Election approval process.
§ 6-16. 4-year reviews.
§ 6-17. Dissolution of District.

### SUBTITLE 7
### MIDTOWN COMMUNITY BENEFITS DISTRICT

§ 7-1. Declarations.
§ 7-2. District created; boundaries.
§ 7-3. Authority created.
§ 7-4. Powers and functions of Authority.
§ 7-5. Limitations on Authority.
§ 7-6. Board of Directors.
§ 7-7. Annual Financial Plan.
§ 7-8. Supplemental Tax.
§ 7-9. Other charges.
§ 7-10. Baseline City services.
§ 7-11. Partnerships.
§ 7-12. Collection and disbursement.
§ 7-13. Administrator.
§ 7-14. Oversight by Board of Estimates.
§ 7-15. Election approval process.
§ 7-16. 4-year reviews.
§ 7-17. Dissolution of District.

### SUBTITLES 8 TO 10
*{RESERVED}*

### SUBTITLE 11
### RETAIL BUSINESS DISTRICTS

***Part 1. General Provisions***

§ 11-1. Definitions.
§ 11-2. Legislative intent .
§ 11-3. Establishment of Districts.
§ 11-4. Modifications.
§ 11-5. District license.
§ 11-6. Establishment of fee.
§ 11-7. Collection of fee.
§ 11-8. Transfers and renewals.
§ 11-9. Business Associations.
§ 11-10. Special fund accounts.
§ 11-11. Penalty for nonpayment.
§ 11-12. Appeals Board.
§ 11-13. Appeals procedure.
§ 11-14. Rules and regulations.
§ 11-15. Compliance with other laws.
§§ 11-16 to 11-20. *{Reserved}*

***Part 2. Designated Districts***

§ 11-21. Oldtown Mall.
§ 11-22. Market Center.
§ 11-23. York Road.
§ 11-24. Pimlico.
§ 11-25. Monument Street.
§ 11-26. Highlandtown.
§ 11-27. Hamilton.
§ 11-28. Federal Hill Market Place.
§ 11-29. Pennsylvania Avenue/Lafayette Market.
§ 11-30. Mount Washington.

### SUBTITLES 12 TO 15
*{RESERVED}*

## SUBTITLE 16
## PUBLIC SAFETY CONSERVATION AREAS

§ 16-1. Definitions.
§ 16-2. Program established.
§ 16-3. Advisory Board.
§ 16-4. Rules and regulations.
§ 16-5. Applications for participation.
§ 16-6. Referral to police district.
§ 16-7. Action by Board.
§ 16-8. Operation of Program.

## SUBTITLE 1
## DOWNTOWN MANAGEMENT DISTRICT

### § 1-1. Definitions.

(a) *In general.*

In this subtitle, the following terms have the meanings indicated.

(b) *Administrator.*

"Administrator" means the individual or entity engaged to administer the programs and undertakings of the Authority.

(c) *Authority.*

"Authority" means the Downtown Management Authority established by this subtitle.

(d) *Board.*

"Board" means the Board of Directors of the Authority.

(e) *CBD.*

"CBD" means the downtown or central business district of the City.

(f) *District.*

"District" means the Downtown Management District established by this subtitle.

(g) *Enabling Legislation.*

"Enabling Legislation" means Article II, § (61) of the City Charter.

(h) *Partnership.*

"Partnership" means the Downtown Partnership of Baltimore, Inc.
*(Ord. 92-057.)*

### § 1-2. Findings.

(a) *In general.*

The following findings are critical to the exercise of the authority set forth in Article II, § (61) of the Charter of Baltimore.

(b) *Importance of Downtown.*

(1) The downtown or central business district ("CBD") of the City of Baltimore is the center of employment for the entire metropolitan region and is the source for a very substantial portion of all jobs within the City.

(2) The CBD is also the center for tourism for the entire State of Maryland, having within its boundaries some of the most popular attractions in the country.

(3) The CBD is an important part of the tax base of the City, contributing taxes totally disproportionate to the relative area involved.

(4) The CBD is a vital link to the long-term health of the City and the focus of critical decisions as to the source of employment for the future.

(c) *Problems facing CBD.*

(1) While an undeniable asset to the region, the CBD is very dependent on public perception regarding safety and cleanliness.

(2) Studies conducted by a task force of the Partnership have identified the existence of significant concern among CBD residents and workers of being a victim of crime, despite statistics indicating that the CBD is as safe or safer than other parts of the City.

(3) Because of the high influx of workers and visitors, the CBD is likely to generate higher amounts of trash, litter, and graffiti than other parts of the City.

(4) In order to maintain the CBD as an attractive destination for visitors, there need to be efforts made to improve the perceptions regarding safety and cleanliness.

(5) Traditional sources of funding, enhancing public services, are no longer available, and a variety of financial crises have suggested that future funding from existing sources will become ever more difficult.

(d) *Concept of Special Benefit District.*

(1) A special benefit district is a mechanism by which property owners within a defined area can agree to impose additional taxes and charges on themselves in order to provide enhanced and supplemental public services.

(2) Special benefit districts have been created in numerous cities across the country, and the reports received suggest that they are almost uniformly highly successful in achieving their objectives.

