IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CITY CRESCENT LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-580<br>(Judge Wheeler) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this response to plaintiff's proposed findings of fact.

**Proposed Finding:**

1. City Crescent Limited Partnership ("CCLP") entered into Lease Number GS-03B-09074, which bears the date August 31, 1990, for the City Crescent Building located at 10 South Howard Street, Baltimore, Maryland. The original term of the Lease was March 31, 1993 through March 30, 2003. See Appendix at 3, 11 (Warren Affidavit, Attachment A).

**Response:**

1. No dispute, although for clarification the term of the lease as defined by the original lease documents was ten years following completion of alterations and improvements to the property. A5.[1] The term from March 31, 1993 through March 30, 2003 was established by

[1] "A__" refers to defendant's corrected appendix, filed March 10, 2006.

Supplemental Lease Agreement No. 9, dated June 10, 1993. A7. See Def. Prop. Findings at ¶ 1, 2.

**Proposed Finding:**

2. In June 2001, CCLP and GSA renewed the Lease for a period of fifteen years, extending the term from March 31, 2003, through March 30, 2018. See Appendix at 16 (Warren Affidavit, Attachment B, Supplemental Lease Agreement No. 23).

**Response:**

2. No dispute.

**Proposed Finding:**

3. The GSA is the primary tenant of the City Crescent Building, having occupied 97% or more of the building's square-footage since 1993. See Appendix at 3 (Warren Affidavit at ¶ 5).

**Response:**

3. No dispute.

**Proposed Finding:**

4. The parties' Lease includes a Tax Adjustment Clause, GSAR 552.270-24 (1985), which provides, in pertinent part:

> (A) The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year). * * *
>
> (B) The Government's share of the tax increase will be based on the ratio of the square feet occupied by the Government to the total rentable square feet in the building. * * *

Appendix at 13 (Warren Affidavit at Attachment A, Lease, Section C, ¶ 3.4). A complete copy of the Lease, including Supplemental Lease Amendment Nos. 1 through 28, is attached to the

Plaintiff's Complaint. For the Court's convenience, the relevant pages have been reproduced in the Appendix at Exhibit 1, Attachment A.

**Response:**

4. No dispute.

**Proposed Finding:**

5. In 1992, the Baltimore City Council increased real estate taxes within the downtown area in which the City Crescent Building is located by enacting Ordinance No. 92-057, which was approved by the Mayor on June 29, 1992, and codified at Article 14, § 1 of the Baltimore City Code. See Baltimore City Code Art. 14 §§ 1-1 through 1-21 (2006), attached as Appendix at 94 to 120.

**Response:**

5. Contrary to City Crescent's assertion, the Baltimore City Council did not increase real estate taxes, but authorized the creation of a special benefit district and a special benefit district surcharge. A15-39. We do not dispute that the ordinance was approved by the Mayor on June 29, 1992, nor that the ordinance was codified at Article 14, § 1 of the Baltimore City Code.

**Proposed Finding:**

6. This statute authorizes the creation of a business district known as the "Downtown Management District" ("the District") to be overseen by the "Downtown Management Authority for Baltimore City" ("the Authority"). Id. at §§ 1-3, 1-4; Appendix at 102-03.

**Response:**

6. No dispute.

**Proposed Finding:**

7. Section 1-10 of this statute, entitled "Supplemental Tax," states that "[a] portion of the funding for the operation of the Authority shall be provided by a supplemental annual property tax, levied on all properties subject to real property taxation. . . ." Id. at § 1-10(a); Appendix at 109.

**Response:**

7. No dispute.

**Proposed Finding:**

8. The annual tax bills for the City Crescent Building include three categories of real estate taxes – State, City, and the supplemental annual property tax – all of which are calculated by multiplying the City Crescent Building's assessed value by the applicable tax rate. See Appendix at 4, 7 (Warren Affidavit at ¶ 8, 19, Attachments C, I); accord Appendix at 110 (Baltimore City Code Art. 14, § 1-10(b)); Appendix at 91 (Fowler Affidavit at ¶ 8).

