# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CITY CRESCENT LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 05-580<br>(Judge Wheeler) |

## AFFIDAVIT OF OTIS WARREN, JR

I, Otis Warren, Jr., being duly sworn, hereby depose and state as follows:

1. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

2. I am the President of Otis Warren Management, Inc., one of the partners that operates the City Crescent Limited Partnership ("CCLP"), the Plaintiff in this action.

3. I have read the questions posed in the third numbered paragraph of the Court's Amended Scheduling Order, dated May 12, 2006, and I have provided this affidavit to further explain what specific actions were taken by CCLP in reliance upon the GSA's continued payment of the supplemental annual property tax up through 2001/2002.

4. CCLP relied upon the GSA's continued payment of the tax in making several long-term decisions related to the City Crescent Building,

including in calculating a new annual rent for the 15-year Lease extension. CCLP calculated the new annual rent for the extended term based upon revenues that it needed to cover its debt-service payments on its new loan for the City Crescent Building, and these calculations were accounting for the GSA's payment of rent, operating costs, and the GSA's proportionate share of all taxes above the Base Year taxes.

**The Lease's Original Provision for a 10-Year Lease Extension**

5. The parties established the original term of the Lease, March 31, 1993 through March 30, 2003, by executing Supplemental Lease Agreement No. 4, dated January 2, 1992, and Supplemental Lease Agreement No. 9, dated June 10, 1993. See Exhibit A (Supplemental Lease Agreement Nos. 4, 9, and 23). SLA No. 4 also provided four different options for a potential 5- or 10-year Lease extension, and each of these options included the GSA's continued liability for tax increases: (i) a base rent of $30.27/sf, plus the continuation of all real estate tax and operating cost escalations, for an additional 10-year term; (ii) a base rent of $38.04/sf, plus the continuation of all real estate tax and operating cost escalations, for an additional 5-year term; (iii) if the GSA opted to pay its own electricity costs, a base rent of $25.91/sf, plus the continuation of all real estate tax and operating cost escalations, for an additional 10-year term; and (iv) if the GSA opted to pay its own electricity costs, a base rent of $31.36/sf, plus the continuation of all real estate tax and operating cost escalations, for an additional 5-year term.

**The Parties' Agreement on a 15-Year Lease Extension in SLA No. 23**

6. In the Fall of 1997, CCLP first approached the GSA regarding the negotiation of a new Lease renewal term that would supersede the four options then currently available in SLA No. 4. Because of advantageous interest rates, CCLP was in a financial position to offer the GSA a monthly rent that was lower than the terms of SLA No. 4 in exchange for the GSA's renewal of the Lease for an additional 15-year term running from March 31, 2003 through March 30, 2018. CCLP required this additional 15-year lease term in order to secure long-term financing for the City Crescent Building, and needed the GSA's monthly payments to provide to its lenders in order to establish monthly debt-service payments through March 2018.

7. The parties' negotiations continued through 2001, when they reached an agreement on a lease extension, which was memorialized in SLA No. 23. See Exhibit A (Supplemental Lease Agreement No. 23). SLA No. 23, dated June 6, 2001, extended the Lease for 15 years through March 30, 2018. The annual rent in SLA No. 23 was lower than the options previously available in SLA No. 4. In accordance with SLA No. 23, the GSA's rent for the period from March 31, 2003 through March 30, 2008 is $28.00/sf ($7,464,072 per year), and the rent increases to $28.80/sf ($7,677,331 per year) for the period from March 31, 2008 through March 30, 2018; this agreed-upon rent in SLA No. 23 was lower than the options included in SLA No. 4, which offered $38.04/sf for a 5-year extension and $30.27/sf for a 10-year extension. SLA No. 23 also provided even lower rates if

the GSA had chosen to pay for electricity on its own, but the GSA opted not to do so.

