# In the United States Court of Federal Claims

No. 05-580C

(Filed: July 10, 2006)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

CITY CRESCENT LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

GSA Building Lease; Contract Interpretation; Real Estate "Tax Adjustment" Clause; Special Assessments Distinguished; Reliance on Continued Government Payment in Lease Renewal Negotiations.

*Robert G. Watt*, with whom was *Christopher M. Anzidei*, Watt, Tieder, Hoffar & Fitzgerald, LLP, McLean, Virginia, for Plaintiff.

*Michael J. Dierberg*, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Robert Notigan*, General Services Administration, Washington, D.C., Of Counsel, for Defendant.

## **OPINION AND ORDER**

WHEELER, Judge.

This case involves the interpretation of a "Tax Adjustment" clause that the General Services Administration ("GSA") employs when it leases building space to house federal agencies. The clause provides that the Government will pay additional rent for its share of any increases in real estate taxes after the first year of a lease. The issue presented is whether the Government is liable under this clause for its portion of a supplemental annual property tax (which the parties agree may be called a "Supplemental Tax/Surcharge") imposed by the City of Baltimore in a central business and tourism district known as the "Downtown

-1-

Management District."   The case is before the Court on the parties' cross-motions for summary judgment.

Plaintiff contends as a matter of contract interpretation that the Tax Adjustment clause applies to the Supplemental Tax/Surcharge, and requires the Government to pay its share of the annual increases in this real estate tax.   Plaintiff also asserts on waiver and estoppel grounds that it set the renewal terms for a 15-year lease extension in 2001 in reliance on the Government's continued payment of the Supplemental Tax/Surcharge.  The Government had paid the annual tax increases for seven years before reversing course in 2002, more than a year after the parties negotiated the 15-year lease extension.   Plaintiff says that, if it had known the Government would cease paying the Supplemental Tax/Surcharge, it would have offered the Government a higher rental rate for the lease extension.   Plaintiff contends that the Government took unfair advantage by negotiating favorable terms for the lease extension, and then abrogating a material condition on which those terms were based.

In contrast, Defendant contends that the Supplemental Tax/Surcharge is a "special assessment" enacted by the City of Baltimore, and is not a real estate tax covered by the Tax Adjustment clause.   Defendant also states that, even though it paid its share of the tax increase for seven years, it has the inherent authority to recoup erroneous payments, and cannot be estopped from doing so.

For the reasons stated below, the Court finds that there are no genuine issues of material fact, and that Plaintiff is entitled to judgment as a matter of law.   Accordingly, Defendant's motion for summary judgment is DENIED, and Plaintiff's cross-motion for summary judgment is GRANTED.

## Factual Background[1]

On August 31, 1990, Plaintiff City Crescent Limited Partnership ("CCLP") entered into Lease Number GS-03B-09074 with the GSA to lease the City Crescent Building located at 10 South Howard Street, Baltimore, Maryland.   Following the completion of building alterations and improvements, the lease was to run for a ten-year term from March 31, 1993 to March 30, 2003.   (Pl. App. at 2, 11-13, Affidavit of Otis Warren, Jr., March 16, 2006, [hereinafter "Warren Aff.,"] ¶ 3, and August 31, 1990 Lease).   In June 2001, CCLP and the GSA renegotiated the lease, extending the term for 15 years from March 31, 2003 to March 30, 2018.   (Id. at 3, 16-24, Warren Aff. ¶ 4, and Supplemental Lease Agreement No. 23).

---

[1]   The material facts in this case are not in dispute.   The facts described herein are from the parties' Proposed Findings of Uncontroverted Fact, an Appendix of documents that Plaintiff ("Pl. App.") and Defendant ("Def. App.") each filed with the Court, including affidavits.

The GSA is the primary tenant of the City Crescent Building, occupying at least 97 percent of the building's square footage since 1993.  (Pl. App. at 3, Warren Aff. ¶ 5).