(3) Critical to any special benefit district is the creation of a partnership between the public and private sector, with the public sector committing to maintain services at specified levels and the private sector agreeing to accept new taxes and charges for the purpose of supplementing public services.

(4) A district in this City cannot be successful without the full cooperation of the City, the State of Maryland, and the various private property owners within that district.

(e) *Considerations.*

(1) The Council has considered the materials compiled by the Downtown Partnership of Baltimore, Inc., regarding the alternatives to the creation of a district and the pattern of success for such districts elsewhere.

(2) The Council has considered the comments and suggestions of property owners, retail merchants, hotel and motel operators and owners, property tenants, and workers in the CBD.

(3) The Council finds that a special benefit district of the kind authorized by the Enabling Legislation would be an important and vital element of the long-term health and growth of the CBD, the City, and the region.

(4) Although 1 or more districts would be of great value throughout the CBD, the district created herein will be a significant start towards achieving the goals and objectives outlined above.

(5) Since 1982, the Partnership has been responsible for the management and operation of ever-increasing parts of the CBD, and has demonstrated its ability to deal with the kinds of problems such a district needs to address.

(6) The City should not burden a district with unnecessary layers of administration, nor should the City deny itself the benefit of the experience and expertise acquired by the Partnership.

(7) The Council finds that the existing system of assessments, appeals, and adjustments for vacancies on income-producing properties adequately addresses the concerns raised in the Enabling Legislation.

(8) The Council finds that an assessment system for a district should be uncomplicated, direct, and fair. The system provided for in this subtitle satisfies such criteria.

(9) The Council finds that the district should encourage the involvement of minorities in the operation of the district and in the business community itself.

*(Ord. 92-057.)*

**§ 1-3. District created; boundaries.**

(a) *In general.*

Pursuant to the Enabling Legislation, and within boundaries that are authorized by such laws, there is hereby created a district to be known as the "Downtown Management District", within the boundaries set forth on Exhibit A and Exhibit A-1 to this subtitle (which are part hereof).

(b) *Expansions.*

The District may be expanded (and as so expanded, shall be deemed included within the term "District" as used hereafter), in 1 or more resolutions of this Council, up to, but not beyond, the boundaries authorized in the Enabling Legislation upon a recommendation from the governing board of the Authority created by this subtitle which is endorsed by the Board of Estimates of the City.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-4. Authority created.**

(a) *In general.*

As authorized by the Enabling Legislation, there is hereby created a downtown commercial district management authority to be known as the "Downtown Management Authority for Baltimore City".

(b) *Status.*

The Authority:

(1) shall not be or constitute or be deemed an agency of the City or the State of Maryland;

(2) shall, to the greatest extent allowable by law, be deemed a special taxing district, and therefore a governmental body, both politic and corporate, exercising only such powers as are provided for in this subtitle;

(3) shall not exercise any power specifically withheld by the terms of either the Enabling Legislation or, if more restrictive, this subtitle.

(c) *Interpretation of powers.*

However, the powers of the Authority shall be broadly interpreted in order to allow the Authority to achieve the goals of the Enabling Legislation, including the provision of supplementary security and maintenance services, the promotion and marketing of the District, and the provision of amenities in public areas.

*(Ord. 92-057.)*

**§ 1-5. Powers of Authority.**

Except as limited by the Enabling Legislation and this subtitle, the Authority shall possess the following powers:

(1) to acquire, hold, and use both real and personal property necessary to achieve its purposes, including the acquisition by purchase, lease, use, or other rights;

(2) to make contracts, including contracts to provide services for areas adjoining the District;

(3) to engage the services of an administrator, which may be an individual or an entity, including the Partnership, to administer the programs and undertakings of the Authority;

(4) to sue and be sued, provided that the District, the Authority, and the Administrator shall benefit, to the fullest extent allowable by law, from any provisions of federal, state, and local law limiting the liability of employees, officers, agents, and officials of governmental bodies;

(5) to accept grants;

(6) to borrow funds for purposes consistent with the public purposes of the Authority, provided that unless specific approval is provided by the Board of Estimates no borrowing shall be for a term beyond the date for renewal of the District under § 1-20 of this subtitle;

(7) to adopt an annual budget and impose, charge, and collect the taxes or charges on benefitted properties within the District authorized by the Enabling Legislation and this subtitle; provided, however, that no taxes shall be levied against (i) residential properties with fewer than 4 dwelling units, or (ii)properties which are exempt under state law from ordinary property taxes;

(8) to create and enter into partnerships between the Authority and various property owners otherwise exempt from ordinary property axes, which partnerships may provide for the provision of permitted services and benefits by the Authority in exchange for payments arranged by contract, donation, gift, services in kind, or other mechanism by which funds or benefits are provided to the Authority;

(9) to establish and elect such officers as are not specified in this subtitle and provide for their terms and duties;

(10) to contract for and purchase goods and services, but as provided in the Enabling Legislation, such contracting shall not be subject to Baltimore City requirements regarding wage scales, competitive bidding, or other local procurement laws, but nonetheless shall be subject to applicable ordinances regarding City policy on encouraging and achieving goals for minority and women's business enterprises participation in the contracting activities of the Authority;

(11) to adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle;

(12) to implement the programs and goals of the Authority directly through employees, or through 1 or more contracts, which contracts can be with independent contractors or contract employees;