**Response:**

8. City Crescent incorrectly suggests that each real estate tax bill included three different taxes. Instead, starting with tax year July 1, 1995 to June 30, 1996, City Crescent each year received two separate bills. The real estate tax bill, with the words "DEAR PROPERTY OWNER: THIS IS YOUR REAL PROPERTY TAX BILL" at the top of the page and the words "REAL PROPERTY TAX BILL" at the top of the portion to be returned with payment, included only two taxes: a state real property tax, and a city real property tax. E.g. Def. Supp. App. at

1, 3, 5.[2] Each line item for the taxes refer to them as a "TAX." Id. A separate bill, with the words "DEAR PROPERTY OWNER: THIS IS YOUR SPECIAL BENEFIT DISTRICT SURCHARGE" at the top of the page, and the words "SPECIAL BENEFIT DISTRICT SURCHARGE" at the top of the portion to be returned with payment, included solely the special benefit district surcharge. E.g. Def. Supp. App. at 2, 4, 6; Pl. App. at 87. The line item for the special benefit district surcharge refers to it as a "SURCHRG." Id. We do not contest that the method for calculating the state real property tax, the city real property tax, and the special benefit district surcharge is determined by multiplying an applicable rate by the assessed value.

**Proposed Finding:**

9. The supplemental annual property tax is utilized to fund governmental services for the general public in downtown Baltimore. In accordance with its statutory mission, the DMA promotes and markets the downtown area, provides supplementary security and maintenance services, and provides amenities. See Appendix at 90 (Fowler Affidavit at ¶ 5).

**Response:**

9. It is unclear what City Crescent means by " governmental services." If City Crescent means that the funds are included and used as part of the City of Baltimore's revenues, then City Crescent is incorrect. Article 14, § 1-15 of the Baltimore City Code states:

---

[2] These and other examples of the real estate tax bills and the special benefit district surcharge bills may be found in exhibit 3 to plaintiff's complaint. Later bills, starting either with the 2000/2001 tax year or the 2001/2002 tax year, revised the real estate tax bill format slightly, for example indicating "REAL PROPERTY TAX LEVY" at the top of the page. E.g. Pl. App. at 86. Like the earlier real estate tax bills, they contain only two taxes (the state real estate tax and the city tax) and do not include the special benefit district surcharge. Id.

> (b) *Funds not part of City revenues.*
> Amounts collected by the City on behalf of the [Downtown Management] Authority:
> (1) shall not be included in the revenues of the City;
> (2) shall not be deemed subject to the budgetary and appropriation process . . .

A31. Furthermore, "[t]he [Downtown Management] Authority is authorized and directed to establish with the appropriate City agencies the methods by which the Supplemental Tax is to be assessed, collected, and <u>disbursed to the Authority</u>." Balt. City Code Art. 14, § 1-15(a), A30 (emphasis added). The Downtown Management Authority is not an agency of the City of Baltimore. Balt. City Code Art. 14, § 1-15(a), A30.

We do not dispute that "[i]n accordance with its statutory mission, the DMA promotes and markets the downtown area, provides supplementary security and maintenance services, and provides amenities." However, this is not an exhaustive list of the activities of the DMA, nor the matters funded by the special benefit district surcharge. <u>See</u> Def. Prop. Findings at ¶ 7 (providing additional examples of services and physical improvements funded by the special benefit district surcharge).

**<u>Proposed Finding:</u>**

10. The purpose of the DMA is to supplement and augment traditional public services, and the DMA's services are virtually identical to services provided by governmental agencies, including traditional "Clean and Safe" services. These services are provided to all of the downtown area for the benefit of the general public. <u>See</u> Appendix at 90 (Fowler Affidavit at ¶ 5).

**Response:**

10. The primary purpose of the DMA is the provision of services and improvements for the special benefit district. See Balt. City Code Art. 14, §§ 1-2(d), 1-4(c); A19, 21. It is unclear what City Crescent means by "DMA's services are virtually identical to services provided by governmental agencies." However, we do not dispute that many of the physical improvements and services provided by the DMA and funded by the special benefit district surcharge could be provided by a governmental agency instead of the DMA. We do not dispute that the general public receives a benefit from the services and physical improvements funded by the special benefit district surcharge. To the extent that City Crescent implies that the special benefit district, and the physical improvements and services provided for the special benefit district, are not intended to provide a special benefit (a benefit above and beyond that received by the general public), this is incorrect. See e.g. Balt. City Code Art. 14, A13-A39 (title of Article is "Special Benefit Districts" and the top of every other page refers to "Special Benefit Districts").