**The Parties' Negotiations Addressed the Specific Issue of Taxes, and the GSA Agreed to Continue Paying all Tax Adjustments in SLA No. 23.**

8. From the start of the Lease renewal negotiations in 1997 through the execution of SLA No. 23 in 2001, CCLP is not aware of any instance in which the GSA ever informed CCLP that it would cease paying real estate tax adjustments attributable to the supplemental annual property tax. On the contrary, CCLP's written offers made to the GSA during the negotiations leading up to SLA No. 23 made it clear that CCLP was relying on the GSA's continued payment of all tax increases over the Base Year amount, and the GSA did not question its obligation to pay the supplemental annual property tax. While CCLP offered the GSA several concessions related to the annual rent and other Lease terms during these negotiations, CCLP's offers to the GSA consistently identified the tax-adjustment provisions as terms that would remain unchanged under the new Lease. See Exhibit B (GSA's May 10, 2001 Letter accepting CCLP's offer and CCLP's Letters dated February 23, 2001, March 13, 2001, and April 24, 2001, which are referenced in the GSA's letter).

9. For example, Paragraph D of CCLP's February 23, 2001 letter offers the GSA a reduced annual rent and other incentives but otherwise provides that "all terms and conditions of the lease not specifically changed by this offer would remain in full force and effect, including the provisions regarding operating cost and real estate tax adjustments," and Paragraph E of this offer provides that "[t]he bases and schedule for adjustments in real estate taxes and

operating costs established under the lease will remain unchanged during the fifteen year renewal term, except that the operating cost base will be reduced by $2.55 per square foot (i.e., $794,868.15) in the event that the Government exercises the option on a net electricity basis." Exhibit B. Similar provisions are also included in Paragraphs E and F of CCLP's March 13, 2001 offer.

10. As the negotiations progressed, the parties specifically discussed the GSA's liability for tax increases under the Lease. CCLP's letter dated April 24, 2001 offered a one-year abatement of all tax and operating cost increases during the first year of the new Lease term (March 31, 2003 – March 30, 2004) as an inducement for the GSA to enter into an extension. See Exhibit B. As with its previous offers, CCLP's letter provided that bases and schedule for tax (and operating cost) adjustments would otherwise remain unchanged, and that the GSA would continue to pay any such tax adjustments beginning again on March 31, 2004, through the end of the Lease.

11. SLA No. 23 memorializes the parties' agreement on a one-year abatement of any tax and operating cost increases, providing that "there shall be no operating or real estate tax adjustment paid by the Government at the beginning of the 11th year, March 31, 2003, of the lease, in recognition of the increased rent rate. *Operating costs and real estate tax adjustments will continue on an annual basis in accordance with the lease* on March 31, 2004, the 12th anniversary of the lease." Exhibit A (SLA No. 23) (emphasis added). During these negotiations culminating in SLA No. 23, the GSA had an opportunity to voice any opposition that it may have had to the supplemental annual property

tax. The parties' negotiations addressed the specific issue of tax adjustments, but the GSA never informed CCLP of any intention that it may have had to cease payment of the supplemental annual property tax altogether under the Tax-Adjustment Clause.

**CCLP's Calculation of the Annual Rent in SLA No. 23, which Serves as the Basis for the Amount of CCLP's Debt-Service Payments, Accounts for the GSA's Continued Obligation to Pay the Supplemental Annual Property Tax.**

12. CCLP's calculation of the annual rent to be paid by the GSA under SLA No. 23 was premised upon the GSA's payment of the supplemental annual property tax. With the exception of the one-year abatement from all tax increases (running from March 31, 2003 – March 30, 2004), the parties agreed in SLA No. 23 that the GSA's tax liability would remain unchanged for the remainder of the Lease term. CCLP's rental calculations were based upon the assumption that it would continue to receive additional revenue from the GSA for tax adjustments.