The Tax Adjustment clause in the lease, General Services Acquisition Regulation ("GSAR") 552.270-24 (June 1985), provides in pertinent part as follows:

> (A) The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year). * * *

> (B) The Government's share of the tax increase will be based on the ratio of the square feet occupied by the Government to the total rentable square feet in the building. * * *

(Id. at 13, Lease, Section C, ¶ 3.4.)[2]

The 1992 Maryland General Assembly enacted House Bill No. 1252, amending the charter of Baltimore to authorize the creation of a Downtown Management Authority ("DMA").  (Complaint, Exh. 2).  In the same year, the Baltimore City Council enacted Ordinance No. 92-057, codified at Article 14 §§ 1-1 through 1-21 of the Baltimore City Code ("the City Ordinance").  (Def. App. at 13-38).  The City Ordinance authorized the creation of a business district known as the "Downtown Management District," to be administered by the "Downtown Management Authority for Baltimore City."   See id. at 20-21.  The Mayor of Baltimore approved the City Ordinance on June 29, 1992.  (Complaint, Exh. 2).

Section 1-10 of the City Ordinance, entitled "Supplemental Tax," states that "[a] portion of the funding for the operation of the Authority shall be provided by a supplemental annual property tax, levied on all properties subject to real property taxation. . . ." (Def. App. at 27).  Each year, the DMA adopts a budget and operations plan for the Downtown Management District (the "District"), which is approved under the process described in the City Ordinance.  The City Crescent Building is located within the District, and CCLP has paid annually the taxes assessed under the City Ordinance.

---

[2] An earlier version of a GSA Tax Adjustment clause contained the word "general" before "real estate taxes."  See Wright Runstad Properties Ltd. P'ship v. United States, 40 Fed. Cl. 820, 825 (1998) (citing Woodbridge Constr. Corp., GSBCA No. 14200, 98-1 BCA ¶ 29,345; McDaniel Brothers Constr. Co., GSBCA No. 6973, 84-2 BCA ¶ 17,497)).  As will be discussed, the term "general real estate taxes" is a qualified and more narrow term than "real estate taxes." By deleting the word "general" from its Tax Adjustment clause, the GSA broadened the scope of its responsibility for real estate tax increases.

Following its statutory mandate, the DMA uses the revenue received under Section 1-10 of the City Ordinance to provide supplemental security and maintenance services, also known as "clean and safe services," along with other amenities intended to promote and market the District. The DMA sometimes refers to the supplemental annual property tax as a "real property surcharge," or a "special benefit district surcharge." (Affidavit of J. Kirby Fowler, Jr., June 14, 2006, [hereinafter "Fowler Aff.,"] ¶ 2). As previously noted, the parties agree that the tax may be called a "Supplemental Tax/Surcharge." Baltimore's Director of Finance collects the Supplemental Tax/Surcharge, and then transfers the tax revenue from the city to the DMA. Id. The DMA uses the revenue from the Supplemental Tax/Surcharge solely within the District, and the revenue is not commingled with general city funds. Id. at ¶ 3.

The DMA's clean and safe services are intended to create "a comfortable, inviting and safe pedestrian environment for Downtown employees and visitors." (Fowler Aff., Exh. 1 at 4, "Downtown Partnership Summary of Initiatives.") The public safety initiatives include providing public safety guides, on-call pedestrian safety escort services, a video camera patrol network, a public safety coalition, personal safety training, property security evaluations, "street smart" awareness campaigns, panhandling interaction, and homeless outreach. Id. The "maintenance and beautification" efforts complimenting the public safety program include "clean sweep ambassadors," litter and graffiti removal, maintenance training, homeless training and employment, community service deployment, a streetscape improvement program, a facade improvement program, landscaping and maintenance, pedestrian signage, and open space improvements. Id.

The clean and safe services are offered to all property owners and the general public within the District, including visitors, employees, and residents. In administering its programs, the DMA does not distinguish between those within the District who pay the Supplemental Tax/Surcharge, and those who do not pay the Supplemental Tax/Surcharge. (Fowler Aff. ¶ 5). None of the DMA's programs is offered exclusively to property owners who pay the tax. Id.

In addition to Section 1-10's general fund raising provision, Section 1-11 of the City Ordinance, "Other Charges," provides that "the Authority may impose charges and fees for any special services requested by and performed for one or more property owners." Baltimore City Code, Art. 14, § 1-11(a)(2). This provision is not intended to raise revenue for the Supplemental Tax/ Surcharge, but rather to impose special assessments.