(13) to assist the leasing, marketing, and promotion activities within the District, to the extent such activities are approved by the governing board of the Authority;

(14) to appoint, hire, or engage such auditors, accountants, attorneys, assistants, aides, employees, and advisors as may be deemed necessary for the proper performance of the duties of said Authority, but consistent with this subtitle; and

(15) to do all other things necessary or convenient to carry out its goals, objectives, and powers. *(Ord. 92-057; Ord. 96-093.)*

**§ 1-6. Limitations on Authority.**

The Authority shall be subject to the following limitations:

(1) The Authority is not permitted to exercise any police or general powers other than those authorized by the Enabling Legislation, State law, or this subtitle;

(2) The Authority may not pledge the full faith and credit of the City;

(3) The Authority shall comply with the requirements of City ordinances and City policies requiring achievement of goals regarding participation of minority and women's business enterprises and shall submit a quarterly report on the status of minority participation in the operation and governance of the Downtown Management District to the President and each member of the City Council;

(4) The Authority shall not extend its life and shall not modify the boundaries of the District except in accordance with this subtitle;

(5) The Authority shall not impose taxes, fees, and assessments in excess of those authorized by this subtitle or those approved by the Board of Estimates of the City or the City Council;

(6) The Authority shall not exercise powers of eminent domain;

(7) In order to adhere to the requirement of the Enabling Legislation that employees of the Authority reside in the City of Baltimore, the Authority shall not hire any new employee that does not voluntarily deliver to the Authority an affidavit certifying that the employee's residence is within the political boundaries of the City of Baltimore and that such employee intends to remain as a resident for the foreseeable future;

(8) Any fees, charges, or taxes collected by the Authority pursuant to this subtitle shall be used only for the purposes set forth in this subtitle and for no other purposes;

(9) Except as otherwise authorized by law, including the Enabling Legislation and this subtitle, and as necessary to exercise the powers provided for herein, the Authority shall not engage in competition with the private sector; and

(10) Notwithstanding any other provisions of this subtitle, unless specifically approved by the Board of Estimates, no borrowing, leasing, contracting, or other agreement or obligation shall be for a term beyond the date for renewal of the District under § 1-20 of this subtitle. *(Ord. 92-057; Ord. 96-093.)*

**§ 1-7. Board of Directors.**

(a) *In general.*

The Authority shall be governed by and administered through a Board of Directors. The Board shall be subject to the following requirements.

(b) *Interim Board.*

(1) The initial interim Board of the Authority shall be those individuals whose names are set forth on the list attached to Ordinance 92-057 as Exhibit B.

(2) As described below, the interim Board shall be primarily responsible for recommending a full Board for the Authority to the Board of Estimates, and is not expected to engage in any other substantive activity.

(c) *Term.*

(1) The initial interim members shall serve as the members of the Board for a period not to exceed 6 months, unless extended by the Board of Estimates, and only until a full Board is approved by the Board of Estimates as provided hereafter.

(2) In the event of resignation, expiration, or other departure from the Board, or removal in accordance with the bylaws of the Authority, of any member of the Board, successors shall be elected by the remaining members of the Board.

(d) *Number and appointment.*

(1) The number of members of the full Board shall be not less than 10, excluding vacancies, and no more than 25.

(2) The interim membership of the Board shall be the 5 individuals listed on Exhibit B. The interim Board, upon approval of the District and the Authority in accordance with § 1-19 of this subtitle, shall propose to the Board of Estimates the initial full membership of the Board and the proposed terms for each director.

(3) Interim Board members may be included in the recommended full Board list.

(4) Such recommendation shall occur within 10 days of approval of the District, and shall be subject to the consent and concurrence of the Board of Estimates.

(5) The Board shall have the full authority to increase or decrease its membership, within the above limits, provided that at all times after approval of the initial full Board by the Board of Estimates, the requirements of this subtitle are adhered to.

(e) *Minimum representation.*

The following minimum representation shall be present on the Board, except during periods of temporary vacancies:

(1) 1 member shall be appointed by the Mayor.

(2) 1 member shall be appointed by the Governor.

(3) 1 member shall be selected by and approved through Resolution of the City Council.

(4) The Administrator shall designate an individual to be on the Board.

(5) At least 1 member shall be appointed by and shall represent each of the following constituent groups within the District:

(i) a trade group recognized by the Board as representing the hotels and motels within the District, which at the time of passage of this subtitle is acknowledged to be the Hotel and Motel Association of Greater Baltimore;

(ii) a trade group recognized by the Board as representing the retail merchants within the Market Center area, which at the time of passage of this subtitle is acknowledged to be the Market Center Association;

(iii) a trade group recognized by the Board as representing the retail merchants within the Charles Street corridor, which at the time of passage of this subtitle is acknowledged to be the Charles Street Association;

(iv) a trade group recognized by the Board as representing the property owners and managers within the District, which at the time of passage of this subtitle is acknowledged to be the Building Owners and Managers Association of Metropolitan Baltimore;

(v) a group recognized by the Board as representing the leaders of major institutional and business interests within the District, which at the time of passage of this subtitle is acknowledged to be the Greater Baltimore Committee;

(vi) a professional trade organization recognized by the Board as representing the users of commercial real estate space within the District. which at the time of passage of this subtitle is acknowledged to be the Greater Baltimore Board of Realtors; and

(vii) in the event that the Partnership is not the Administrator, the Partnership or any successor organization having similar functions and constituent boundaries, as determined by the Board;

provided that each such member of the Board shall also be or represent an owner of property subject to the tax imposed by this subtitle.