**Proposed Finding:**

11. The DMA's services are necessary due to the increased needs of a downtown area for general government services that make the downtown clean and safe for the general public. Individual property owners receive no specific services or benefits in exchange for the supplemental annual property tax, and any benefits provided by the Authority run to the general public. Appendix at 90-91 (Fowler Affidavit at ¶¶ 5-6, 9).

**Response:**

11. To the extent that City Crescent attempts to describe the legislative intent in creating the DMA or the special benefit district, this is a question of law, not fact, and neither City

Crescent nor Mr. Fowler can speak for the City of Baltimore. It is unclear what City Crescent means when stating that "[i]ndividual property owners receive no specific services or benefits in exchange for the supplemental annual property tax." To the extent that City Crescent means that all of the property owners within the special benefit district benefit from a variety of improvements and services provided for the special benefit district, we agree. As to the benefits to the general public, see our response to plaintiff's proposed finding of fact No. 10.

**Proposed Finding:**

12. Baltimore's supplemental annual property tax is not utilized to finance specific services or capital improvements that would benefit one or more property owners. Appendix at 90-91 (Fowler Affidavit at ¶¶ 6, 9). Any such projects would be funded through the assessment of a special charge made under a separate provision of Article 14 § 1-11(a)(2), which empowers the Authority to "impose charges and fees for any special services requested by and performed for 1 or more property owners." Appendix at 110. The City Crescent Building has received no special benefits in exchange for its supplemental annual property taxes. Appendix at 3-4 (Warren Affidavit at ¶ 7).

**Response:**

As to the first sentence, see our response to plaintiff's proposed finding No. 11. As to the second sentence, Article 14 § 1-11(a)(2) merely addresses the ability of the Downtown Management Authority to impose other charges than the special benefit district surcharge. See Def. Resp. to Pl. Cross Mot. at § II-G. As to the third sentence, City Crescent provides no support for this assertion other than the self-serving and conclusory assertion from the president of a company related to City Crescent. Pl. App. at 3 (affidavit of Otis Warren).

**Proposed Finding:**

13. For the taxable years running from 1995/1996 through 2001/2002, CCLP submitted to the GSA its tax bills for the City Crescent Building, which included the State of Maryland tax ("State Tax"), the City of Baltimore tax ("City Tax"), and the supplemental annual property tax. In each of these years, CCLP's calculation of the additional rent due under the Tax-Adjustment Clause included the supplemental annual property tax. In each of these years, the GSA paid additional rent to CCLP pursuant to CCLP's calculation of the amount due under the Tax-Adjustment Clause, which included the supplemental annual property tax. See Appendix at 4, 25 (Warren Affidavit at ¶ 8, Attachment C).

**Response:**

13. No dispute, except as to City Crescent's characterization of the bills it received. See supra ¶ 8 (response to City Crescent's proposed finding of fact No. 8).

**Proposed Finding:**

14. In four of these years, CCLP and the GSA's Contracting Officer memorialized the annual calculation of the additional rent due under the Tax-Adjustment Clause by jointly executing a written "Real Estate Tax Escalation Analysis." See Appendix at 4, 44 (Warren Affidavit at ¶ 9, Attachment D, Tax Escalation Analyses for 1995/1996, 1996/1997, 1999/2000, and 2000/2001).

**Response:**

No dispute, except that the escalation analyses were not "jointly executed". Instead, they were issued by the GSA based upon information provided by City Crescent, and approved by the

contracting officer. Pl. App. at 45-49. They are not signed by any representative of City Crescent. Id.

**Proposed Finding:**

15. The GSA and CCLP memorialized the 1997/1998 real estate tax increase as a formal change to the Lease documents. See Appendix at 4, 50 (Warren Affidavit at ¶ 10, Attachment E, Supplemental Lease Agreement No. 18 for the 1997/1998 Tax Year).