13. An internal financial analysis of SLA No. 23 prepared on June 4, 2001, two days prior to the date of SLA No. 23, confirms that CCLP's rental calculation for the new term relied upon cash flow from the GSA's continued payment of the GSA's percentage share of taxes, including the supplemental annual property tax, in excess of the agreed-upon base year taxes of $795,531.82. See Exhibit C (CCLP's June 4, 2001 Financial Analysis of New Lease Term). A summary of the relevant portions of this analysis are set forth below:

- CCLP's analysis includes a projection of its debt-service payments through March 15, 2018 (see the column entitled, "Debt Service"). These payments are based upon a cash flow to CCLP that included the annual rent set forth in SLA No. 23: $7,464,072 in annual rent from the GSA from March 31, 2003 through March 30, 2008, and then $7,677,332 in annual rent from March 31, 2008 through March 30, 2018 (see the column entitled "Base Rent" and add together the two entries for any given year, e.g., the entries for 3/15/04 and 9/15/04 are both $3,732,036 for a total of $7,464,072 in annual rent for 2004).
- CCLP's projection of its debt-service payments also accounted for cash flow from the GSA's tax reimbursement.
  - For example, this schedule accounts for zero tax reimbursement revenue in calculating the debt-service payments for 3/15/03 and 9/15/03 (see the column entitled "RE Tax Reimb"), in recognition of the one-year abatement of tax adjustments agreed upon in SLA No. 23.
  - The remainder of the debt-service payments, however, account for a tax-reimbursement from the GSA. For example, the next two debt-service payments, 3/15/04 and 9/15/04, account for a projected tax liability of $936,300 (calculated by adding together entries for 3/15/04 and 9/15/04 under the column "Less Taxes") and tax reimbursement revenue totaling $139,039 (calculated by adding together entries for 3/15/04 and 9/15/04 under the

column "RE Tax Reimb"). Thus, CCLP's debt-service payments for this time period anticipated that its net tax liability would be $797,261, which includes the $795,531.82 in base year taxes on the GSA lease (for 97% of the Building) as well as $1,729.18 in taxes attributable to the small portion of the building occupied by Otis Warren Management, Inc. (1.4% of the Building). The debt-service payments for all of the other remaining years on the Lease are calculated in the same manner, accounting for the GSA's Lease payment per SLA No. 23, less the projected tax liability on the entire building, plus revenue from the GSA's tax reimbursement for all taxes (including the supplemental annual property tax) on its share of the building, leaving a difference of the GSA's base year taxes plus a small amount of taxes attributable to OWM's portion of the building.

14. CCLP ultimately secured long-term financing for the City Crescent Building on October 25, 2001, ten days after the GSA provided its Lease Status Report to CCLP's lenders, dated October 15, 2001. In this Lease Status Report (attached to my prior affidavit), the GSA represented to CCLP's lenders that the Lease, as amended through that date, was in full force and effect and that there were no circumstances, events or conditions that would give rise to any offset by the GSA.

15. While CCLP's debt-service schedule was revised slightly between June 2001 and October 25, 2001 (due to interest rate changes), its final debt-

service schedule is nearly identical to the projections performed by CCLP just prior to executing SLA No. 23 and is based upon the same accounting method. See Exhibit D (CCLP's final debt-service schedule). In sum, CCLP's debt-service payments took into account the GSA's continued reimbursement of its percentage share of all taxes on the City Crescent Building (including the supplemental annual property tax) that were in excess of the base year taxes.

16. Thus, the GSA's failure to pay the supplemental annual property tax since October 2002 and its recoupment of taxes paid prior to 2002 has forced CCLP to find alternate sources of revenue or utilize Partner cash contributions in order to continue making its debt-service payments. If the GSA had notified CCLP that it no longer intended to pay the supplemental annual property tax, then CCLP would have accounted for the amount of this tax by offering a higher annual rent or else CCLP would have made different financial arrangements in obtaining long-term financing.

Further Affiant Sayeth Not.

I declare under penalty of perjury under the laws of the United States of America and the State of Maryland that the foregoing is true and correct to the best of my personal knowledge.

Dated the 12th day of June, 2006.

Otis Warren, Jr.

On the 12th day of June, 2006, before me personally appeared Otis Warren, Jr., personally known to me to be the person whose name is subscribed herein.

In witness whereof I hereunto set my hand and official seal.

Notary Public

My commission expires: 9/15/08