The city first imposed the Supplemental Tax/Surcharge on property owners within the District during the tax year July 1, 1992 to June 30, 1993. (Fowler Aff. ¶ 4). For the tax years from 1995/1996 to 2001/2002, CCLP submitted to the GSA its tax bills for the City

Crescent Building.  In each of these years, CCLP calculated the additional rent due from the GSA under the Tax Adjustment clause by including the Supplemental Tax/Surcharge.  For the City's tax bills relating to the Supplemental/Tax Surcharge, the bill stated at the top of the page: "DEAR PROPERTY OWNER: THIS IS YOUR SPECIAL BENEFIT DISTRICT SURCHARGE," and at the top of the portion to be returned with payment, the bill stated: "SPECIAL BENEFIT DISTRICT SURCHARGE."  The bill's line item for the charge referred to it as "SURCHARGE" or "SURCHRG."  (Pl. App. at 3, 26-41, Warren Aff. ¶ 8, and Baltimore City Tax Bills, 1995/1996 – 2001/2002).

The GSA paid CCLP for the Supplemental Tax/Surcharge in each of the seven tax years from 1995/1996 to 2001/2002.  In four of these years, the GSA memorialized the annual calculation of the additional rent due under the Tax Adjustment clause in a written "Real Estate Tax Escalation Analysis," copies of which were provided to CCLP.  The GSA followed this practice for 1995/1996, 1996/1997, 1999/2000, and 2000/2001.  (Id. at 4, 45-49, Warren Aff. ¶ 9, and Tax Escalation Analysis).   For 1997/1998, the GSA and CCLP memorialized the tax adjustment in a Supplemental Lease Agreement.  (Id. at 4, 51, Warren Aff. ¶ 10, and Supplemental Lease Agreement No. 18).  For the 1998/1999 and 2001/2002 tax bills, the GSA paid the tax increase after receipt of the tax bills from CCLP.  (Id. at 5, 27-33, Warren Aff. ¶ 11, and Tax Bills Submitted to the GSA for 1998/1999 and 2001/2002).

In an October 15, 2002 letter, the GSA's Contracting Officer notified CCLP that the GSA would no longer pay tax increases attributable to Baltimore's Supplemental Tax/Surcharge.  Id. at 63-64.  In this letter, the GSA contended that the tax must be a "general real estate tax" to be compensable under the lease's "Tax Adjustment clause."  Id.  The Contracting Officer asserted that the Supplemental Tax/Surcharge was a "District Surcharge," and was not compensable under the lease.  Id.  The Contracting Officer also stated that the prior years' tax analysis had been computed incorrectly, and claimed that the GSA was entitled to reimbursement of $311,522.54 in "overpayments" under the lease.  Id.  The letter contained as an attachment revised Real Estate Tax Escalation Analyses for the previous years.  Id. at 65-73.

The GSA ultimately recouped $311,522.58 in taxes paid to CCLP for the tax years 1995/1996 through 2001/2002.  In 2002, the GSA deducted $4,548.70 from its payment of a tax adjustment otherwise due to CCLP for 2002/2003 tax increases.  The GSA withheld the remaining portion, $306,973.88, through a reduction of $76,743.47 in its rental payments on July 1, 2005, August 1, 2005, September 1, 2005, and October 1, 2005.  (Id. at 6-7, Warren Aff. ¶ 18).  The GSA has not paid the Supplemental Tax/Surcharge since tax year 2001/2002.  If the GSA were found liable for the Supplemental Tax/Surcharge, the amounts due for later years would be $36,655.08 for 2002/2003, $96,400.23 for 2004/2005, and $49,812.79 for

2005/2006.  (Id. at 7, 79-87, Warren Aff. ¶ 19, Tax Bills for 2002/2003 – 2005/2006).[3]
These amounts total $182,868.10, which when added to the $311,522.58 paid and later
recouped by the GSA, yield a grand total of $494,390.68.  Assuming liability going forward,
additional amounts for the Supplemental Tax/Surcharge would be due from the GSA through
the expiration date of the lease, currently March 30, 2018.