(6) At least ⅔ of the Board shall be comprised of owners or representatives of owners of property subject to the tax imposed by this subtitle; provided that members of the Board elected under clauses (1) though (5) above may be included in such group if they otherwise qualify.

(7) The Board shall endeavor to maintain representatives on the Board from the tourist and convention industry, professionals practicing in the District, retail merchants in the District, and tenants of properties in the District; however, no minimum representation applies.

(8) Consistent with the encouragement of partnerships between the Authority and property owners exempt from the tax imposed by this subtitle, the Board should consider representation of such partners within the Board.

(f) *Exercise of Authority powers.*

All powers of the Authority shall be exercised by and through the Board, unless delegated by the Board to 1 or more officers thereof or to the Administrator.

(g) *Bylaws, rules, and regulations.*

(1) The Board my adopt such bylaws, rules, and regulations as it deems necessary in carrying out the powers of the Authority, so long as the same shall not be inconsistent with the terms of this subtitle or of any ordinance amendatory or supplementary hereof or of the Enabling Legislation.

(2) All bylaws shall be subject to the approval of the Board of Estimates.

(3) The Board may establish its own procedures relating to the internal administration of the Authority, except as may be restricted by the Enabling Legislation or this subtitle.

(h) *Officers.*

The Board shall select from among its members, individuals to serve, at the pleasure of the Board, as president, vice-president, treasurer, and secretary of the Authority, delegating to such individuals such responsibilities as the Board deems appropriate.
*(Ord. 92-057; Ord. 04-672.)*

**§ 1-8. Fiscal affairs.**

The fiscal affairs of the Authority shall be conducted in accordance with the following provisions.
*(Ord. 92-057.)*

**§ 1-9. Annual Financial Plan.**

(a) *Board to adopt.*

The Board shall adopt an annual Financial Plan, based on the City's fiscal year, which at the time of the passage of this subtitle is July 1 through June 30, consisting of at least:

(1) a proposed schedule of taxes or charges to be imposed throughout the District;

(2) in the first Financial Plan submitted, a budget for the current fiscal year of the City; and

(3) in Financial Plans for each fiscal year after the year of approval of this subtitle, a budget for the full fiscal year.

(b) *Public hearing.*

Before adopting the Financial Plan, the Board of the Authority shall arrange for a public hearing to be held on the Financial Plan. Such hearing shall not occur any sooner than after notice of such hearing has been published in a newspaper of general circulation in Baltimore City at least once a week for 3 consecutive weeks.

(c) *Board of Estimates approval required.*

(1) The Financial Plan shall be subject to the approval of the Board of Estimates in accordance with the procedures set forth in this subtitle.

(2) The Authority may not approve a Financial Plan that includes taxes or charges in excess of those approved by the Board of Estimates.

(d) *Initial budget.*

(1) The initial budget for the Authority shall include all of the fiscal year ending on June 30, 1993 (the "Initial Fiscal Year"), and may include the costs of preparing the Financial Plan and implementing the Authority and the District, so long as such costs were incurred during that fiscal year.

(2) In the event that the Authority is not implemented as a result of the operation of § 1-19 of this subtitle, neither the Authority nor the District, nor the City, shall have any liability for costs incurred prior to the initiation of operations, whether or not incurred by the Administrator or on behalf of the District or the Authority.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-10. Supplemental Tax.**

(a) *In general.*

A portion of the funding for the operation of the Authority shall be provided by a supplemental annual property tax, levied on all properties subject to real property taxation, unless exempt under this subtitle, the Enabling Legislation, or other applicable laws (the "Supplemental Tax").

(b) *Assessment, collection, enforcement.*

(1) The Supplemental Tax shall be assessed and collected in conjunction with the property taxes assessed and collected by the City (the "Regular Tax"), unless otherwise established by the Board and approved by the Board of Estimates.

(2) Enforcement of the Supplemental Tax shall be in accordance with the enforcement of the Regular Tax, and all provisions applicable to the assessment, collection, enforcement, and refunding of the Regular Tax shall apply to the Supplemental Tax unless modified herein.

(c) *Limitations.*

The Supplemental Tax shall be further subject to the following limitations.

(1) The rate of the Supplemental Tax for the Initial Fiscal Year shall be that amount (the "Initial Base Rate") required to generate $1,700,000 in revenues for a full budget year from properties subject to the Supplemental Tax (the "Initial Base Budget").

(2) For any year after the Initial Fiscal Year, the rate of the Supplemental Tax may be increased to generate revenues equal to the "Adjusted Base Budget", which is the Initial Base Budget plus a cumulative annual increase in the Initial Base Budget equal to 5% of the Initial Base Budget for each year after the Initial Fiscal Year, but shall be subject to the further limitations set forth below:

(i) Any increase in the rate of the Supplemental Tax must be approved by a majority of the Board members that are property owner representatives for purposes of § 1-7(e)(6).