**Response:**

15. City Crescent is correct that the parties memorialized the tax adjustment for tax year 1997/1998 through Supplemental Lease Agreement No. 18, however it is unclear what City Crescent means by a "formal change" to the lease, nor in what way City Crescent believes the lease was changed. There is no indication that the parties intended to modify any provision of the lease by way of Supplemental Lease Agreement No. 18.

**Proposed Finding:**

16. With respect to the 1998/1999 tax bill and the 2001/2002 tax bill, the GSA paid the tax increase after receipt of the tax bills from CCLP. See Appendix at 5, 25 (Warren Affidavit at ¶ 11, Attachment C, Tax Bills Submitted to the GSA for 1998/1999 and 2001/2002).

**Response:**

16. We do not dispute that the GSA paid a rental adjustment pursuant to the tax adjustment clause which included the special benefit district surcharge in the calculation of the tax adjustment for tax year 1998/1999 and tax year 2001/2002. However, we dispute the characterization of the bills received by City Crescent. See supra ¶ 8 (response to City Crescent's proposed finding of fact No. 8).

**Proposed Finding:**

17. In June 2001, CCLP and GSA renewed the Lease for a period of fifteen years, extending the term from March 31, 2003, through March 30, 2018. See supra SOF at ¶ 2. When CCLP and GSA renewed the Lease in 2001, CCLP's calculation of the annual rent to be paid by the GSA was premised upon the GSA's payment of the supplemental annual property tax. See Appendix at 5 (Warren Affidavit at ¶ 13).

**Response:**

17. We do not dispute the first sentence. As to the second sentence, we have no basis at this time to know the manner in which CCLP calculated the annual rent to be paid under the renewal.

**Proposed Finding:**

18. The Lease extension provides that "the real estate tax base remains unchanged." See Appendix at 14 (Attachment B to Warren Affidavit, Supplemental Lease Agreement No. 23). The parties also explicitly addressed future tax adjustments, agreeing that "there shall be no operating or real estate tax adjustment paid by the Government at the beginning of the 11th year, March 31, 2003, of the lease, in recognition of the increased rent rate." Id. at 17.

**Response:**

18. No dispute.

**Proposed Finding:**

19. As part of this Lease renewal process, on October 15, 2001, GSA's Contracting Officer provided a Lease Status Report to CCLP's lenders, which was a prerequisite to CCLP's

ability to obtain long-term financing for the Property. See Appendix at 5, 57 (Warren Affidavit at 14, Attachment F, Lease Status Report dated October 15, 2001).

**Response:**

No dispute, except that the Government has no way of knowing at this time whether the Lease Status Report to CCLP's lenders was a prerequisite to CCLP's ability to obtain long-term financing for the Property.

**Proposed Finding:**

20. Paragraph 3 of the Lease Status Report, provides, in pertinent part:

> The GSA Lease is currently in full force and effect as against the Government. Neither the Government nor the Partnership are in default under the GSA lease, nor are there conditions that are existing or pending in and of themselves which may ripen into default under the GSA Lease. All duties and obligations of the Partnership with respect to the Project due through the date hereof have been satisfied or waived. There are no circumstances, events or conditions presently in existence that would confer upon the Government the right (i) to seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to the Partnership under the GSA Lease or (ii) to seek to terminate the GSA Lease. . . .The Government has not requested any changes to the Project which would cause a reduction of the non-maintenance portion of the rent.

See Appendix at 5, 59 (Warren Affidavit at ¶ 14, Attachment F, Lease Status Report dated October 15, 2001).

**Response:**

20. No dispute.

**Proposed Finding:**

21. In Paragraph 2 of the GSA's Lease Status Report, the Contracting Officer confirmed that the Lease was authorized by the United States and that any required approvals for performance of the Lease had been obtained. See Appendix at 5, 59 (Warren Affidavit at ¶ 14, Attachment F (Lease Status Report at 2).

**Response:**

No dispute.

**Proposed Finding:**

22. After the GSA provided this Lease Status Report, CCLP's lenders provided long-term financing to CCLP for the Property. CCLP also relied on GSA's representations in the Lease Status Report that GSA would not seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to CCLP under the Lease. See Appendix at 5, 6 (Warren Affidavit at ¶¶ 12, 15).