Prior to the GSA's October 15, 2002 letter stating that the GSA would no longer pay
the annual Supplemental Tax/Surcharge, the GSA and CCLP negotiated the above-
referenced 15-year extension to the lease term.  CCLP first approached the GSA in the Fall
of 1997 to negotiate a new lease renewal term.  (Affidavit of Otis Warren, Jr., June 12, 2006,
[hereinafter "Warren Supp. Aff.,"] ¶ 6).  The lease originally contained four different options
for potential five or ten-year extensions, specifying a base rent with or without the GSA's
payment of its own electricity costs.  (Id. ¶ 5, Supplemental Lease Agreement No. 4, dated
January 2, 1992).  However, due to favorable interest rates, CCLP was able to offer a lower
monthly rent than stated in Supplemental Lease Agreement No. 4, in exchange for the GSA's
renewal of the lease for an additional 15-year term running from March 31, 2003 to March
30, 2018.  Id. ¶ 6.  CCLP required this additional 15-year lease term to secure long-term
financing for the City Crescent Building, and needed the GSA's monthly payments to service
its debts with lenders through March 2018.  Id.

The parties agreed to a 15-year lease extension with a reduced annual rent in
Supplemental Lease Agreement No. 23, dated June 6, 2001.  Id. ¶ 7, Exh. A.[4]

There is no evidence that, during the lease renewal negotiations, the GSA ever
informed CCLP that it would cease paying annual real estate tax adjustments attributable to
the Supplemental Tax/Surcharge.  CCLP's written offers to the GSA during the negotiations
consistently stated that CCLP was relying on the GSA's continued payment of all tax
increases over the base year amount.  The GSA did not question its obligation to pay the
Supplemental Tax/Surcharge.  (Warren Supp. Aff. ¶ 8, Exh. B).

---

[3]  The GSA received a one-year abatement from all tax increases in 2003/2004 when it
agreed to a 15-year extension of the lease in June 2001.  (Pl. App. at 7).

[4]  Under Supplemental Lease Agreement No. 23, the GSA's rent for the period March 31,
2003 through March 30, 2008 is $28.00/square foot ($7,464,072 per year), increasing to $28.80/
square foot ($7,677,331 per year) for the period March 31, 2008 through March 30, 2018.  In
contrast, the options available to the GSA under Supplemental Lease Agreement No. 4 were
$30.27/square foot for a 10-year extension, and $38.04/square foot for a five-year extension.
(Warren Supp. Aff. ¶ 7, Exh. A).

In CCLP's February 23, 2001 letter, Paragraph D, CCLP offered the GSA a reduced annual rent and other incentives, but otherwise stated that "all terms and conditions of the lease not specifically changed by this offer would remain in full force and effect, including the provisions regarding operating cost and real estate tax adjustments." (Warren Supp. Aff. ¶ 9, Exh. B at 4).  Paragraph E of this letter further provided that "[t]he bases and schedule for adjustments in real estate taxes and operating costs established under the lease will remain unchanged during the fifteen year renewal term, except that the operating cost base will be reduced by $2.55 per square foot (i.e. $794,868.15) in the event that the government exercises the option on a net of electricity basis." Id., Exh. B at 5.  Similar provisions also appeared in CCLP's March 13, 2001 offer letter. Id., Exh. B at 6-8.

As the negotiations progressed, the parties specifically discussed the GSA's liability for tax increases under the lease.  CCLP's April 24, 2001 letter offered the GSA a one-year abatement for all tax and operating cost increases during the first year of the new lease term (March 31, 2003 - March 30, 2004) as an inducement for the GSA to enter into an extension. Id. ¶ 10, Exh. B at 11.  As with its previous letters, CCLP provided that the bases and schedule for tax adjustments would otherwise remain unchanged, and that the GSA would continue to pay any such tax adjustments again, beginning on March 31, 2004 through the end of the lease. Id.

Supplemental Lease Agreement No. 23 memorializes the parties' agreement on a one-year abatement of any tax and operating cost increases, providing that:

> [t]here shall be no operating or real estate tax adjustment paid by the Government at the beginning of the 11th year, March 31, 2003, of the lease, in recognition of the increased rent rate. *Operating costs and real estate tax adjustments will continue on an annual basis in accordance with the lease* on March 31, 2004, the 12th anniversary of the lease."

Id., Exh. A, at 10 (emphasis added).  During the negotiations leading to this agreement, the GSA did not voice any opposition to the continued payment of the Supplemental Tax/Surcharge.  Even though the parties' negotiations addressed the specific issue of tax adjustments, the GSA did not inform CCLP that it had any intention to cease paying the Supplemental Tax/Surcharge under the Tax Adjustment clause. Id. ¶ 11.