(ii) The rate of the Supplemental Tax shall not at any time exceed the then current equivalent of a limitation on March 1992 of 30¢ per $100 of assessed value. This limitation shall be adjusted for any increases in the cost-of-living, using standards approved by the Board, up to a maximum cost-of-living adjustment of 5% from the prior year. This clause (ii) limitation shall not apply to any portion of the Supplemental Tax imposed to retire obligations ("Approved Debt Service") incurred with the approval of the Board of Estimates under §§ 1-5(6), 1-6(10), and 1-16 of this subtitle.

*(Ord. 92-057; Ord. 96-093.)*

**§ 1-11. Other charges.**

(a) *Property subject to Supplemental Tax.*

(1) Properties within the District subject to the Supplemental Tax shall not be required to pay any other charges or fees for services generally provided within the District by the Authority.

(2) However, the Authority may impose charges and fees for any special services requested by and performed for 1 or more property owners.

(b) *Others.*

The Board of the Authority, with the approval of the Board of Estimates, may establish other fees and charges for specific services performed within the District, within areas adjoining the District, for properties and owners not subject to the Supplemental Tax and in conjunction with partnerships encouraged by this subtitle.
*(Ord. 92-057.)*

**§ 1-12. Baseline City services.**

(a) *Agreement to maintain.*

Prior to imposing and collecting the Supplemental Tax authorized by this subtitle, the Authority shall enter into a memorandum of understanding with the Mayor of the City regarding the level of services to be maintained by the City as the City's partnership obligation to the Authority and the District's taxpayers.

(b) *Scope of agreement.*

(1) Such a memorandum shall:

(i) describe the existing levels of service within the District;

(ii) commit the City to the maintenance of such levels of service; and

(iii) outline the further undertakings of the City in response to the initiative represented by the creation of the District (the "Baseline Plus").

(2) In addition, the City may include in the memorandum a process by which the Authority and the City shall cooperate on a comprehensive sidewalk repair program, which shall include the issuing of notices by the City relating to footways requiring repair, repaving, or regrading, and the arranging for repairs to be made by the Authority, with the enforcement support of City assessments, where appropriate.

(c) *Governing principles.*

The maintenance of existing services shall be governed by 2 principles:

(1) No decrease in such services shall occur except as part of an overall decrease in services necessitated by changes in funding, policy, or resources, and then only in proportion to the decreases implemented elsewhere in the City.

(2) Any increase in such services generally throughout the City shall be matched with increases in such services within the District, in proportion to the increases implemented elsewhere in the City.
*(Ord. 92-057; Ord. 96-093.)*

## § 1-13. Partnerships.

(a) *Authority encouraged to create.*

The Authority is authorized and encouraged to enter into partnerships with the property owners and users within the District and adjoining areas that are not subject to the Supplemental Tax ("Exempt Partners") for the purpose of furthering the broad objectives of improving and enhancing public services throughout the CBD.

(b) *Specific powers.*

In furtherance of that objective, the Authority may:

(1) contract to provide varying levels of services to areas adjoining the District;

(2) agree to accept donations, contributions, and voluntary payments of any kind from Exempt Partners (collectively, "Voluntary Payments"), with or without agreements regarding specific services and functions;

(3) enter into agreements with Exempt Partners to include property owned by those Exempt Partners within the District in return for Voluntary Payments and/or commitments regarding the provision of similar services and functions within properties owned by Exempt Partners; and

(4) establish rates and charges for the provision of services to Exempt Partners.

*(Ord. 92-057; Ord. 04-672.)*

## § 1-14. Vacancy factor.

The Authority is directed to recommend to the Board of Estimates whether some process or automatic adjustment is necessary to reflect the direction of the Enabling Legislation regarding current rates of occupancy in buildings.

*(Ord. 92-057.)*

## § 1-15. Collection and disbursement.

(a) *In general.*

The Authority is authorized and directed to establish with the appropriate City agencies the methods by which the Supplemental Tax is to be assessed, collected, and disbursed to the Authority.

(b) *Funds not part of City revenues.*

Amounts collected by the City on behalf of the Authority:

(1) shall not be included in the revenues of the City;

(2) shall not be deemed subject to the budgetary and appropriation process; and

(3) shall be disbursed promptly upon collection.

(c) *City to bear expense of collection, etc.*

As part of the City's contribution to the District, such collection, assessment, disbursement, record-keeping, and enforcement as may be involved in the process shall not be a charge to or against the Authority or the District but shall be an element of the Baseline Plus.

(d) *Department of Finance authorized to collect.*

(1) The Department of Finance of the City is authorized to collect the Supplemental Tax and such other charges as are approved by the Board of Estimates.

(2) The assessment for the Supplemental Tax may be included with the periodic real property tax bill submitted to the owners of properties within the District.

(3) The Department of Finance shall make regular remittances of the amounts collected to the Board of the Authority.

(e) *Penalties and interest.*

The penalties and interest applicable to delinquent taxes shall be applied to delinquencies in payment of the Supplemental Tax.

(f) *Lien on property.*

(1) The amount of any outstanding assessment on any property, and accrued interest and other charges, shall constitute a lien on the property.

(2) The lien:

(i) shall take precedence over all other liens, whether created prior to or subsequent to the assessment, commensurate with a lien for state and county taxes, general municipal taxes, and prior improvement assessments; and

(ii) shall not be defeated or postponed by any private or judicial sale, by any mortgage, or by any error or mistake in the description of the property or in the names of the owners.