**Response:**

22. We do not dispute the first sentence of City Crescent's proposed finding No. 22. As to the second sentence of this proposed finding, it is unclear for what City Crescent allegedly relied upon the lease status report. By this time, the lease had already been renewed. Def. App. at 15-16 (supplemental lease agreement No. 23, dated June 6, 2001, and accompanying letter from the contracting officer on the same date). Furthermore, the only support City Crescent provides for its vague allegation of reliance upon the lease status report is the conclusory, self-serving statement of Mr. Warren that "CCLP also relied on GSA's representations . . ." Pl. App. at 5, ¶ 15. This is not a sufficient basis for establishing reliance by City Crescent for anything.

**Proposed Finding:**

23. In a letter dated October 15, 2002, [sic] that it would no longer pay tax increases attributable to Baltimore's supplemental annual property tax. In this letter, the GSA contended that this tax must be a "general real estate tax" to be compensable under the Lease's Tax Adjustment Clause. Appendix at 6, 62 (Warren Affidavit at ¶ 16, Attachment G, GSA Letter dated October 15, 2002). The GSA asserted that the supplemental annual property tax was a "District Surcharge" and was not compensable under the Lease. The GSA also asserted that the prior years' tax analyses had been computed incorrectly. See id. The GSA's letter claimed entitlement to reimbursement for $311,522.54 in purported "overpayments" under the Lease, attaching revised Real Estate Tax Escalation Analyses for the previous years. Id.

**Response:**

No dispute.

**Proposed Finding:**

24. On or about June 1, 2004, the Contracting Officer issued a Final Decision finding that GSA was entitled to a refund of the supplemental annual property tax amounts that had been paid by the GSA throughout the term of the Lease. Appendix at 6, 74 (Warren Affidavit at ¶ 17, Attachment H, Contracting Officer's Final Decision). In the Final Decision, the Contracting Officer asserted that the supplemental annual property tax is a "special assessment" and is therefore not a "real estate tax" compensable pursuant to the terms of the Lease. Id. at 75.

**Response:**

24. No dispute, except that the special benefit district surcharge was not paid by the GSA "throughout" the term of the lease. See supra ¶ 13.

**Proposed Finding:**

25. The GSA has obtained reimbursement of $311,522.58 of taxes paid to CCLP for the taxable years running from 1995/1996 through 2001/2002. In 2002, the GSA deducted $4,548.70 from its payment of a tax adjustment otherwise due to CCLP for 2002/2003 tax increases. The remaining portion, $306,973.88, was withheld by the GSA through a reduction of $76,743.47 in its rental payments made to CCLP on July 1, 2005, August 1, 2005, September 1, 2005, and October 1, 2005. See Appendix at 6-7 (Warren Affidavit at ¶ 18).

**Response:**

25. No dispute.

**Proposed Finding:**

26. Starting with the bill for tax years 2002/2003, the calculation utilized by the GSA to determine its additional rent due under the Tax-Adjustment Clause has not included the supplemental annual property tax levied by Baltimore. See Appendix at 7, 78 (Warren Affidavit at ¶ 19, Attachment I, Tax Bills for 2002/2003 – 2005/2006). The GSA owes $36,655.08 in additional rent for the tax year 2002/2003, $96,400.23 for the tax year 2004/2005, and $49,812.79 for the tax year 2005/2006. In Supplemental Lease Agreement No. 23, the parties agreed that the GSA would not pay any tax adjustments for the period running from March 31, 2003, through March 30, 2004. See Appendix at 7, 16 (Warren Affidavit at ¶ 19, Supplemental Lease Agreement No. 23).

**<u>Response:</u>**

26. We do not dispute the first sentence of proposed finding No. 26. We dispute the second sentence of proposed finding No. 26. We do not dispute the third sentence of proposed finding of fact No. 26.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

<u>/s/ Deborah A. Bynum</u>
DEBORAH A. BYNUM
Assistant Director

<u>/s/ Michael J. Dierberg</u>
MICHAEL J. DIERBERG
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Fl.
1100 L. St. NW
Washington, DC 20530
Telephone: (202) 353-0536
Facsimile: (202) 307-0972

April 10, 2006

Attorneys for Defendant