CCLP calculated the reduced annual rent under the extended term lease based upon the revenue that it needed to cover its debt-service payments on its new loan for the City Crescent Building.  The calculations took into account the GSA's monthly payments of rent, operating costs, and the GSA's proportionate share of all taxes above the base year taxes.

(Warren Supp. Aff. ¶ 4).  CCLP has provided internal financial analyses confirming that its rental calculation for the new term relied upon cash flow from the GSA's continued payment of its share of taxes, including the Supplemental Tax/Surcharge, in excess of the agreed upon base year taxes of $795,531.82.  Id. ¶ 13, Exh. C.

CCLP ultimately secured long-term financing for the City Crescent Building on October 25, 2001, ten days after the GSA provided a Lease Status Report, dated October 15, 2001, to CCLP's lenders.  Id. ¶ 14.  In this Lease Status Report, numbered paragraph 3, the GSA stated:

> The GSA Lease is currently in full force and effect as against the Government.  Neither the Government nor the partnership are in default under the GSA lease, nor are there conditions that are existing or pending in and of themselves which may ripen into default under the GSA Lease.  All duties and obligations of the Partnership with respect to the Project due through the date hereof have been satisfied or waived.  *There are no circumstances, events or conditions presently in existence that would confer upon the Government the right (I) to seek an offset against, take a deduction from or otherwise reduce any payment required to be made by it to the Partnership under the GSA Lease* or (ii) to seek to terminate the GSA Lease . . . .  The Government has not requested any changes to the Project which would cause a reduction of the non-maintenance portion of the rent.

(Pl. App. at 58-61, October 15, 2001 Lease Status Report; emphasis added).  The report is signed by Douglas Dooling, the GSA's Contracting Officer.  Id.

The GSA's failure to pay the Supplemental Tax/Surcharge since October 2002 and its recoupment of taxes paid prior to 2002 has caused CCLP to find alternate sources of revenue or to utilize partner cash contributions in order to continue making its debt-service payments.  (Warren Supp. Aff. ¶ 16).  If the GSA had notified CCLP during lease renewal negotiations that it intended to cease paying the Supplemental Tax/Surcharge, CCLP would have accounted for the amount of this tax by offering a higher annual rent to the GSA, or by making different financial arrangements in obtaining long-term financing.  Id.

On June 1, 2004, the GSA Contracting Officer, Mr. Dooling, issued a Final Decision finding that the GSA was entitled to a refund of the Supplemental Tax/Surcharge amounts that had been paid by the GSA from 1995/1996 through 2001/2002.  (Pl. App. at 75-76).  The Contracting Officer asserted that the Supplemental Tax/Surcharge "is a special assessment

that is not a real estate tax compensable under the tax adjustment clause of the lease." Id. Plaintiff initiated this lawsuit on May 27, 2005.

Plaintiff's two-count complaint alleges a breach of contract stemming from Defendant's failure to pay the annual real estate tax increases for the Supplemental Tax/Surcharge, and seeks a declaratory judgment that Defendant has a contractual obligation to pay for these annual increases.  Defendant denies any liability on the ground that the Supplemental Tax/Surcharge is a "special assessment." The parties have addressed the issues presented on cross-motions for summary judgment, as supplemented with additional information that the Court requested.  See Order dated May 12, 2006.  The Court has jurisdiction over Plaintiff's claim pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Contract Disputes Act of 1978, 41 U.S.C. § 609(a).

### Discussion

I.  <u>Summary Judgment is Appropriate</u>.

Summary judgment may be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The moving party bears the initial burden of establishing the absence of any disputes of material fact.  Seal-Flex, Inc. v. Athletic Track and Court Constr., 98 F.3d 1318, 1321 (Fed. Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When the movant has met its initial burden, the non-movant must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law."  Id. Alternatively, if the moving party can show that there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence.  Celotex, 477 U.S. at 325.

Where both parties argue in favor of summary judgment and allege an absence of any genuine issues of material fact, the Court still must determine independently the appropriateness of summary disposition in a particular case.  Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987)).  The Supreme Court has emphasized that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citations omitted).