(3) No error in the proceedings of the City or the Board of the Authority shall exempt any property from the lien, or from payment thereof, or from the penalties or interest thereon, as herein provided.

*(Ord. 92-057; Ord. 96-093.)*

## § 1-16. Long-term debt.

(a) *In general.*

Any borrowing by the Authority that is intended to survive beyond the next date for renewal of the District ("Long-Term Debt") is subject to the following conditions.

(b) *Maximum amount.*

(1) The aggregate amount of Long-Term Debt outstanding at any one time may not exceed $2,000,000.

(2) No Financing Plan may be submitted and no Long-Term Debt may be approved if the current and projected payments for the sum of (i) debt service on the Long-Term Debt and (ii) any other debt having a maturity in excess of 1 year, in any year exceed 10% of the revenues of the Authority.

(c) *Required Financing Plan.*

(1) No Long-Term Debt may be issued by the Authority until after a Financing Plan has been presented for review and approval by the Board, the Department of Finance of the City, and the Board of Estimates of the City.

(2) Each Financing Plan shall provide information on:

(i) the use of the proceeds of the Long-Term Debt;

(ii) the anticipated term of the obligations;

(iii) the annual maximum debt service anticipated for the Long-Term Debt; and

(iv) the means by which the Long-Term Debt will be retired if a terminating event described in § 1-20 occurs.

(3) In addition, the Plan shall consider the operation and maintenance costs of any improvements funded with the Long-Term Debt and the means by which those expenses will be paid.

(d) *Public hearing.*

Before submitting a Financing Plan for approval under subsection (c) above, the Authority shall, after notice to all taxpayers in the District, hold a public hearing at which the Plan is presented.

(e) *Limitation on sales.*

No Long-Term Debt may be issued and sold to the general public or to other than institutional investors, lending institutions, and other sophisticated purchasers of debt obligations.

(f) *Capital projects.*

Capital projects for which both City funds and Long-Term Debt proceeds are to be used must be approved in accordance with applicable requirements, including, but not limited to, approval in the Capital Budget and the Ordinance of Estimates.
*(Ord. 96-093.)*

**§ 1-17. Administrator.**

(a) *Initial Administrator.*

The initial Administrator of the Authority shall be the Partnership, unless otherwise determined by the Board.

(b) *Powers of Administrator.*

The Administrator shall have the following powers with regard to the District and the Authority:

(1) The Administrator shall prepare the Financial Plan for review and approval by the Board of the Authority.

(2) The Administrator shall implement the approved Financial Plan and arrange for the collection and disbursement of the Supplemental Tax and all other charges, fees, and revenues of the Authority.

(3) The Administrator shall establish such procedures and processes as are necessary to perform the functions called for under the Financial Plan and the budget.

(4) The Administrator is hereby charged with responsibility for the day-to-day operations of the Board and its employees and contractors.

(5) The Administrator shall be empowered to exercise the powers granted to the Authority under this subtitle, provided that the Board of the Authority shall retain final discretion and power with regard to all substantive agreements, contracts, and other arrangements binding on the Authority.

(6) The Administrator shall hire and retain such employees, agents, and contractors as are needed to perform its functions for the Authority, provided that all such hiring and contracting shall comply with §§ 1-5(10) and 1-6(3) of this subtitle.

(7) The Administrator shall be deemed to be the direct agent of the Authority, such that any immunity afforded to the Authority and its officers, employees, and agents shall be afforded as well to the Administrator.

(8) The Administrator shall have such further rights, powers, and authority as may be granted to it by the Board of the Authority.

(9) Any limitations on the powers and authority of the Authority shall apply as well to the Administrator in performing the functions charged to the Administrator by this subtitle or by the Board of the Authority.

*(Ord. 92-057.)*

**§ 1-18. Oversight by Board of Estimates.**

(a) *In general.*

The Board of Estimates shall have the following powers with regard to the District and the Authority.

(b) *Establishment of full Board.*

The full Board of the Authority proposed by the interim Board in accordance with § 1-7 of this subtitle shall be subject to the approval of the Board of Estimates.

(c) *Financial Plan; rates and charges.*

(1) The Financial Plan and the schedule of rates and charges shall be subject to the approval of the Board of Estimates.

(2) Beginning with the Financial Plan for Fiscal 1994, the Board of the Authority shall submit such materials at least 2 months prior to the proposed effective date of a budget or Supplemental Tax.

(3) In considering a proposed budget and schedule of taxes and charges, the Board of Estimates shall not have the power to exceed or increase either the budget or the schedule of taxes, rates, and charges beyond those proposed by the Authority.

(d) *Occupancy-based adjustments.*

The Board of Estimates shall review and consider any request by the Authority regarding adjustments to reflect existing occupancy of properties. Such adjustments shall be matters of policy and not decisions on specific properties.

(e) *Bylaws.*

The Board of Estimates shall review and approve the initial bylaws of the Authority and any proposed amendments thereto.

(f) *Approval and renewal process.*

The Board of Estimates shall be the final arbiter and decision maker regarding the approval and renewal process for the District specified in this subtitle.

*(Ord. 92-057.)*

**§ 1-19. Election approval process.**

(a) *In general.*

The Authority shall not impose any taxes or charges until the approval process set forth below is completed and certified by the Board of Estimates.