Summary judgment is particularly appropriate in addressing an issue of contract interpretation, where the meaning of a contract clause is disputed. Conner Brothers Constr. Co., Inc. v. United States, 65 Fed. Cl. 657, 667 (2005) (citing Varilease Tech. Group, Inc. v. United States, 289 F.2d 795, 798 (Fed. Cir. 2002) ("Issues of contract interpretation . . . raise questions of law that are uniquely appropriate for summary judgment")); Statesman II Apartments, Inc. v. United States, 66 Fed. Cl. 608, 615 (2005) (quoting Record Steel and Constr., Inc. v. United States, 62 Fed. Cl. 508, 518 (2004) ("Contract interpretation is a matter of law, and thus issues of contract interpretation can be readily susceptible of resolution via summary judgment")). See also Mays v. United States Postal Service, 995 F.2d 1056, 1059 (Fed. Cir. 1993) (contract interpretation is a matter of law).

II.  The Meaning of the Tax Adjustment Clause

Contract interpretation begins with the plain language of the agreement. Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993) (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). "If the provisions are clear and unambiguous, a court will give them their plain and ordinary meaning and will not resort to parol evidence." Barseback Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997). The plain language of the GSA's Tax Adjustment clause obligates the Government to pay additional rent for its share of "increases in real estate taxes" levied on CCLP's property. GSAR 552.270-24 (June 1985), 48 C.F.R. § 552.270-24. The question is whether Baltimore's "supplemental annual property tax" in the Downtown Management District constitutes a "real estate tax" for purposes of the GSA's Tax Adjustment clause.

The supplemental annual property tax authorized by the Baltimore City Ordinance is "levied on all properties subject to real property taxation[.]" Baltimore City Code, Art. 14, § 1-10(a). There is no distinction in the law between "property" and "real estate." The terms "real estate" and "real property" are synonyms of "property," and all are defined as "[l]and and anything growing on, attached to, or erected on it." Black's Law Dictionary 1254 (8th ed. 2004). Interpreting the plain language of the City Ordinance and the Tax Adjustment clause, the Court must conclude that the supplemental annual property tax on its face is a "real estate tax."

Although the City's tax sometimes is referred to as a "real property surcharge," or a "special benefit district surcharge," and the parties have agreed to call it a "Supplemental Tax/Surcharge," it is helpful to look behind these descriptions and examine the specific characteristics of the tax. The tax is an *ad valorem* real estate tax assessed, collected, and enforced in the same manner as other Baltimore real estate taxes. Baltimore City Code, Art. 14, §§ 1-10(b), 1-15(b). The tax is not for a single fixed amount, and is not intended to expire after a fixed number of years. The tax is assessed every year, and is of indefinite

duration.  The "clean and safe services" funded by the tax predominantly benefit the general public, not any specific property owners.  The tax is used to augment the level of traditional governmental services required to keep the downtown Baltimore area clean and safe for the general public.  Individual property owners do not receive specific services, benefits, or preferences in exchange for payment of the tax.  There are no capital improvement projects being funded by the tax.  Indeed, the Baltimore City Code contains a separate provision, not at issue here, Art. 14, § 1-11(a)(2), intended for "special assessments."  Based upon these characteristics, the tax fits squarely within the plain meaning of "real estate tax" for purposes of the GSA's Tax Adjustment clause.

Strong precedent for CCLP's position is found in <u>BGK Main Street Operating Assoc., Ltd. P'ship, Inc. v. General Services Administration</u>, GSBCA No. 16238, 04-2 BCA ¶ 32,658, a case nearly identical to this one.  In <u>BGK</u>, the GSA's lease contained a later version of the Tax Adjustment clause, GSAR 552.270-24 (Aug. 1992), but with the same operative language as here.  The clause in <u>BGK</u> stated that "[t]he Government shall make annual lump sum payments to cover its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year) . . . ."  <u>Id.</u> at 161,653.  The tax in <u>BGK</u> resulted from an ordinance in the City of Norfolk, Virginia establishing a downtown service district, much like the City of Baltimore's Downtown Management District.  When the GSA objected by saying that "[t]he Federal Government does not pay business district taxes," the contractor appealed.  The General Services Board rejected the Government's position, finding that the City of Norfolk ordinance unquestionably created a "real estate tax."  <u>Id.</u> at 161,654.  Norfolk's additional tax for a downtown service district is nearly identical to Baltimore's tax for the Downtown Management District.