(b) *Assessable Base and Ownership Roll.*

(1) The Board of Estimates shall obtain from the Director of Finance the "Assessable Base" of the District, which shall constitute a listing by property and a calculation of the sum of assessments on properties subject to the Supplemental Tax. The Assessable Base shall provide the total assessable value for purposes of calculating voting percentages by value.

(2) The Board of Estimates shall also obtain from the Director of Finance a list of all properties and their owners, each property thereby counting as 1 vote regardless of the number of owners (the "Ownership Roll"). The Ownership Roll shall be used to determine votes based on the number of property owners.

(3) In the event of dispute or uncertainty, the Board of Estimates shall determine, with finality, the Assessable Base and Ownership Roll upon which the procedures shall be based.

(c) *Notices.*

Notices shall be provided to each property affected by this subtitle regarding the passage of the subtitle and the rights of protest available hereunder.

(d) *Protest period.*

(1) Upon enactment of this subtitle, there shall ensue a 30-day period within which the Board of Estimates is directed to accept notarized petitions of protest (the "Protest Period").

(2) Such petitions shall be on any form which, to the satisfaction of the Board of Estimates, specifies the location of the property, the name of the owner and such additional information as would enable the Director of Finance to certify the current assessment of such property.

(e) *Percentage opposition.*

(1) If within the Protest Period, the Board of Estimates does not receive protests (the "Base Level Protests"), determined to be valid by the Board of Estimates, either

(i) representing property owners owning more than 40% of the Assessable Base, or

(ii) representing the same percentage of property owners from the Ownership Roll,

the Authority shall, at the conclusion of the Protest Period, be certified as approved for operations.

(2) In the event of a dispute as to ownership or representation, the Board shall disregard the protest unless satisfied as to the person properly authorized to act on behalf of the property owner.

(f) *Referendum.*

If protests in excess of the Base Level Protests are received, the Board of Estimates shall establish procedures it deems appropriate for a referendum of property owners within the District, to determine whether property owners of at least 50% of both the Assessable Base and the Ownership Roll are in support of the District. Such a referendum shall be conducted and completed within 30 days after the end of the Protest Period.

*(Ord. 92-057.)*

**§ 1-20. Renewal and expiration.**

(a) *In general.*

The Authority and the District shall be subject to the following provisions regarding renewal and expiration.

(b) *Renewal.*

(1) It is the expectation of the Council that the District will be successful.

(2) No sooner than 4 years and no later than 5 years from the passage of this subtitle, the Council shall hold 1 or more public hearings to evaluate the activities and undertakings of the Authority and the District. At the conclusion of the hearings, the Council shall utilize the procedures described in § 1-19 to determine whether the opposition in excess of the Base Level Protests exists to the continuation of the District.

(3) If such opposition exists, the Board of Estimates shall conduct a referendum comparable to that described in § 1-20 to determine whether the District is to continue for another 5 years.

(4) This process shall be repeated periodically to satisfy the requirements of the Enabling Legislation.

(c) *Expiration.*

(1) If the District and the Authority are not approved through the process described in § 1-19 of this subtitle, or are not renewed as provided above, the Authority shall cease its operations and the District ceases to exist, with the end of the fiscal year of the City in which the terminating event occurs.

(2) The Authority shall continue its existence only so long as is necessary to terminate operations in a reasonable fashion and shall include, as part of the Financing Plan required by § 1-16, a mechanism by which Long-Term Debt can be retired if a terminating event occurs.

(3) If a terminating event occurs, in addition, the Authority shall arrange for the refunding of all funds not needed to satisfy outstanding obligations and reserves for uncertain obligations and liabilities.

*(Ord. 92-057; Ord. 96-093; Ord. 04-672.)*

**§ 1-21. Minority involvement.**

(a) *In general.*

It is the intent of the Council that involvement by minorities in the business community and in the affairs of the District is to be encouraged.

(b) *MBE/WBE goals to apply.*

Accordingly, City policies regarding the achievement of goals for minority and women's business enterprises shall apply to the District and the Authority, and furthermore, the Authority is encouraged to seek means by which greater minority involvement can take place with the District and the larger central business district of the City.

*(Ord. 92-057.)*

## EXHIBIT A
## DISTRICT BOUNDARIES

The Boundaries of the Downtown Management District are:

Beginning at the point of intersection of the center lines of Greene Street and Saratoga Street; then, east along the center line of Saratoga Street to a point of intersection with an alley located immediately west of Howard Street; then north along the center line of said alley to intersect with the center line of Franklin Street; then east along the center line of Franklin Street to intersect with the property line between Lot 4 and Lot 5 of Block 551; then north along that property line continuing across Hamilton Street to intersect with the center line of W. Centre Street; then east on Centre Street to intersect with the center line of I-83; then south and southeast on I-83 to intersect with the center line of the Fallsway; then south on the center line of the Fallsway to a point of intersection with the center line of Pratt Street; then west along the center line of Pratt Street to the center line of Light Street; then south on the center line of Light Street to intersect with the center line of Lee Street; then west on Lee Street to intersect with the center line of Charles Street; then north on Charles Street to intersect with the center fine of Conway Street; then west along the center line of Conway Street to the center line of Sharp Street; then north on the center line of Sharp Street to intersect with the center line of Camden Street; then west along the center line of Camden Street to intersect with the center line of Greene Street; then north along the center line of Greene Street to the point of beginning.