A prior decision of this Court in <u>Wright Runstad Properties Ltd. P'ship v. United States</u>, 40 Fed. Cl. 820 (1998) also is instructive.  In <u>Wright Runstad</u>, our Court interpreted the same GSA Tax Adjustment clause at issue here, GSAR § 552.270-24 (June 1985), but found that the City of Seattle's one-time tax to help finance the construction of a downtown bus tunnel was a special assessment.  After determining that the tunnel project would confer a benefit on the plaintiff in the amount of $3,451,198, the City billed plaintiff that amount, payable in installments of $230,521.08 over 15 years.  <u>Id.</u> at 822.  The Court observed that Seattle's "special assessment" exemplified the definition of that term: (i) the assessment was a one-time charge for a specific tunnel project; (ii) the assessment did not fund general government services; (iii) the assessment was levied only against the properties specially benefitted by the tunnel; and (iv) the assessment's amount was calculated to be commensurate with the benefit to each individual property.  <u>Id.</u> at 826.  On these facts, the Court concluded that Seattle's special assessment was not a "real estate tax" under the GSA's Tax Adjustment clause, and that the GSA therefore was not obligated to pay any share of the increased costs resulting from the special assessment.  Taken together, <u>BGK</u> and <u>Wright</u>

Runstad provide compelling guidance in distinguishing "real estate taxes" from "special assessments" for purposes of the GSA's Tax Adjustment clause.

These factually similar cases aside, ample federal and state case law has developed on the distinctions between "general real estate taxes" and "special assessments," beginning with the Supreme Court's landmark decision long ago in Illinois Central R.R. Co. v. City of Decatur, 147 U.S. 190 (1893).  On close inspection, however, the body of law concerning this often discussed distinction is not as helpful as it may first appear.  The GSA's Tax Adjustment clause does not refer to "*general* real estate taxes," but to the broader term, "real estate taxes."  Many of the cases relied on by Defendant are distinguishable from the present case because they construe clauses relating to "*general* real estate taxes," or involve clear cases of "special assessments."  See, e.g., S.S. Silberblatt Inc. v. United States, 888 F.2d 829 (Fed. Cir. 1989) (special assessment not compensable under lease clause that adjusts rent for increases in "general real estate taxes"); McDaniel Brothers Constr. Co., GSBCA Nos. 6973, 7283, 84-2 BCA ¶ 17,497 ("special assessment" for drainage district improvements not compensable under lease clause that adjusts rent for increases in "general real estate taxes"); Carstens v. McLean, 7 F.2d 322, 323 (9th Cir. 1925) (agreement by lessee to pay "annual taxes" did not apply to special assessment for waterway district improvements); G&A Inc. v. Nahra, 514 N.W.2d 255 (Mich. App. 1994) (agreement by lessee to pay "all of the real property taxes" did not apply to special assessment to construct off-street parking); Walling Warehouse Co. v. Springhill Fuel Co., 562 P.2d 1221, 1222 (Or. 1977) (agreement by lessee to pay "any increase in real estate taxes" did not apply to a sewer lien assessment); Allstate Mgmt. Corp. v. Grand Union Co., 142 A.D. 2d 344, 346 (N.Y. App. Div. 1988) (agreement by lessee to pay "its pro rata portion of any increase in real estate tax assessment" referred only to "a tax," and not to special assessments such as a "sewer assessment"); Thompson v. First National Bank of Hollywood, 321 So.2d 466, 467 (Fla. Dist. Ct. App. 1975) ("In the context of landlord-tenant law, 'special assessments' are not ordinarily embraced by the term 'taxes'").

Defendant also relies upon Maryland decisions defining a "special assessment," but these decisions stem from express state or local legislative enactments of special assessments. See, e.g., Williams v. Anne Arundel County, 638 A.2d 74, 77 (Md. 1994) (discussing an assessment for improvements and services for jointly owned community property); V.F.W. v. Montgomery County, 115 A.2d 249, 250 (Md. 1955) (assessment for street paving); Sulzer v. Montgomery County, 484 A.2d 285, 286 (Md. 1984) (special assessment for parkway construction); Gould v. Mayor of City Council of Baltimore, 59 Md. 378 (1883) (assessment for street paving).  Moreover, none of these cases involves liability for charges under a lease's tax adjustment clause.  While the Court may look to state law for assistance in resolving ambiguities, the Court finds that the plain meaning of the GSA's Tax Adjustment clause renders resort to state law unnecessary.