## EXHIBIT A-1
## ADJACENT AREA

Adjacent Area A-1 is hereby defined as that area bounded generally by Franklin Street to the south, Eutaw Street to the west, Martin Luther King, Jr. Boulevard and Read Street to the north. and Park Avenue to the east. As of January 1, 1993, the Downtown Management District shall be automatically expanded to encompass and include adjacent Area A-1

**EXHIBIT B**
**MEMBERS OF INITIAL INTERIM BOARD**

H. Grant Hathaway
Milt Rosenbaum
Laurie B. Schwartz
Walter Sondheim, Jr.
Otis Warren, Jr.

# Exhibit 4

# DOWNTOWN PARTNERSHIP INITIATIVES FOCUS AREA



# TURNING DOLLARS INTO ACTION

Downtown Partnership of Baltimore is a dynamic non-profit corporation dedicated to making Downtown Baltimore a great place to invest, work, live and play. As the leading advocate for Downtown, we work in partnership with business and government to identify needs, develop strategies, shape public policy and implement programs to strengthen the economic vitality of Downtown Baltimore and its role within the region. Below is a breakdown of how the Partnership maximizes investments from our members and partners.

**REVENUES**




**FUND ALLOCATION**



# DOWNTOWN PARTNERSHIP SUMMARY OF INITIATIVES

## DOWNTOWN PARTNERSHIP OF BALTIMORE

The Partnership's mission and work plan are to ensure the on-going economic growth of the existing business base and to support redevelopment, revitalization and new investment in key areas of Downtown. The goal is to create and maintain a diverse Downtown neighborhood for employees, visitors and residents. Initiatives include:

**BUSINESS & ECONOMIC DEVELOPMENT**

In its role of Downtown advocate, the Partnership seeks to eliminate obstacles to business growth through on-going troubleshooting and strategic planning of key issues facing the business community. Programs include:

- Business Retention Outreach
- Governmental and Institutional Relations
- Public Policy and Strategic Planning
- Key Development Efforts-
  - Parking/Transportation Improvements and Administration
    - Downtown Area Shuttle (DASH) service for Downtown employees and visitors
  - Central Business District Redevelopment
  - Retail Expansion
  - Downtown Housing Initiative
  - Small and Minority Business Outreach

**ECONOMIC RESEARCH & ANALYSIS**

The Partnership analyzes important trends and key economic indicators critical to Downtown as a means to maintaining a competitive business development environment. Results from this research are delivered through the following publications:

- State of Downtown Report- An Annual Economic Analysis of Downtown Baltimore
- Downtown Baltimore Annual Development Report
- Bi-monthly Business Development and Investment Update

**AREA REVITALIZATION**

The Partnership is a facilitator and supporter, along with other community partners, in driving investment and development to the following:

- Mt. Vernon Cultural District
- Charles Street Development Corporation
- WestSide Renaissance Corporation
- Downtown Housing Initiative

**MARKETING & COMMUNICATIONS**

A key goal of the Partnership is to foster a positive image of Downtown as a place to live, work and play. Marketing efforts include:

- Business Marketing
  - business events, publications and retention advertising
- Consumer Marketing
  - campaigns, promotions and events
- Residential Marketing
  - marketing to developers and residents
- Market Research
- Promotion of Clean and Safe Services
- GoDowntownBaltimore.com website

# DOWNTOWN PARTNERSHIP SUMMARY OF INITIATIVES

**MEMBERSHIP**

The Partnership is the voice of the Downtown business community, providing members with an array of benefits that allow business executives to be engaged and connected to Downtown's momentum and vitality. Member services include:

· Advocacy
· Networking Opportunities
· Targeted Business Events
· Annual Member Directory
· Quarterly Newsletter and Monthly E-mail Program
· Members Only Benefits on GoDowntownBaltimore.com website

## DOWNTOWN MANAGEMENT DISTRICT

Downtown Partnership manages and administers the delivery of clean and safe services for the Downtown Management District, a business improvement district encompassing 106 blocks in the core of Downtown Baltimore. Surcharges collected from property owners fund the following areas of focus:

**PUBLIC SAFETY**

The Partnership strives to create a comfortable, inviting and safe pedestrian environment for Downtown employees and visitors. Public Safety initiatives include:

· Public Safety Guides
· On-Call Escort Service
· Video Camera Patrol Network
· Public Safety Coalition
· Personal Safety Training
· Property Security Evaluations
· Street Smart Awareness Campaign
· Panhandling Interaction
· Homeless Outreach

**EXTERIOR ENVIRONMENT**

A clean, attractive and well-maintained Downtown is paramount to a healthy and prosperous business district and Downtown community. Partnership efforts in maintenance and beautification which compliment the public safety program include:

Maintenance
· Clean Sweep Ambassadors
· Litter and Graffiti Removal
· Maintenance Training
· Homeless Training and Employment
· Community Service Deployment

Beautification
· Streetscape Improvement Program
· Façade Improvement Program
· Landscaping and Maintenance
· Pedestrian Wayfinding/Signage System
· Open Space Improvements