For the reasons stated, the Court concludes that the GSA must pay its share of the increases in real estate taxes attributable to Baltimore's Supplemental Tax/Surcharge. Defendant is liable to CCLP for amounts previously recouped and unpaid, and for its share of future increases in real estate taxes for the remainder of the lease.  Through the 2005/2006 tax year, the parties agree that the amount due is $494,390.68.

III.  <u>Negotiation of the 15-Year Renewal</u>

If there were any doubt that Baltimore's Supplemental Tax/Surcharge is a "real estate tax" for purposes of the GSA's Tax Adjustment clause, the Court also finds that Plaintiff CCLP relied to its detriment on the Government's continued payment of the Supplemental Tax/Surcharge in negotiating the 15-year lease renewal.  As noted, the Government's continued payment of the tax increase was a material condition of the overall negotiations, such that if CCLP had known of the Government's intention to cease payment of the Supplemental Tax/Surcharge, CCLP would have increased the proposed rental rate to offset that amount.  In effect, therefore, the GSA obtained the most favorable terms available from CCLP in negotiating the 15-year lease extension, and then abrogated one of the material conditions of CCLP's proposal.

Ordinarily, the Government possesses the inherent authority to recoup funds erroneously or mistakenly paid.  <u>See, e.g.</u>, <u>Kimco Realty v. United States</u>, 51 Fed. Cl. 257, 264 (2001) (Government has a common law right to recoup erroneously paid taxes without analyzing estoppel or effect of contractor's reliance); <u>Wright Runstad</u>, 40 Fed. Cl. at 827 (same).  Here, however, the GSA's payment of its share of the Supplemental Tax/Surcharge for seven years cannot be regarded as an error or mistake.  Rather, the GSA knowingly paid the tax for seven years, and then abruptly changed its position after negotiating a 15-year lease renewal.  The GSA adopted a new interpretation of the Tax Adjustment clause after it had extracted from CCLP favorable terms for the lease extension.

The circumstances here are akin to those in <u>Litton Systems, Inc. v. United States</u>, 196 Ct. Cl. 133, 449 F.2d 392 (1971).  In <u>Litton</u>, the Government changed an accounting method in mid-performance of a number of existing contracts.  The contractor had relied upon the "long and consistent use" of the former accounting method which had been employed "with the Government's knowledge, approval and acquiescence[.]" 196 Ct. Cl. at 148, 449 F.2d at 401.  The changed accounting method when applied retroactively caused the contractor to assign greater costs to fixed price contracts after the prices had been set.  On these facts, the Court held that the contractor was entitled to reasonably adequate notice of the accounting change, and that the change should apply only prospectively to new contracts awarded after the change.  The Court observed that, had the contractor known of the accounting change when prices were negotiated, it certainly would have sought to negotiate higher prices.  <u>Id.</u>

The terms that the parties rely upon in negotiating an agreement must be given legal effect.  A contract reflects a negotiated bargain, and "can hardly mean one thing today and another tomorrow."  Cramp Shipbuilding Co. v. United States, 122 Ct. Cl. 72, 97 (1952).  The Government cannot lawfully alter a material condition – continued payment of the Supplemental Tax/Surcharge – upon which the parties' relied.  Accordingly, Defendant is bound by its interpretation of the Tax Adjustment clause relied upon by Plaintiff in the negotiation of the 15-year lease renewal.

### Conclusion

For the above reasons, Defendant's motion for summary judgment is DENIED, and Plaintiff's cross-motion for summary judgment is GRANTED.  Plaintiff is entitled to recover the amount due from the GSA for the Supplemental Tax/Surcharge through tax year 2005/2006, $494,390.68, plus interest as allowed under the Contract Disputes Act, 41 U.S.C. § 611.  The Court grants Plaintiff a declaratory judgment that the GSA must include the annual increases in the Supplemental Tax/Surcharge in its future rent calculations under the Tax Adjustment clause for the remainder of the lease.  The Clerk of the Court shall enter Judgment for Plaintiff consistent with this Opinion.  Each party shall bear its own costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge